INTERNATIONAL TELEPHONE AND
TELEGRAPH CORPORATION,
Plaintiff,

v.

GENERAL TELEPHONE & ELECTRON-
ICS CORPORATION and Hawaiian
Telephone Company, Defendants.

Civ. No. 2754.

United States District Court,
D. Hawaii.

July 14, 1972.

1160

---

Vernon F. L. Char, Damon, Shigekane, Key & Char, Honolulu, Hawaii, Howard J. Aibel, Scott E. Bohon, Edwin A. Kilburn, Daniel R. Solin, Robert E. McKee, New York City, Maxwell M. Blecher, Harold R. Collins, Jr., Blecher & Collins, Los Angeles, Cal., for plaintiff.

Marshall M. Goodsill, Martin Anderson, Jenks, Kidwell, Goodsill & Anderson, Honolulu, Hawaii, Thomas R. Mulroy, Mark Crane, William I. Goldberg, Hopkins, Sutter, Owen, Mulroy & Davis, Chicago, Ill., Theodore F. Brophy, James M. Baisley, Donald P. McCormick, Milton Handler, Stanley D. Robinson, Kaye, Scholer, Fierman, Hays & Handler, New York City, for defendants.

## DECISION

PENCE, Chief Judge.

In October 1967, International Telephone and Telegraph Corporation (ITT) filed a Clayton § 16[1] complaint in this court against General Telephone & Electronics Corporation (GTE) and Hawaiian Telephone Company (Hawaiian), in essence maintaining that by GTE's acquisition of Leich Electric Company (Leich) in 1950, Automatic Electric Company (AE) in 1955, and Lenkurt Co., Inc. (Lenkurt) in 1959, all being manufacturers and distributors of telecommunications equipment, it became a vertically integrated telephone company, with its telephone operating companies buying almost all of their transmission equipment, switching systems, apparatus and other telephone communications equipment from GTE's own manufacturing subsidiaries. ITT further complained that by GTE's acquisition of telephone operating companies, during the above period and thereafter, particularly the acquisition of California Water and Telephone Company, West Coast Telephone Company, The Southwestern States Telephone Company and Western Utilities Corporation in 1964, Central Iowa Telephone Company (Central Iowa) in April 1967, Hawaiian in May 1967, and Northern Ohio Telephone Company (Northern Ohio) in November 1967, the manufacturing competitors of GTE's subsidiaries AE, Lenkurt and Sylvania Electric Products, Inc. (Sylvania), i. e., the independent manufacturers of telecommunications equipment (Western Electric Company Incorporated (WE) not being included in that category)[2] have been and will be foreclosed from selling telephone equipment and supplies to GTE's operating companies, to the detriment of actual and potential competition by such manufacturers.

ITT charged that the acts of GTE were in violation of §§ 1 and 2 of the Sherman Act, and § 7 of the Clayton Act, 15 U.S.C. §§ 1, 2 and 18. ITT also charged that the acquisition of Hawaiian violated §§ 2, 5 and 7 of Act 190 of the Hawaii Laws of 1961. ITT requested only equitable relief, including a request that GTE be ordered to divest itself of its interests in Peninsular Telephone Company (Peninsular), the Western Utilities Group, Central Iowa, Hawaiian and Northern Ohio, as well as its manufacturing subsidiaries AE, Lenkurt and Sylvania, to the end that the independent telephone operating companies market for telecommunications equipment (i. e., excluding the American Telephone and Telegraph System (Bell)) would be opened to competition among all the independent telecommunications equipment manufacturing companies.

As indicated, in essence ITT purported to act in the status of a "private attor-

1. 15 U.S.C. § 26.

2. See p. 31, *infra.*

ney general"[3] in this action against GTE. ITT asked for no money damages under its federal claims. It did ask for costs and attorneys' fees for its claims under the Hawaiian Act.

GTE answered, denying any violations, and filed a "contingent counterclaim", also under § 16 of the Clayton Act, asking (contingent upon ITT's success) for equitable relief thereunder for violations by ITT of §§ 1, 2, 3 of the Sherman Act and §§ 3 and 7 of the Clayton Act because of ITT's vertical integration through its ownership of Vitelco (Virgin Islands) and Ricotelco (Puerto Rico), telephone operating companies, its acquisitions of companies manufacturing telecommunications equipment, and its interests in telephone operating and manufacturing companies in South America and Europe. ITT responded to this with an amended complaint, adding an additional allegation of foreclosure by GTE of Canada and other foreign telecommunications equipment markets.

Subsequently this court ordered that ITT's claims in chief re the United States and Canadian markets, as well as the Virgin Islands and Puerto Rico aspects of GTE's counterclaims, would be tried together. The problem of ITT's "other foreign markets" was continued for later disposition.

After a multitude of motions had been disposed of,[4] extensive discovery had been completed and a trial date set, in April 1970 GTE moved under Rule 19 that ITT be required to join as defendants other vertically integrated United States telephone companies, in-

cluding Bell, United Utilities, Incorporated (United) and Continental Telephone Corporation (Continental). This motion was resisted by ITT as well as by Bell. After a hearing at which Bell appeared as amicus in opposition, this court in an oral bench decision, in substance held that because of the 1956 Consent Decree filed in *United States v. Western Electric Co.*, 1956 Trade Cases 68,246 (D.N.J.1956), Bell's vertical integration and its operating and manufacturing activities had been encapsulated and severed apart from that of the remaining telephone operating and equipment manufacturing companies in the U. S., commonly called the "independents" or "nonBell",[5] and it was not necessary for the determination of ITT's action or GTE's counterclaim that Bell and the other two named telephone companies be made parties to the suit.

After even more intensive and extensive pretrial preparation,[6] four years after it was filed this matter was tried in January and February 1971.[7] Thereafter extensive post-trial briefs and proposed findings were also filed by the parties.

But the legal cannons were not yet stilled. After "the tumult and the shouting" had subsided, and this court had started writing its decision, in May 1971 GTE filed a motion to dismiss ITT's complaint for failure to state a claim upon which relief could be granted (F.R.Civ.P. 12(b)(6)) and alternatively claimed that the court lacked subject matter jurisdiction. GTE urged that ITT's suit was barred by the *proviso* of

---

3. See Scanwell Laboratories, Inc. v. Shaffer, 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); National Helium Corp. v. Morton, 326 F.Supp. 151 (D.Kan.1971).

As Miles W. Kirkpatrick, Chairman, FTC, said in The FTC and Antitrust Enforcement: "'All the King's Horses and All the King's Men' of the FTC and the Antitrust Division combined are simply not sufficient to deal with every competitive defect existing in every industry throughout the economy." 1971 N.Y.

State Bar Ass'n Antitrust Law Symposium, p. 19.

4. *E. g.*, ITT v. GTE, 296 F.Supp. 920 (D.Haw.1969).

5. See pp. 26–31, *infra*.

6. 35 pretrial orders were issued.

7. 65 depositions were taken, and designated deposition evidence, together with designated documents totaling several thousand pages, filled over 10 feet of shelf space.

Clayton § 16,[8] insisting that the Federal Communications Commission (FCC), as successor in the communications field to the Interstate Commerce Commission (ICC), had sole regulatory power over GTE and only the U. S. could possibly bring a Clayton § 7 divestiture action against GTE. This was argued and taken under submission in June 1971.

On the state of the pleadings, therefore, both GTE's motion raising the issue of subject matter jurisdiction and motion to dismiss must first be decided.

### Application of § 16 Proviso

The proviso of § 16 of the Clayton Act which GTE maintains is an "inseparable bar to relief" sought by ITT, in essence states that no "*private* attorney general" may sue under the provisions of § 16 for equitable relief against any common carrier subject to the Commerce Act of February 4, 1887, whose acts are under the jurisdiction of the ICC; only the U. S. may be plaintiff.

GTE's position is that it is being sued as a telephone common carrier subject to the provisions of the Communications Act of 1934, that the relief requested by ITT is directed toward matters subject to the regulation, supervision, or jurisdiction of the FCC, and despite the absence of any specific reference to the FCC in the § 16 proviso, that Congress nevertheless intended the proviso also to bar private injunctive suits under § 16 against FCC regulated carriers in the same manner as it applies to ICC regulated carriers.

### Subject Matter Jurisdiction

■ ■ GTE's motion to dismiss for want of subject matter jurisdiction is denied. Jurisdiction vis-á-vis merits must not be confused.

"By jurisdiction we mean power to entertain the suit, consider the merits and render a binding decision thereon; and by merits we mean the various elements which enter into or qualify the plaintiff's right to the relief sought. There may be jurisdiction and yet an absence of merits [citations omitted], as where the plaintiff seeks preventive relief against a threatened violation of law of which he has no right to complain, either because it will not injure him or *because the right to invoke such relief* is lodged exclusively in an agency *charged with the duty of representing the public in the matter*. Whether a plaintiff seeking such relief has the requisite standing is a question going to the merits, and its determination is an exercise of jurisdiction. [Citations omitted.] If it be resolved against him, the appropriate decree is a dismissal for want of merits, not for want of jurisdiction." (Emphasis added.) General Investment Co. v. New York Central Railroad Co., 271 U.S. 228, 230–31, 46 S.Ct. 496, 497, 70 L.Ed. 920 (1926).

Here, too, GTE's motion to dismiss is an attack on ITT's standing,[9] as a "private attorney general", to seek injunctive relief against defendant. Although "lack

---

8. "*Provided*, That nothing herein contained shall be construed to entitle any person, firm, corporation, or association, except the United States, to bring suit in equity for injunctive relief against any common carrier subject to the provisions of the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, in respect of any matter subject to the regulation, supervision, or other jurisdiction of the Interstate Commerce Commission."

9. ITT has inaccurately characterized GTE's motion as an attack on ITT's ca-

pacity to sue. Such a defense would be waived if not specifically raised by answer. F.R.Civ.P. 9(a). For the distinction between capacity to sue and failure to state a claim upon which relief can be granted, see De Franco v. United States, 18 F.R.D. 156, 159 (S.D.Cal.1955). While the Court in Central Transfer Co. v. Terminal R.R. Assn., 288 U.S. 469, 475, 53 S.Ct. 444, 77 L.Ed. 899 (1933) discussed capacity of a private party to sue under Clayton § 16, the Court was actually using the term "capacity" in a nonlegal sense to describe the right of a private party to maintain a § 16 suit.

of standing" does not, as a conceptual matter, neatly fit into the category of "failure to state a claim upon which relief can be granted", *General Investment* would authorize treating the motion as such.[10]

*Failure to State a Claim*

GTE's motion to dismiss for failure to state a claim upon which relief could be granted is likewise denied. As indicated above, there is no mention whatsoever in the *proviso* of § 16 of telephone companies, the Communications Act of 1934, or of the FCC. GTE nevertheless asserts that the *proviso* is applicable to and dispositive of this case on the following theory:

(a) The ICC is charged with the enforcement of § 7 of the Clayton Act "where applicable to common carriers subject to the Interstate Commerce Act."[11]

(b) Although not originally included in the definition of "common carrier" in the original Act to Regulate Commerce of 1887,[12] telephone companies were so defined in the 1910 amendment to that Act.[13] Thus, when the Clayton Act was promulgated in 1914, telephone companies were common carriers subject to the provisions of the Interstate Commerce Act and some part of their activity[14] was subject to the regulation, supervision, or other jurisdiction of the ICC. At that time, therefore, suits in equity against telephone companies, under § 16, could be brought *only* by the U. S. and not by private litigants.[15]

GTE then postures (c) that when the Communications Act of 1934 was passed, transferring to the FCC the regulation of telephone, telegraph and radio communication, formerly performed by the ICC, Postmaster General and the Radio Commission, there was no manifestation of Congressional intent to alter in any way the then existing statutory scheme of antitrust enforcement as the same might apply to telephone companies. Therefore, GTE posits, (d) Congress intended to perpetuate the bar against *private* Clayton § 7 injunctive suits against telephone companies; that (e) although § 16 was not amended so as to, by its terms, reflect Congress' intent, nevertheless it should be construed to exclude such private injunctive suits against telephone companies thereafter subject to the provisions of the 1934 Act and the governance of the FCC.

GTE's theory is couched upon several assumptions, viz.:

1. Legislative history compels acceptance of the construction and application GTE attaches to the proviso.

2. GTE's interpretation of the proviso is commanded by common sense and the history of regulation of the telephone and railroad industries.

3. The subject matter of this suit is one regulated, supervised, or otherwise solely within the jurisdiction of the FCC.

4. This is a suit against a telephone company (common carrier), subject to the provisions of the Communications Act.

▮ In order for GTE to prevail on this motion, the verity of these assumptions must mandate the legal conclusion postulated by GTE.[16]

---

10. See also Antonioli v. Lehigh Coal & Nav. Co., 47 F.R.D. 198, 201 (E.D.Pa. 1969).

11. 15 U.S.C. § 21 (1963).

12. 25 Stat. 379.

13. 36 Stat. 544.

14. Telephone regulation has historically been largely a matter of state concern. Fainsod, Gordon & Palamountain, Jr., Government and the American Economy 375 (3d Ed. 1959).

15. Even the agencies charged with enforcement under Clayton § 11 (15 U.S.C. § 21) possibly may not be able to secure Clayton § 7 equitable relief. *Cf.* Federal Trade Comm. v. Int'l Paper Co., 241 F.2d 372 (2 Cir. 1956), with Board of Governors, Etc. v. Transamerica Corp., 184 F.2d 311 (9 Cir. 1950).

16. As indicated hereafter, the court feels it unnecessary to deal at this juncture with assumption 4, since the treatment of assumptions 1, 2 and 3 is dispositive of

*A. Legislative History*

In a period of nearly forty years since the passing of the Communications Act of 1934, the *proviso* to § 16 of the Clayton Act has remained unchanged, referring therein only to the Interstate Commerce Act and the ICC. GTE can suggest only "congressional oversight" as an explanation for the absence of any direct reference therein to either the Communications Act or the FCC. Congress' treatment of the Clayton Act in 1934 and thereafter, however, negates any inference of "oversight" by it, then or later.

In 1934 Congress was manifestly aware that changes would have to be made in the Clayton Act to take cognizance of the newly created federal commission with sweeping jurisdiction over communications. Congress is always also aware that, as is always the case with any legislation as broad-based as the Communications Act, housekeeping measures are necessary to coordinate the new legislation with previously enacted law.

Both these considerations are reflected in the makeup of the 1934 Act. Various provisions of the Interstate Commerce Act relating to communications were adopted in sections of the Communications Act,[17] while the Radio Act and provisions of the Interstate Commerce Act relating to communications were repealed.[18]

The Clayton Act required modification as well. The House Report on the 1934 Act states:

"The latter section [§ 602] also makes certain changes in other law, *including the Clayton Act, made necessary by the setting up of the new Commission and conferring upon it jurisdiction over communications.*" (Emphasis added.) H.R.Rep.No.1850, 73d Cong., 2d Sess. (June 1, 1934).

One such change was made in § 11 of the Clayton Act. Previously, § 11 had entrusted the ICC with enforcement of various sections of the Clayton Act against common carriers. Section 602 (d) of the Communications Act amended § 11 of the Clayton Act to read as follows:

"That authority to enforce compliance with sections 2, 3, 7, and 8 of this Act by the persons respectively subject thereto is hereby vested: in the Interstate Commerce Commission where applicable to common carriers subject to the Interstate Commerce Act, as amended; in the Federal Communications Commission where applicable to common carriers engaged in wire or radio communication or radio transmission of energy * * *." 48 Stat. 1102.

Section 11 of the Clayton Act was thus expressly amended by Congress to transfer enforcement of the substantive provisions of the Clayton Act from the ICC to the FCC with regard to common carriers engaged in communication.[19] Most significantly, however, § 16 was *not* changed! In view of Congress' awareness that the Clayton and Communications Acts were interrelated, it

GTE's motion. The court does note that (1) this is a suit against a bona fide *holding* company embracing manufacturing and service companies as well as telephone operating companies, and— in conscious dicta—(2) the FCC has no antitrust jurisdiction over—and hence cannot enjoin or undo the operations of —a holding company, *as such.*

17. Compare, *e. g.,* §§ 213 and 221(a) of the Communications Act, 47 U.S.C.A. (1962), with §§ 19a and 5(2) of the Interstate Commerce Act, 49 U.S.C.A. (1959).

18. Communications Act, §§ 602(a) and (b). Subsection (c) amends "an Act

Relating to the landing and operation of submarine cables in the United States." 42 Stat. 8.

19. The grant of power to the FCC to enforce various provisions of the Clayton Act is not exclusive. In addition to the Commission's administrative jurisdiction, judicial jurisdiction may be exercised by federal district courts and invoked either by the government or by private individuals. See United States v. W. T. Grant Co., 345 U.S. 629, 631–32, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); FTC v. Int'l Paper Co., 241 F.2d 372 (2 Cir. 1956).

must be presumed that the lack of change in § 16 did not result from oversight, but was due to an intentional and affirmative decision to leave the *proviso* unchanged, and in effect, to remove any barrier to private injunctive suits against telephone companies.[20]

Finally, GTE's "inadvertence" argument is further rebutted by Congressional action in 1950, when the Clayton Act was again amended to take cognizance of the FCC. Section 7 of the Clayton Act as then amended reads:

"Nothing contained in this section shall apply to transactions duly consummated pursuant to authority given by the * * * Federal Communications Commission * * * under any statutory provision vesting such power in such Commission * * *." 64 Stat. 1125.

Thus Congress indicated that it was not unmindful of the interplay between the Clayton and Communications Acts. Nothing pertaining to telephone companies, therefore, can now be read into the § 16 *proviso* that is not already there clearly spelled out.

### B. History of Regulation of Telephone Industry

The reason for barring § 16 private injunctive suits against railroads has been stated as follows:

"[The proviso's] obvious purpose is to preclude any interference by injunction with any business or transactions of interstate carriers of sufficient public significance and importance to be within the jurisdiction of the Commission, except when the suit is brought by the Government itself." Central Transfer Co. v. Terminal RR Assn. of St. Louis, 288 U.S. 469, 475, 53 S.Ct. 444, 446, 77 L.Ed. 899 (1933). The record of the ICC from 1910 to 1934 suggests that in practice, if not in theory, very little of the business or transactions of telephone companies was considered to be "of sufficient public significance and importance" to stir up any exercise of ICC jurisdiction.

Lack of staff, funding,[21] and expertise prevented the ICC from effectively administering the acts regulating the telephone industry. No separate organization existed within the ICC to regulate communications; already existing bureaus handling analogous problems in other areas were responsible for handling similar aspects of telecommunications.[22]

Despite the widening of its jurisdiction to include telephone companies, the ICC thus clearly remained a railroad commission. Its performance in the telephone area has been described as "desultory and perfunctory"[23] and as "regulation by default."[24] The ICC did not initiate investigations; rather it waited until it was presented with complaints. No general rate investigation was ever carried out. From 1910 to 1934 the ICC dealt with telephone rates in but four cases, none of these involving issues of major importance.[25]

The contrast between ICC's activism in regulating railroads and its passiveness in the case of telephones is explained by the different role the federal government has played in the development of

---

20. Cf. United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 344, 83 S.Ct. 1715, 1731, 10 L.Ed.2d 915, note 22 (1963):

"We have not overlooked the fact that there are corporations in other industries not subject to the FTC's jurisdiction. Chief among these are air carriers subject to the Civil Aeronautics Board and other carriers subject to the Interstate Commerce Commission. Both agencies have been given, expressly, broad powers to exempt mergers and acquisitions in whatever form from the antitrust laws. See 49 U.S.C. §§ 1378, 1384; 49 U.S.C. § 5(11) and (13). Therefore, the exclusion of assets acquisitions in such industries from § 7 would seem to have little significance."

21. See Phillips, The Economics of Regulation 657 (1965).

22. See Smead, Governmental Promotion and Regulation of Business 741 (1969).

23. *Ibid.*

24. See Fainsod, *supra*, n. 14.

25. See Smead, *supra*, n. 20, at 742.

the telephone and railroad industries. In the early part of the twentieth century most telephone activity was but of local interest, intrastate, and was dominated by a single firm, the Bell Company, whose dominance engendered in the federal government a "hands-off" philosophy of telephone regulation:

> "Given Bell's dominance, together with the absence of significant entry and intermodal rivalry, it is perhaps understandable that regulation became preoccupied with the general level of earnings or revenue requirements. With the possible exception of the Federal Communications Commission's investigation of the telephone industry in the 1930's, aggressive regulatory concern over matters affecting market structure and price structure was almost nonexistent. What emerged was a philosophy of 'natural monopoly' for common carrier communications in which the promotion of the public interest was equated with the successful operation of the Bell System. Bell was entrusted with the maintenance of systematic integrity and the task of planning for national and regional requirements." Trebing, Common Carrier Regulation—The Silent Crisis, 34 L & CP 299, 306 (1969).

With the fact of Bell dominance conceded, there was no need for the government to concern itself with market structure; with Bell entrusted with planning and operational responsibility, there was little need for government involvement in these areas. Thus the scope and degree of government involvement in telephone communications was quite restricted, a fact confirmed by the lacklustre performance anent that industry of the ICC from 1910 to 1934.

By the Transportation Act of 1920,[26] Congress instructed the ICC to form a consolidation plan establishing a limited number of systems earning a similar

rate of return [27] in order to guide and plan railroad development to meet national needs.[28] Since the government thus assumed responsibility for planning railroad development, with market and price structure considered in its deliberations, suits by individuals could potentially upset a delicately balanced program of railroad development and operation. The *proviso* of § 16 was apropos.

The same was not true for telephones. The conceded hegemony of Bell and the largely intrastate focus (in 1934) of telephone activity resulted in only a limited role for the government to play. In that industry there was no such apparent need for the inhibition of the *proviso* to § 16.

The performance of the ICC in the telephone area made it obvious that a change both in the statutes and administration of regulation of communications was needed. The House Report to the Communications Act of 1934 clearly recognizes this:

> "[The Interstate Commerce Commission] was originally created to regulate railroads and still is primarily concerned with the transportation field, but in 1910 an amendment to the Interstate Commerce Act made common carriers engaged in the transmission of intelligence by wire or wireless subject to its jurisdiction. While a series of minor amendments have followed this 1910 legislation, the act has never been perfected to encompass adequate regulation of communications, but has really been an adaptation of railroad legislation to the communications field. As a consequence, there are many inconsistencies in the terms of the act and also many important gaps which hinder effective regulation. In this bill the attempt has been to preserve the value of court and commission interpretation of that act, but at the same time modifying the provisions

---

26. 41 Stat. 456.

27. 41 Stat. 481. The Transportation Act of 1940, 54 Stat. 905, placed the initiative

for consolidation on the railroads themselves.

28. See Fainsod, *supra*, n. 14.

so as to provide adequately for the regulation of communications common carriers." H.R.Rep.No.1850, 73d Cong., 2d Sess., June 1, 1934.

■ The 1934 Act created the FCC, to which were transferred the duties, powers and functions in communications formerly exercised by the ICC, Postmaster General, and Radio Commission. More than a mere transfer and consolidation of existing provisions was accomplished in the 1934 Act:

" * * * for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies *and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication,* there is created a commission to be known as the 'Federal Communications Commission' * * *." (Emphasis added.) 47 U.S.C.A. § 151 (1962).

The Act contains many new, non-derivative provisions, increasing the scope of federal regulation of interstate communications. In each·of its several sections [29] which separate telephone, telegraph and radio communications are provisions which directly or indirectly refer to the application of antitrust laws to each separate industry. If Congress had intended to extend the § 16 *proviso* to the FCC, it would not have overlooked doing so. The *proviso* of § 16 of the Clayton Act does not apply to private injunctive suits against telephone companies.

As the above analysis indicates, pursuant to 47 U.S.C.A. 221(a) the FCC could have been tendered primary jurisdiction [30] over the antitrust aspects of any or all of GTE's *horizontal* acquisitions herein involved. GTE however chose not to submit its acquisitions to the FCC for § 221(a) processing.

Here, both the horizontal and vertical acquisitions of GTE are challenged. Even if it were assumed that § 221(a) gave the FCC like power over vertical acquisitions of telephone companies (a most questionable assumption) since GTE has never made any application to the FCC for possible antitrust immunization, there is no validity whatsoever to GTE's insistence that the antitrust aspects of its acquisitions have been "regulated or supervised" by the FCC, or that here and now the FCC has sole jurisdiction over the subject matter of this suit.

■ While admittedly the FCC would have primary jurisdiction if GTE's rates and practices relating thereto were here being challenged under the antitrust laws,[31] ITT's action is not so bottomed. The FCC has no jurisdiction over the problems of this case, in its present posture.

GTE's belated motion to dismiss can only be and is denied.

Returning now to the merits of this action, this court makes the following

## FINDINGS OF FACT

### I. *Parties*

ITT is a Delaware corporation, a conglomerate industrial colossus, engaged in a wide variety of business in the U. S. and abroad. Through its telecommunications division, ITT Kellogg, it manufactures, distributes and sells telephone equipment, components and supplies in U. S. and foreign commerce.

ITT is second only to WE, on a worldwide scale, in the manufacture of telephone equipment, having 67 telephone equipment factories in 30 foreign countries and 5 similar plants in the U. S. (including ITT Caribbean Manufacturing in Puerto Rico). It also has a wire and cable plant in San Diego. As of

---

29. E. g., 47 U.S.C.A. §§ 215, 220(h–j) and 221 (telephone companies) ; § 222 (telegraph carriers) ; §§ 301–394 (radio).

30. See Federal Maritime Board v. Isbrandtsen Co., 356 U.S. 481, 78 S.Ct. 851,

2 L.Ed.2d 926 (1958), dissent of Frankfurter, J. at 519.

31. United States v. R.C.A., 358 U.S. 334, 348, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

1969, it owned and operated approximately 300,000 telephones in Puerto Rico and the Virgin Islands. It has been a vertically integrated telephone company since 1925, when, while operating Ricotelco, it acquired International Western Electric from WE.[32] It commenced the manufacture of telephone equipment in the U. S. after 1940. It acquired Kellogg Switchboard & Supply Co. in 1951 and consolidated its manufacturing divisions under the name of ITT Kellogg.

Although prior to the 1960's it had large interests in foreign telephone operating companies, in recent years ITT, both voluntarily and through expropriation, has disposed of substantially all its telephone companies outside the U. S. Now, certainly in the U. S. and Canada communications markets, it can fairly be characterized primarily as a telecommunications manufacturing company with telephone operations being a relatively minor segment of its business.

GTE, a New York corporation, as a holding company, owns and controls 33 telephone operating companies in 34 states of the U. S., serving, in 1969, 9,-146,000 telephones, and another three operating companies in Canada and the Dominican Republic, serving, in 1969, 1,-157,000 telephones. GTE wholly owns AE, which in turn owns Lenkurt and operates five telephone equipment manufacturing plants in the U. S. GTE also owns and operates GTE Laboratories, Inc. (GTE Laboratories), a telephone equipment research facility. It also owns GTE Service Corporation (GTE Service); General Telephone Directory Company (GT Directory); General Telephone Credit Company, Inc. (GT Credit); GTE Communications, Inc. (GTE Communications); GTE Data Service Corporation (GTE Data); Sylvania; and GTE International, Inc. (GTE International). GTE has a total of 116 manufacturing plants throughout the world (including the U. S.). GTE is the successor to General Telephone Company (General), which was formed in 1935 to operate as a holding company for telephone operating companies.

Hawaiian, a Hawaii corporation, now a wholly-owned subsidiary of GTE, is a telephone operating company providing statewide telephone and communication services among the islands of the state of Hawaii and between Hawaii and other states, as well as foreign countries. (It is the only GTE subsidiary named as a party to this case.)

AE is GTE's developing, manufacturing, supply and distributing company for telecommunication transmission equipment. It manufactures a substantially complete line of such equipment (AE does not manufacture wire or cable), and is the second largest manufacturer thereof in the U. S. (WE is first), with annual (as of 1969) sales of $180 million of switch gear, $59 million of station apparatus, $33 million of other equipment. In 1969, it distributed $196 million of telecommunication supplies not manufactured by it. The non-Bell, i.e., independent, telephone companies purchase most of their equipment from AE.

Lenkurt, an AE subsidiary, is a leading producer of video, voice and data transmission equipment for the communications, industrial and government markets.

Sylvania manufactures a variety of electrical products including specialized electronic equipment for various fields other than the telecommunications industry.[33]

The "Bell System" means the American Telephone and Telegraph Company (ATT) and Western Electric Company, Incorporated (WE), and their subsidiaries, and the Bell Telephone (Bell) operating companies. Bell blankets the U. S. (see Appendix 1), and the number of

32. See pp. 108–10, *infra*, for more details on its Puerto Rico development.

33. Although GTE expected Sylvania's organization to augment AE's research and development in the field of electronic telecommunications, this goal was never realized. As of 1971, Sylvania was manufacturing nothing for the telecommunications industry, *per se*.

# 1170

telephones owned and operated by ATT in the U. S. has jumped from 14,280,000 in 1935 to 95,942,200 in 1969 (see Appendix 2 for annual growth).

The number of telephones in the U. S. in 1935 was 17,465,000, of which 3,185,-000 (18%) were operated by independent telephone companies. At that time General owned and operated 381,000 telephones, i.e., 2.2% of the total in the U. S. or 12% of the independents' telephones. By 1969 there were 115,501,000 telephones in the U. S., of which 19,559,-000 (17%) were operated by independents. Of these GTE owned 9,022,000, i.e., 7.8% of the total U. S. telephones or 46% of the independents (see Appendix 3).

The total gross operating revenue of telephone companies or systems in the U. S. in 1935 was $1,042,000,000, of which $95,000,000 went into the coffers of the independents. Bell took the rest. General's share of the independents' revenue was then 12%. In 1969 the national total gross operating revenue from telephones was $18,672,000,000, of which $2,614,000,000 was generated by the independents. GTE's portion of the independents' revenue was 49% (see Appendix 4).

The total gross plant investment of telephone companies or systems in 1935 was $4,805,000,000, of which the independents had a $596,000,000 investment, and General's investment was 11% thereof. By 1969 the total gross plant investment was $61,919,000,000, of which the independents had $11,393,000,000. GTE's plant investment was $5,357,000,-000 or 47% of the independents' total investment (see Appendix 5).

In 1935 there were 6,627 telephone operating companies in the U. S. Bell had 24 of those and 13 were in the General system. By 1969 the number of telephone operating companies had shrunk to 1,919, 25 of which were Bell and 33 GTE (see Appendix 6), and out of 1,894 *independent* telephone operating

companies, the top 25 controlled 81.2% of all independent telephones. The top six of these were as follows:

| | | Telephones | % of Independent Market |
|---|---|---|---|
| 1. | GTE | 9,022,400 | 46.13% |
| 2. | United | 2,233,100 | 11.42 |
| 3. | Continental Tel. Corp. | 1,248,800 | 6.39 |
| 4. | Central Telephone Utilities Corp. | 895,900 | 4.58 |
| 5. | Mid-Continent Tel. Corp. | 496,200 | 2.54 |
| 6. | Rochester Tel. Corp. | 494,200 | 2.53 |
| | TOTAL | | 73.59% |

As indicated above, United is the third largest telephone operating company in the U. S. In 1967 it acquired some nine telephone operating companies with over 500,000 telephones.[34] In 1966 United bought controlling interest in North Electric Company (North Electric) and in 1967 acquired the balance to make it a wholly-owned subsidiary. North Electric manufactures and installs telephone equipment for central office exchanges, including crossbar telephone switchboards and allied products. It also manufactures and installs small telephone switchboards for use in offices and factories. North Electric has contractual and patent licensing arrangements with the L. M. Ericsson Telephone Company of Sweden, a large international manufacturer of telecommunications equipment.

Continental is the fourth largest. As of the end of 1969 its subsidiaries served approximately 1,492,000 telephones in 42 states, Canada and five Caribbean countries, and at the same time was in the process of acquiring 35,000 additional telephones. One of its subsidiaries, Superior Continental Corporation manufactures wire and cable and auxiliary equipment. Other subsidiaries publish telephone directories, render data service, etc.

In 1970 Mid-Continent Telephone Corp. purchased Buckeye Telephone & Supply Company of Columbus, Ohio, a distributor of equipment and supplies to inde-

34. The telephones operated by the companies it acquired ranged from 1500 of the Ellinwood Telephone Co. in Kansas to the 212,281 telephones of the Telephone Service Company of Ohio.

pendent telephone companies. Buckeye's sales for the period ending April 30, 1970 were $5.3 million.

In 1949 General owned some 1,187,000 telephones but it was vertically integrated only in a *de minimis* way.[35] In 1950, however, it acquired Leich, which manufactured switching equipment and also was a distributor of telecommunications equipment. At the end of 1962 Leich was merged into AE. General did not "go big", vertically, until October 1955 when, by acquiring Theodore Gary and Company, it not only added almost 600,000 telephones to its system (in 1954 it had 1,804,000 telephones), but it also brought to General a 78%[36] interest in AE. In 1955, AE was admittedly "the largest producer of communications equipment for the independent telephone industry."[37] At that time, AE owned a one-third interest in Lenkurt, a manufacturer of electronic transmission equipment, and was Lenkurt's exclusive distributor. In 1959 the balance of the Lenkurt stock was acquired by GTE.

By its acquisition of the Theodore Gary properties, GTE thus became not only a fully integrated telephone company but it also became the largest telephone operating company of all the independents and, as indicated above, had acquired control of the second largest telecommunications manufacturing company in the U. S., the major supplier to non-Bell companies.

In 1959 GTE acquired Sylvania,[38] believing that Sylvania's expertise in the field of electronics would be of great value in the development of the electronics potential for better transmission and services in the telecommunications industry.[39] In 1962 GTE acquired Panhandle Electric, another manufacturer of transmission equipment and made it an AE division.

When, in 1967, this suit was brought by ITT, approximately 48 telephone equipment manufacturing companies supplied the entire telecommunications industry in the U. S.

## Lines of Commerce

From its inception, telephone service in the U. S. has been conceived as voice communication between distant points through telephone instruments. Recently this "service" has become involved with other forms of communications, including data transmission. In the U. S. communications systems utilizing "telephone equipment" are principally operated by the telephone operating companies heretofore listed. However, similar communications systems are used by some industrial and other commercial enterprises as well as some federal, state and local government units.

In any such communications systems, the most important types of equipment are apparatus, switching equipment and transmission equipment. In the telephone operating company systems "apparatus" consists of the telephone itself and such other items of equipment usually located on the premises of the user. "Switching equipment" interconnects the line and telephone of one user with lines and telephones of other users.

Switching equipment includes, without limitation, central office equipment, switches, relays and selectors. There are, of course, two types of switching equipment: central office equipment and private branch exchange equipment (PBX). (An automatic PBX is called a PABX.) Central office equipment interconnects the line of one subscriber with the lines of other subscribers connected to the central office of the telephone operating company or with the toll switching network. Toll switching sys-

---

35. In 1937 General acquired one-sixth of the stock of North Electric. General sold that interest in 1953.

36. Subsequently, GTE acquired the remaining 22%, making AE 100% owned by GTE.

37. ITT, Proposed Findings of Fact (ITT F&F), p. 32.

38. It was at this time that General Telephone Company changed its name to General Telephone & Electronics Corporation.

39. But see n. 33, *supra*.

**1172**

tems interconnect local central office switching systems with other toll offices. The central office serves as the switching network to connect telephones for local calling purposes as well as to connect that central office with the toll switching point. The toll network is a nation-wide toll network in which all telephone operating companies participate.

Any industrial and commercial enterprises, federal, state and local government units operating "communications systems", if they wish to communicate outside of their own limited, "internal" system, must use the telephone operating companies' systems and toll network. For example, PBX or PABX equipment while connecting the telephones on the subscriber's premises with each other, must have some sort of interconnect with an outside central office exchange of a telephone operating company.

Transmission equipment is used for transmitting electrical impulses from point to point. Traditionally, from the time that Bell first used a wire for that purpose, wire or cable has been the equipment used in a telephone system for transmitting those electrical impulses necessary to carry the voice from point to point. Of recent years, however, microwave radio has been added to the transmission equipment field.

The principle companies engaged in the manufacture of a relatively full line of telecommunications equipment for sale to telephone operating companies in the U. S. are:

Western Electric Company
Automatic Electric (including its subsidiary Lenkurt)
Stromberg-Carlson Corp.
North Electric Co.
ITT

Northern Electric of Canada distributes its version of Western Electric type #5 Cross-Bar switching equipment through Stromberg-Carlson, and minor amounts of subscriber apparatus through Graybar Electric. Lenkurt and Collins provide the major portion of transmission equipment sold to the independent telephone operating companies. Neither AE nor Lenkurt manufactures wire or cable. ITT does, as does WE.

*Wire and Cable*

GTE has maintained that transmission equipment, for the purpose of determining the relative market in this case, must include wire and cable. In the telephone industry, however, items of transmission equipment which are unique and complex in their construction, compatability and engineering conception are distinguished from the far less sophisticated and generally fungible commodity-type supply items such as wire and cable.[40] WE's answer to GTE's written question requesting WE's sales of transmission equipment did not include sales of wire and cable although it manufactures the same. Thus, wire and cable, poles, pole line hardware, pins, cross-arms, etc., are considered in the telephone industry as supply items, because, as between the various manufacturers thereof, these items are essentially similar in appearance, technology and compatability, no matter who makes them. On the other hand, carrier, microwave radio and radio multiplex equipment, while falling under the broad category of "transmission equipment", consist of highly complex electronic devices with thousands of diverse components. In this respect they differ markedly from cable and wire— which are simply metal conductors. The manufacturing processes of each are technically poles apart.

Most of the companies manufacturing electronic transmission equipment do not manufacture wire and cable, and those which manufacture both electronic transmission equipment and wire and cable generally do so at separate facilities. The manufacture of wire and cable has nothing in common (except wire itself) with the manufacture of highly sophisticated microwave radio.

There is a general industry recognition that the cable and wire business is a separate economic unit. We find Mr. Les

40. See also GTE Answering Brief of November 21, 1970, 3.15, p. 36.

Warner, GTE's Chief Executive Officer, saying:

"* * * [A]s a matter of policy we have attempted to avoid going into the manufacture of the so-called supply or specialty items which include not only wire and cable, but pole-line hardware, poles, pins, cross arms, tools, and things like that, because you can't really argue the technological advantages of coordination between operations and research and manufacturing in those mundane areas whereas you can on things like central office equipment and even telephone instruments and microwave, radio and multiplexing systems and what not." PX 2, p. 8, ITT Doc. No. 243.

ITT, manufacturing both electronic transmission equipment and wire and cable, itself sells each category of equipment through a separate sales force.

As indicated by GTE,[41] there are differences in the number and character of the companies which manufacture each of the three categories of telephone equipment in the U. S. A number of the companies manufacturing electronic transmission equipment are recent entrants into the market, e. g., Farinon Electric, Vicom, Radio Frequency Laboratories, Hughes Aircraft, Microwave Associates and Transcom Electronic. At least 22 companies in the industry manufacture only electronic transmission equipment.

There is no dispute, however, that cable and microwave radio, on a strictly functional basis, can be interchangeable, in that either may perform the function of transmitting electrical impulses in a telephone network. Therefore it must be said that, in a broad sense, cable does compete with microwave radio for the same uses. Nevertheless, cable and electronic carrier equipment are not *completely* interchangeable in that electronic carrier equipment may only be used by applying it to an already-existing cable.

In general, it costs more to add additional wirepairs to create new circuits over an existing route than it does to substitute electronic carrier equipment. Similarly, coaxial cable for long distance communication, whether under water or over land, is more costly than microwave radio.

The decision as to whether to employ *coaxial cable or microwave radio for a particular trunk circuit is a matter of economics, i. e., which will give the best service at the lowest cost.* This does not mean, however, that the market for communications wire and cable is one and the same with the market for microwave and similar electronic carrier equipment.

Even though cable may be functionally interchangeable, Brown Shoe Co., Inc. v. U. S., 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed. 2d 510 (1962), made it clear that mere potential interchangeability or cross-elasticity may be insufficient to mark the legally pertinent limits of a relevant line of commerce. Sharply distinct submarkets can exist within the outer limits of a general market, and such submarkets may be the focal point of judicial inquiry under Clayton § 7. See Reynolds Metals Co. v. F. T. C., 309 F.2d 223, 226.

"The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." Brown Shoe, 370 U.S. at 325, 82 S.Ct. at 1524.

■ The number of firms making only electronic transmission products, the gross difference in the manufacturing facilities, the peculiar characteristics thereof, the distinct prices and the general recognition in the industry of a submarket in electronic transmission equipment as a separate economic entity, all impel this court to find that cable and wire manufacture is a separate economic unit of the communications industry and that

41. GTE, Proposed Findings of Fact (GTE F & F, 2.25, p. 18.

electronic transmission products constitute a submarket in the transmission equipment field separate and distinct from the submarket in wire and cable.[42]

### Product Market

GTE urges that, since the three types of equipment are not functionally interchangeable, apparatus, switching and transmission equipment are each a separate line of commerce. It further maintains that ITT has failed to prove each market, i.e., the sales involved in each; thus ITT's case must fall for lack of such proof.

Both *du Pont* [43] and *Brown Shoe* recognize, as it is here recognized, that within any market, submarkets may exist,

"[b]ut the boundaries of the relevant market must be drawn with sufficient breadth to include the competing products of each of the merging companies and to recognize competition where, in fact, competition exists." *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. at 1524.

■ GTE recognizes that "for the purposes of this case, the term 'telephone equipment' includes only the above three categories of equipment." The mergers here involved basically affect only the market in telephone equipment. It is in and for that market that in fact the problem of competition exists. It is in that market, ITT maintains, that competition actually has been and "may be substantially lessened." The relevant market here is "telephone equipment" and

perforce must encompass the above three types of equipment.

### Geographic Market

■ In the broadest sense, of course, since the corporations engaged in the U. S. in the manufacture of automatic switch equipment, station apparatus and transmission equipment offer such telephone equipment for sale throughout the U. S., and also are prepared to export the same to any customers throughout the world, it could be said that the geographic market is "the world." For the purpose of ITT's complaint, however, the parties do not seriously dispute that the U. S. is the geographic market for telephone equipment.[44]

Due to the sophisticated nature of telephone equipment, transportation is not a significant factor in its cost. With the exception of WE which manufactures most kinds of equipment in several locations, most telephone equipment manufacturers will manufacture each type of equipment at but one location. As indicated, regardless of where a factory may be located, either in the U. S. or out, freight costs, *per se*, as a general rule have no limiting effect upon competition among U. S. and foreign manufacturers who sell their equipment in the U. S.

### Customer Market

A major disagreement between the parties is whether sales of telephone equipment to every class of customer wherever located in the U. S. are to be included as within the relevant customer

---

42. *Cf.* dry thread sewing machinery submarket in United States v. United Shoe Machinery Corp., 110 F.Supp. 295, 303 (D.Mass.1953) ; men's, women's and children's shoes as relevant lines of commerce in *Brown Shoe*, 370 U.S. at 326, 82 S.Ct. 1502, florists' aluminum foil submarket in *Reynolds Metals*, 309 F.2d at 227; aluminum conductor vis-á-vis copper conductor held a submarket and a separate line of commerce for purposes of Clayton § 7 in United States v. Alcoa, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1969).

43. United States v. E. I. du Pont & Co., 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

44. While defendants' counterclaim involves the Virgin Islands and Puerto Rico, by the term "United States" is here meant simply the 50 states of the Union. As appears in the decision on that counterclaim, *infra*, pp. 113–14, the relevant geographic market might well have included the Virgin Islands and Puerto Rico. All market data used by both plaintiff and defendants have excluded them, however, and as this exclusion in no way affects the validity of this court's findings and conclusions on plaintiff's complaint, the court uses the data of that 50-state market in evaluating plaintiff's complaint.

market. As is not abnormal in Clayton § 7 cases, defendant GTE wishes the market to be as large as possible in order to effect a decrease in its "market" share percentile.

In the obverse, ITT, as a "private attorney general", contends that a clearly defined submarket exists in telephone equipment sales to independent (non-Bell) telephone companies, a contention which would markedly increase GTE's "market" share percentile.

GTE maintains that customer market for telephone equipment in the U. S. must include not only the telephone operating companies, Bell and non-Bell, but also industry and commercial companies, communications common carriers other than telephone companies, federal, state and local governmental agencies and export purchasers. In its broadest context, that statement is true. There is a "more than $3 billion" annual market in the U. S. for sales of telecommunications equipment. This "total market" however is definitely not wide open to unfettered competition *inter se* by manufacturers of such equipment. This factor, with others, has created clearly defined divisions of or submarkets within that "total market."

As was pointed out so succinctly in *Brown Shoe*, the ultimate determination of the relevant "market", whether customer or geographic, i. e., the market fundamentally affected by any merger, must evolve from the commercial realities of the industry in question. Turning then to the "realities" of the customer market of the commercial telecommunications industry, Bell, as of 1969, controlled 83% of all of the telephones in the U. S. and is the largest single purchaser of telephone equipment. Given this gigantic customer purchasing potential of Bell, it then becomes necessary at the outset to determine if, in the commercial realities of the telephone industry, Bell's purchases must be included in the relevant customer market here in issue. In this context, therefore, the effect of what has come to be known as the Bell Consent Decree upon competition in the customer market must be analyzed.

### Bell Consent Decree

Beginning in 1901, Bell System companies entered into supply contracts with WE, American Telephone & Telegraph's (ATT) wholly-owned manufacturing subsidiary. By 1913 each Bell company had entered into such a contract. In 1949, during the Truman administration, the Attorney General initiated an antitrust action against WE and ATT, attacking the legality of their vertical relationship. Undoubtedly the underlying factor for that Sherman §§ 1, 2, 3 action was that through ATT's vertical integration arising from its ownership of the Bell system operating companies and WE, its telecommunication equipment manufacturing company, non-Bell manufacturers of similar equipment were almost entirely eliminated from competing for the Bell System equipment market. The alleged purpose of the government's action was to restore competition in the manufacture and sale of telephone equipment. The complaint therefore asked that WE be divested by ATT and split into three separate companies; that all contracts and understandings between WE and Bell that Bell companies purchase their telecommunications equipment from WE be terminated.

Seven years later, during the Eisenhower administration, the suit was ended with a final judgment against WE and ATT with the consent of the parties and what is known as the Bell Consent Decree was entered.

In its pertinent parts the decree:

1. Enjoined ATT and WE from manufacturing any telephone operating equipment of a type not sold to the Bell System companies for use in furnishing common carrier communications and ATT was enjoined from engaging in any business other than furnishing common carrier communication services.

2. ATT and WE were required to grant a non-exclusive royalty-free license under WE's then U. S. patents to any company wishing to manufacture the same, and to grant similar licenses at reasonable non-discriminatory royalties

under all its future patents, as well as furnish all necessary technical information, to patent licensees.

Other than that, the decree did not "alter the fundamental relationships between ATT and WE and between these companies and the Bell operating companies." Thus WE has continued to be the "manufacturing and supply unit of the Bell system." [45]

As conceded by GTE, the Bell System's vertical integration status under the Bell Consent Decree is virtually impregnable.[46] At the time of the decree it was recognized by the Department of Justice that "the decree would operate as a kind of umbrella over WE's monopoly." [47]

It cannot be said that thereafter WE has, in any substantiality, competed for the equipment business of independent telephone companies. Following the consent decree WE has steadily withdrawn from the independent market as much as possible, stating, as recently as March 10, 1970 through Mr. J. H. Pursel, General Manager, Pricing and Commercial Relations for WE:

> " * * * Western, as manufacturing and supply unit of the Bell System, would like to be able to devote all of its efforts to meet its obligations to the Bell System Operating Companies and the United States Government. Accordingly, we do not solicit business of other customers nor have we authorized Graybar, as our sales agent, to do so. Over the years, we have sought to reduce sales to such other customers and generally we are no longer a source of supply other than directly to communication common carriers for a limited number of products. We, of course, continue to sell material required to repair or maintain Western products which have been sold in the past." [48]

In line with the above policy declaration, Graybar had its agency to distribute WE products terminated at the end of 1970. WE will sell its equipment to non-Bell telephone companies in the U. S. only where comparable equipment is not available from some other source.

GTE, nevertheless, has insisted that Bell must be deemed a part of the telecommunications market for the purpose of this case for the reason, among others, that it purchased a substantial amount of telephone equipment from non-affiliated telecommunications manufacturing companies, pointing out that for the years 1955 through 1969 the sales to the Bell System, ITT, North Electric, Collins, Stromberg-Carlson, GTE, Farinon, Lynch and General Electric were some $12 to $16 million per year. During the same period, Motorola's sales to WE (principally mobile telephone equipment) averaged about $10 million per year. These sales, *per se*, do appear quantitatively not insignificant, when not evaluated against the *total* purchases of Bell. In 1968 and 1969 Bell System purchases of telephone equipment from independent manufacturers was only 0.89% and 0.83% of its total purchases. It thus appears that WE supplies 99+% of all telephonic equipment to the Bell System, leaving only crumbs for the independent manufacturers.

Superficially, even in the face of this factual picture, it might be (and, by GTE is) argued that the Bell System market is wide open because the Standard Supply Contract in effect between WE and each Bell operating company, while providing, Art. 1, Para. 1, that WE will fill all orders from a Bell telephone company, then specifically adds that the latter is not obligated to purchase any materials from WE.[49] When one sees that *without obligation* WE is nevertheless called upon to supply over 99% of the Bell System requirements, it can only be concluded that the words of the Bell-WE contract are wonderful to look upon but in market implementation they have no more reality than a western

45. WE NARUC Report 1958–67, pp. 4–5.

46. GTE Trial Brief, 5.18.

47. Celler Hearings, 3574–575.

48. WE Ans., 14.

49. Fletcher Ans., 16.1, 16.5.

movie set. It was manifest from the evidence that Bell purchased from independent manufacturers only to fill the peaks and windows of its demands, i. e., if WE didn't make it or didn't have it, and felt it could use it, then Bell, i.e., WE and the Bell System telephone companies, would buy it from independents—until such time as WE produced it. Thereupon the Bell System no longer would buy it from the independent.

Admittedly, ITT and every other independent manufacturer is desirous of selling to Bell whenever possible. The appetite of the Bell giant for telecommunications products is so great that even the crumbs which fall from its board are large enough to be savory morsels for the independents. It is equally evident from the evidence, however, that these same morsels cannot be expected to be annual and competitively open fare for the independent manufacturers. The Bell "market" is available only so long as WE does not decide to consume all of its business itself.

In United States v. General Telephone & Electronics, Civil No. 64–1912,[50] GTE alleged in its answer to the government's complaint:

"A result of the Bell System Consent Decree has been the foreclosure of that portion of the market for telephone equipment consisting of the Bell System telephone operating companies from competition by telephone equipment manufacturers other than Western Electric because the Bell System telephone operating companies purchase all their equipment and supplies from Western Electric." ITT Trial Brief, 50.

Unquestionably the ultimate and actual effect of the Consent Decree, therefore, was to sever Bell's telecommunications equipment business from the broad market and establish the independent telephone operating companies as a remaining and realistically distinct submarket.

In 1968, General Telephone Company of California, one of GTE's major subsidiaries, at a California PUC hearing, placed into evidence the expert testimony of Professor Jules Backman, economist from New York University:

"Q. Now, looking to the market for telephone equipment manufacturers, do you consider Bell System part of the market?

"A. As a practical matter, it is not in terms of its availability as a buyer, although there may be some small things that are bought."

As a business reality, it is patently manifest that any Bell "market" is not and cannot be conjoined with the "independent" telephone industry market to enlarge the relevant customer market here in question.

*Industrial and Governmental Customers*

GTE has also insisted that industrial, governmental and export customers are part of the relevant customer market. Rare indeed is the industrial product which is not used by a broad spectrum of consumers, e. g., paint, aluminum foil, aluminum wire and shoes. All parties agree that some railroads, power companies and governmental agencies, as well as consumers abroad, buy various types of telecommunications equipment. Many manufacturers and suppliers, like North Electric, Stromberg-Carlson and Graybar have separate sales divisions or manufacture specialized equipment for their industrial and governmental customers.

While practically every "independent" telecommunications manufacturer and supplier has made and sold some of its products to buyers outside the telephone industry, to each and all, however, the primary market is the independent telephone industry.[51] Every non-Bell industry witness has testified that the principal market for the sale of telephone

---

50. See reference to this 1964 government action, *infra.*

51. Dye Dep., p. 22.

equipment is the independent telephone industry.[52]

GTE's own files constantly refer to the independent telephone industry as a separate market for the sale of telephone equipment,[53] and in its proposed finding of fact before the FCC in *Carterfone*,[54] General submitted that AE "is the largest supplier of telephone equipment to the independent telephone industry." [55] Then, in a later proceeding before the California PUC, General Telephone of California stated that "Non-Bell telephone companies * * * purchase equipment and supplies in a competitive market. Equipment is manufactured for this market by AE and four other large manufacturers [94% of total] * * *. The market serving non-Bell telephone companies is an industrial market, a legal market * * *." [56]

Mr. Warner, president and chief executive officer of GTE, testified:

"One of the things that seems to be little known in the public in general is the fact that the independent industry itself, in total, now has, I think, something in the range of 12 or 14 billion dollars invested in plants and equipment. So that, in any other concept other than by comparison to the Bell System, this is a giant industry * * *." Warner dep., pp. 55–56.

As heretofore indicated, telephone operating companies not in the Bell System are known in the industry as "independents" or non-Bell companies. They have their own trade association, the United States Independent Telephone Association (USITA). USITA engages in the full range of trade association activities, publishing statistical and other information concerning the independents and representing the viewpoints of the independents before national and state legislative and regulatory bodies. One function of USITA through its committees is to enable the independents to negotiate on a united basis when dealing with Bell.

*Carterfone*

Moreover, GTE has urged that the *Carterfone* decision [57] has so restructured the customer market for subscriber equipment—PABX, switching equipment, key systems and associated apparatus, that one-half of the market for apparatus (that employed with PABX systems) has been opened up to all competitors and the other half "will be fully opened" when tariffs are revised to permit direct electrical connection.

GTE insists that by *Carterfone* the ultimate market for customer-premise equipment is now a subscriber or other user, and the telephone company status is no longer that of ultimate purchaser but simply that of distributor who must compete with all other sellers or distributors of such equipment to subscribers. Thus urges GTE, *Carterfone* has cured any antitrust violation that may previously have existed in this field and negated any possible reasonable probability of future foreclosure by any vertically integrated telephone system. The thrust of this contention is that the concept of a total "independent" customer market has been now fragmented by *Carterfone*, and ITT's proof of GTE's percentile control of the apparatus "submarket" is invalidated; that *ipso facto* then, this invalidates all of ITT's "market" facts and conclusions.

What the *Carterfone* decision did was but rule that the tariffs prohibiting interconnecting of customer-owned devices with a public telephone network were invalid. The FCC, however, did not itself adopt new regulations regarding interconnection, and the FCC permitted the

---

52. Also see nn. 45, 47, *supra*.

53. GTE Annual Reports 1935–1967, PX 275–PX 307; GTE Market Surveys 1967–68, PX 55, 56.

54. See n. 57, *infra*.

55. PX 19.

56. In re Application of General Telephone Company of California No. 498035, Brief for Applicant, pp. 36–37.

57. Carter v. AT & T Co., 250 F.Supp. 188 (N.D.Tex.), aff'd 365 F.2d 486 (5 Cir. 1966), cert. denied 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

use of an interconnecting device "so long as the interconnection does not adversely *effect* the telephone company's operations or the telephone system's utility for others." [58]

The FCC order became effective November 1, 1968, and forthwith all telephone companies—both Bell and non-Bell—filed tariffs with the FCC providing for interconnect of PABX and similar privately owned systems such as microwave transmission systems so long as the telephone company furnished, installed and maintained the interconnect.[59]

Unquestionably *Carterfone* would have an initial effect upon the PABX market, and ITT, along with other American and foreign companies, immediately made optimistic predictions as to the amount of business it would engender—and tried to sell equipment. Unfortunately, the sales actually made did not anywhere reach the optimistic figures of the manufacturers.

The market picture was clearly analyzed by Harold S. Geneen, president of ITT,[60] who stated that the effect of the interface tariff was to put a very high premium on the cost of getting a PABX from someone other than the connecting telephone company. It eradicated the small telephone subscribers from outside competition because it became more economical for them to remain with the telephone company without the interface device than to have to buy from an independent supplier and then pay the cost of the interface device. This, alone, knocked out a third of the potential market. The rural market could not be reached because the outside manufacturers could not supply the support service systems. Thus the prospective market was automatically cut another third.

Another inhibiting factor was that the tying relationship of the telephone companies to their customers, with prompt company-customer service, normally engendered a feeling on the part of a customer that he should look to and rely on "his" telephone company for all types of telephone service. Mr. Geneen also pointed out that WE was building a plant for the sole purpose of expanding Bell's capacity in producing PABX's.

That the telephone companies are not assisting in "broadening the PABX market" was also illustrated by the plight of ITT at Shell Point Village, for retired persons, near Fort Myers, Florida. Shell Point had contracted with ITT to purchase a $500,000 customer-owned and maintained PABX to become operational in August 1970. The United Telephone Company of Florida, a subsidiary of United, with which the PABX would interconnect, obtained, ex parte, from the Florida Public Service Commission a cease and desist order enjoining the installation of the PABX. The theory for the order apparently was a claim that the Village proposed to operate a telephone company without going through the Florida PSC, etc.

It can only be concluded that, as indicated, decisive anti-competitive pressures have been and will be attempted to be maintained by the telephone companies with respect to subscriber apparatus, with the affiliated manufacturer continuing to have an inherently controlled outlet for such products. Contrary to GTE's rationale, this portion of the relevant market has not been "fundamentally changed." The vertically integrated company still has its built-in restraint against outside competition. ITT's market facts and conclusions are not invalidated by *Carterfone*.

58. 13 FCC 2d at 424.

59. FCC ordered the National Academy of Sciences to make a study of the technical factors affecting interconnection and on June 10, 1970, that panel concluded that while the use of telephone-company-provided protection devices was an appropriate temporary expedient, there should ultimately be an equipment certification program conducted by the FCC. This court has received no information that such a program has been implemented.

60. Testimony of Geneen, and Geneen Dep., pp. 228-31.

*New Common Carriers*

■ Still endeavoring to extend the perimeter of the relevant customer market, GTE urges that the action of the FCC in granting on August 13, 1969, the application of Microwave Communications, Inc. (MCI) for using microwave facilities to transmit data as a common carrier between Chicago, Illinois and St. Louis, Missouri [61] has expanded the market for transmission equipment apparatus and switch equipment and thus, by inference, the entire telecommunications equipment market, to the point that it must be considered part of the relevant market and ergo ITT, not having proved the extent of that market, fails in its claim. Contrary to the inference contained in GTE's Proposed Findings of Fact 6.26, viz., that the new microwave common carriers would compete with the telephone service *per se,* the 1700 applications which were received by the FCC from about 32 entities, following the MCI case, were for leave to install and operate common carrier microwave systems, but the applicants did *not* propose to offer normal telephone service but rather, "a service intended primarily for interplant and interoffice communications with unique and specialized characteristics." 18 FCC 2d 960; *cf.* also 24 FCC 2d 193. The problems before the FCC are illustrated by the title of a subsequent Inquiry and Order of July 15, 1970, 24 FCC 2d 318, "Establishment of Policies and Procedures for Consideration of Applications to Provide Specialized Common Carrier Services in the Domestic Public Point-To-Point Microwave Radio Service [particularly for the transmission of data]." The FCC said, at 330, "[t]he filings before us indicate that the special service markets are quite different from the standard toll telephone service." The market for sale of telecommunications equipment to the inde-

pendent telephone industry was not enlarged by the MCI decision. The several decisions of the Commission even more clearly define the perimeter of the telephone equipment market. They also even more clearly sever off that market from what must be considered the commercial, industrial, governmental and export submarkets.

As the preceding analysis makes obvious under *Brown Shoe,* as a practical reality there are three distinct submarkets in the telecommunication field. One is the market for the Bell telephone operating companies, and as indicated heretofore, this market was for all practical purposes gift-wrapped and handed over to WE by the 1956 Consent Decree. A second market is the independent, i. e., non-Bell, telephone operating companies of the U. S. to some of which in the past, not-too-dissimilar "gifts" have been made.[62] The third is a conglomerate of industrial, governmental, etc., users of some such equipment.

*Regulated Industries*

■ Because 47 U.S.C. § 221(a) gives to the FCC the power, upon application by a telephone company, to evaluate the effect upon the subscribers and the public of merger with and acquisition of other telephone companies or their assets, i. e., horizontal mergers, and thereafter upon specific approval by the FCC, to insulate the merger against antitrust attack, GTE next insists that the sole power to bring an antitrust action involving such mergers, etc., within the telephone industry, is vested in the FCC. Therefore, maintains GTE, a private attorney general is precluded from bringing the present antitrust action—even though GTE made no application for merger evaluation nor has any formal approval by FCC of GTE acquisitions ever been made.

---

61. MCI, 18 FCC 2d 953 (1969), reconsideration denied 21 FCC 2d 190 (1970).

62. *Cf.* dismissal in 1966 by the government of its 1964 antitrust action against GTE upon its acquisition of the Western Utilities Group; Attorney General's no-action letter in 1963 to ITT re its proposed acquisition of United; Attorney General's no-action letter in 1966 re proposed acquisition of North Electric by United.

This court does not here challenge the basic correctness of the following statement of the FCC of March 28, 1972:

"[W]e reassert that our statutory authority is broad and imposes heavy responsibilities upon us, *inter alia*, to insure (a) that common carriers, presently and in the future, provide adequate communications service, at just and reasonable and non-discriminatory rates and that they employ practices, and classifications and regulations that are just, reasonable and non-discriminatory, Sections 47 U.S.C., 151, 201–202, 211, 213–214–215, 218–219–220; (b) that they operate all radio facilities in accordance with the public interest requirements of the Act, and the rules and regulations thereunder, Section 47 U.S.C. 301 et seq.; and (c) that they comply with Sections 2, 3 and 7 of the Clayton Act, 47 U.S.C. 602(d). Further, we have the statutory duty to consider and evaluate all relevant factors with respect to the foregoing, including, but not limited thereto, national policies relating to competition, monopolies or combinations, contracts or agreement in restraint of trade, 47 U.S.C. 221(a), 313, 602(d); and Sections 2, 3 and 7 of the Clayton Act." [63]

It may well be that the FCC is given the power to consider and evaluate the relationship between communications common carriers and suppliers of their equipment against the services rendered, within the context of the antitrust laws. The Court in United States v. R. C. A., *supra*, note 31, by dicta has indicated that the FCC has such power in a horizontal acquisition situation. 358 U.S. at 351–52, 79 S.Ct. 457, 3 L.Ed.2d 354. The FCC may even have all the duty so to act, as it self-servingly maintains, but, in reality, if it be a duty, that obligation has been but niggardly, laggardly and tardily exercised as to the telephone industry—as the report prepared by the FCC for the Committee on Commerce of the United States Senate, 92d Congress, 1st Session, under date of March 31, *1970*, disclosed.

"*Issue.*—What are the ramifications of a relationship between communications common carriers and suppliers of their equipment and services, particularly when carrier and supplier are under common control.

"Discussion.—This study was deferred as a later phase of the general AT&T rate investigation initiated in October *1965* as Docket No. 16258. The relationship under study has a number of regulatory and economic ramifications that impacts upon the reasonableness of prices charged by the supplier to the carrier and the cost of services that enter into rate making. The relationship also lessens competition in the equipment market *and may tend to inhibit invention and innovation by sources outside of the integrated companies. It also enables the company to pace the introduction of new technology in accordance with its schedules.* The relationship between Western Electric and the operating companies of the Bell System has been scheduled for investigation in the final phase of the AT&T rate case. The matter is awaiting staff recommendations on consultants, and the availability of money to hire such consultants.

"*Necessary actions before target date* Selection of consultants for preliminary survey and definition of issues requiring investigation, when money is available to hire such consultants." (Emphasis added.)

It was the antitrust division of the Department of Justice which in July 1969 challenged restrictive telephone company practices in the CATV field, i. e., telephone company practices of unnecessarily restricting CATV access to telephone poles and underground conduits, with, also, insistence that only CATV commu-

---

63. The Code indicates that § 602 became *functus officio* in 1941 and is now omitted from U.S.C.A.

nication services be offered by CATV operators. It was not until *after* Bell notified the FCC that it would abandon these practices that, in 1970, the FCC ruled them illegal.[64]

The fact that a horizontal merger may take place in regulated industry has not barred antitrust action thereon by a private attorney general.[65] Challenges by the Department of Justice of mergers, even after approval by a regulating agency, have not always been denied in the field of commercial banks, natural gas pipelines and broadcast interests.[66]

It would appear that under § 221(a), the *only* means given to telephone companies to evade possible attack for violation of the antitrust laws has been circumscribed to encompass only horizontal mergers and acquisitions. In the absence of what amounts to an application for a grant of antitrust immunity for such mergers and an order granting the same under 47 U.S.C. § 221(a), actions under the antitrust laws, in their broadest spectrum, may be brought by persons injured or aggrieved—private attorneys general—as well as by the U. S. or the FCC.[67] When the requisite statutory steps have not been taken, no immunity follows, and the entire arsenal of antitrust weapons is left open for use by an injured party. Such is the case here.

*Vertical Integration*

Underlying GTE's position throughout has been its insistence that vertical integrations of telephone systems are absolutely necessary for the development of best service to the telephone user, and that this is a determinative fact because it is universally accepted as true. GTE points first to ATT which, while owning WE, operates over 96 million telephones throughout the U. S., i. e., over 83% of the nation's telephones, owns 82% of the gross telephone plant, operates 90% of all of the long-distance telephone service, employs 84% of the persons and receives 86% of the revenue of the entire telephone network, and at the same time sets the standard for all telephone service in the U. S.

Also, GTE points out that it, owning AE and Lenkurt, operates over 9 million telephones in 34 states; that United, owning North Electric, operates 2.26 million telephones in 22 states; that Continental, owning Superior-Continental Corporation (wire, cable and carrier equipment), Communications Apparatus Corporation (loading coils and apparatus), and Vidar Corp. (carrier equipment), operates 1.25 million telephones in 42 states. Thus with Bell, GTE, United and Continental operating over 94% of the telephones of the U. S., all of which are vertically integrated, GTE draws the conclusion that its president, Warner, was correct when he stated that the companies that do the best job are the ones that are vertically integrated and have research and manufacturing under their control.[68]

64. Letter from ATT to FCC Chairman Hyde (October 28, 1969); Final Report and Order, 21 FCC 2d 307 (1970), modified, Memorandum Opinion and Order, 18 P & F Radio Reg.2d 1799 (1970).

65. *Cf.* Silver v. New York Stock Exch. 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); Missouri-Kansas Pipeline Co. v. U. S., 312 U.S. 502, 506, 61 S.Ct. 666, 85 L.Ed. 975 (1941); Cascade Nat. Gas v. El Paso Nat. Gas, 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967).

66. United States v. Phila. Nat'l Bank, *supra*, n. 20; United States v. El Paso

Nat. Gas, 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964); United States v. R.C.A., *supra*, n. 31.

67. Packaged Programs v. Westinghouse Broadcasting Co., 255 F.2d 708, 709 (3 Cir. 1958), and cases cited therein; United States v. R.C.A., 358 U.S. at 337 n. 3, 79 S.Ct. 457, 3 L.Ed.2d 354; Georgia v. Pennsylvania R. Co., 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945); Cascade Nat. Gas v. El Paso Nat. Gas, *supra*.

68. Warner, Tr. 669.

GTE additionally equates vertical integration in the U. S. with the "integration in fact" of European governments, e. g., Great Britain, France, Germany, Italy, Spain and almost all other western European nations, which, while operating telephone systems as a government monopoly, normally allocate all of their equipment business to the same manufacturing companies year after year.

GTE further insists that since the requirements of an efficient telephone network demand that the equipment be standardized, with a continuity of supply sources for it, these two factors cannot be achieved without an affiliated manufacturer.[69]

All of the above facts, maintains GTE, permit only one valid conclusion, viz., vertical integration, actual or de facto, is a mandated "way of life" for telephone companies.

The position here taken by GTE is that uniformly adopted by regulated monopolies. Always the public interest is stressed, along with the need for unified system planning, plus allegations that competition would mean lower technical standards and deterioration of maintenance and safety requirements. "Bell's watchword has been 'one system, one policy, universal service' * * *.[70] ATT's argument in Carterfone Device was that "[Interconnection] would inevitably result in degradation of service." [71]

GTE's argument that standardization can only be achieved by vertical integration, that efficiency can only be achieved by the same method, simply is

not sustained. As GTE points out, as a result of Bell's dominance of the entire industry and the Bell Consent Decree patent licensing requirements, most of the apparatus and much of the carrier equipment manufactured in the U. S. by non-Bell companies is identical or very similar and compatible in design to WE's equipment performing the same function. Similarly, a substantial portion of the switching equipment sold by U. S. non-Bell manufacturers is of WE design. Even such switching equipment as if offered by Japanese manufacturers to the U. S. market is manufactured under WE license.[72]

Moreover, the evidence introduced by ITT showed that when there was a strike at AE in 1967, Stromberg-Carlson and ITT were called upon to furnish telephone equipment of exactly the same type as manufactured by AE for the General System.

Although GTE would have this court believe that without vertical integration public telephone service would deteriorate, it made no effort to show that the service of any one of the telephone operating companies whose acquisition is here challenged by ITT was giving poor service prior to GTE's acquisition or that the service markedly improved after acquisition. Nor was there any showing that United was giving poor service prior to its acquisition of North Electric.

The underlying basis of GTE's plaint is that so long as the giant Bell is allowed to remain vertically integrated, then it is simply "not fair" to deny like vertical integration to an independent pygmy.

69. In connection with and, inferentially, to support this argument, GTE produced evidence of many complaints over ITT Kellogg products. As this court has heretofore ruled, this case is not concerned with whether the products made by ITT Kellogg are as good as those of AE or any other manufacturer. In a free, competitive market, the goodness or badness of any product will normally determine the ultimate economic fate of the maker. The court notes, also, that when AE has not

been able to supply its demand, GTE has not hesitated to call upon ITT Kellogg for equipment.

70. Investigation of the Telephone Industry in the United States, H.R.Doc.No.340, 76th Cong., 1st Sess. 145-46 (1939).

71. 5 FCC 2d 360 (1969), 13 FCC 2d 420 (1968) ; Brief and Proposed Findings and Conclusions of Bell System Parties at 20.

72. GTE F & F, 7.16, 7.17.

GTE's position is not without some foundation. After the entry of the Bell Consent Decree, in 1958 the Antitrust Subcommittee of the Committee on the Judiciary of the House of Representatives held hearings upon the circumstances surrounding that Decree. Stanley N. Barnes (now United States Circuit Judge, Ninth Circuit), who was then, as he was in 1956, head of the Antitrust Division of the Department of Justice, testified as follows:

> *Representative Roosevelt.* Now, Judge, in the original statement of the reasons for filing the suit back in 1949, which I am sure you knew about and were cognizant of, the statement was made that the suit does not seek to interfere with the American Telephone & Telegraph Co. except to separate it from Western Electric.
>
> Now, had you decided that was not, when you went ahead with the prosecution of the case, an important part of this proceeding?
>
> *Mr. Barnes.* We decided in the course of our negotiations that we could not get it; therefore, we agreed not to get it.
>
> *Mr. Roosevelt.* You mean you could not win it in court?
>
> *Mr. Barnes.* That is right. You know, this is a very complicated situation. It is complicated by many, many factors, not the least of which is the vast amount of business which is done by Western Electric for the United States Government, and it is—
>
> *Mr. Roosevelt.* Could it still not do that business with the Government without being owned by A. T. & T.?
>
> *Mr. Barnes.* That was one of the questions in which various representatives of the United States Government took the position that it could not.

> In other words, you have got a situation where you have got research halfway between manufacture and operations, and so tied up, according to certain allegations, that from a practical standpoint they have to be together.
>
> Now, I am not buying that. I am just saying that is an argument which has been expressed, and very violently expressed, by people in high places in the Government.
>
> *Mr. Roosevelt.* I am glad you are not buying it, Judge, because I would find it hard to buy, too.
>
> Would you care to say whether the Department of Defense felt that this was a necessary thing?
>
> *Mr. Barnes.* No. The responsibility for this consent judgment rests solely in the Department of Justice, and solely in the Antitrust Division, of which I am head.
>
> *Mr. Roosevelt.* I am a little curious, then, to know why, if you did not buy it, why you thought it was necessary to follow it.
>
> *Mr. Barnes.* As I stated, the only reason why we did not attempt to get a complete divorcement of Western Electric and the A. T. & T. is that we became convinced we could not obtain it by a court action.[73]
>
> \* \* \*
>
> Let me say this, Mr. chairman: I do not take the position that there can never be divestiture in a regulated industry. I think that is going too far. But I say under the peculiar circumstances of this case, we came to the conclusion that the best way to promote competition was what we could do in this particular decree.[74]

When GTE acquired Gary in 1955 and Peninsular in 1957, the FTC and the De-

73. Consent Decree Program of the Department of Justice, Hearings before the Antitrust Subcommittee of the Committee on the Judiciary, House of Representatives, 85th Cong., 2d Sess., 1958, at pp. 4090–91.

74. *Id.*, at p. 4095.

partment of Justice investigated the same but took no action to block the acquisitions. The Department of Justice, in its 1964 Clayton § 7 action against GTE, California Water and Telephone, West Coast Telephone, Southwestern States Telephone and Western Utilities, asked that the acquisitions be enjoined, yet on November 14, 1966, the action was dismissed! The Department of Justice then stated that it was doing so

"for the reason that in view of the unique conditions of the telephone industry and the telephone equipment industry, where vertical relationships between companies similar to that involved in this lawsuit exist to a great extent, the Department has determined that it would be inappropriate, actively, to prosecute this suit against a single company at this time." Stipulation of Facts, GTE Item 88.

Moreover, in 1963, ITT obtained a no-action letter from the Department of Justice regarding ITT's proposed acquisition of United which states this reason for the government's position:

"[W]e note that a similar relationship exists with respect to major companies controlling much larger market shares than those which IT&T controls or proposes to acquire. In view of this circumstance, and on the basis of the representations you have made and the facts now known to us, we do deem it appropriate to advise you that the Department of Justice does not intend to take action with respect to the proposed acquisition by IT&T referred to herein, unless or until action has been taken with respect to similar relationships existing in the largest segment of the industry or other circumstances have caused a substantial and significant change in competitive conditions in the market." Findings of Fact, GTE Item 8.1(n).

In connection with the proposed acquisition of North Electric by United, the government issued a similar no-action letter in 1966 which stated as its reasons:

"[B]ecause of the unique circumstances in the telephone and telephone equipment industries, where similar vertical relationships affect an extremely high proportion of the total market, the Department of Justice does not presently intend to take action unless or until action is taken with regard to one or more of such similar relationships among other companies, or unless there are significant new developments." Findings of Fact, GTE Item 8.1(o).

■ The preceding paragraphs make it apparent that when the Department of Justice in 1956 consented to the continued vertical integration of ATT, by that action it placed itself in a cleft stick from which it became virtually impossible for the Department thereafter to justify any Clayton § 7 action against any merger, vertical or horizontal, in the independent telephone market.

ITT as a private attorney general is not so morally or legally inhibited or restrained by the Department of Justice's or even ITT's own past actions.[75]

■ Nor is this court. That the Department of Justice may have made a unilateral conclusion that it "could not obtain [divorcement of WE from ATT] by a court action", in no manner restrains this court from evaluating ITT's suit within the permissible limits of the antitrust laws. It is for the courts, not the Department of Justice, to make the ultimate decision on whether or no there has been a violation of the antitrust laws and determine the scope of any relief granted.[76] Within the purview of the philosophy underlying the antitrust acts,

---

75. *Cf.* Perma Life Mufflers v. Int'l Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968).

76. Cascade Nat. Gas v. El Paso Nat. Gas, *supra*, at 136.

the only "unique circumstances in the telephone and telephone equipment industries" revolve around "unique" internal restraints which the Department of Justice has placed upon itself by and because of the Bell Consent Decree. Horizontal and vertical mergers in the telecommunications industry are no more unique and no less subject to judicial scrutiny under the floodlights of an antitrust suit than are those in any other industry, save and except where specific legislative[77] or judicial [78] exceptions have been made. As heretofore indicated, the present action does not fall within any such exceptions.

*Probable Substantial Lessening of Competition*

The parties are in agreement that a recognized measure of a telephone company's size and market position is the number of telephones it serves. For example, GTE reports to its shareholders in terms of its growth in stations (telephones) and usually distinguishes between internal growth and growth by acquisition. Perforce, the company's investment in gross plant, i. e., a company's total purchases of telecommunications equipment in its broadest sense plus land, buildings, etc., is directly related to the number of its telephones, e. g.,

| | Telephones | | Gross Plant | |
| Year | GTE % of Total U. S. | GTE % of Non-Bell | GTE % of Total U. S. | GTE % of Non-Bell |
|---|---|---|---|---|
| 1965 .... | 6.9 | 42 | 6.9 | 43 |
| 1966 .... | 7.0 | 43 | 7.2 | 43 |
| 1967 .... | 7.4 | 45 | 7.9 | 46 |
| 1968 .... | 7.7 | 46 | 8.4 | 47 |
| 1969 .... | 7.8 | 46 | 8.7 | 47 [79] |

AE in its marketing studies 1950–1969, repeatedly uses the number of telephones and offices, as well as additions to plant, as the basis for determination of communications equipment purchases, sales analysis and forecasts of production demands, because of the close correlation between the same.[80]

In the post-complaint year of 1969, from GTE's own evaluation of "Estimated United States Market For Telephone Equipment And GTE Sales Of Telephone Equipment To Affiliates",[81] AE (including of course Lenkurt's) sales of telephone equipment were approximately 9.3% of its own "Estimated Minimum Total Sales"—a total of all sales to all U.

S. purchasers, which included sales by WE, sales of wire and cable (other than WE), estimated sales of *all* electronic transmission equipment, sales by foreign companies in the U. S. and probable initial expenditures by New Common Carriers! In that same year, General's purchases, excluding wire and cable, accounted for 7.4% of that *gross* market, or if wire and cable is likewise excluded from that *gross* market, 8.2%. General's 1969 purchases were approximately 51.-8% of all such equipment sold to the independent telephone companies.[82]

Lenkurt's marketing study (PX 45) of sales of its transmission equipment

77. *E. g.*, in the railroad, maritime, aviation, etc., industries.

78. *E. g.*, baseball exemption.

79. GTE Vol. III, Interr. & Stips., PX F, G.

80. PX 48, 49, 51–55.

81. Appendices A1–A6 of GTE's Objections to ITT F & F.

82. GTE Trial Evidence-Stipulated Facts, ITT Item 27.

when combined with Western Electric's data on the same products shows:

TRANSMISSION EQUIPMENT
BELL PURCHASES ($000,000)

| Year | From Western Electric | From Independents (PX 45) | Total Bell |
|------|------|------|------|
| 1966 .... | 360.2 | 10.2 | 370.4 |
| 1967 .... | 377.8 | 11.7 | 389.5 |
| 1968 .... | 420. | 21.2 | 441.2 |

INDEPENDENT TELEPHONE COMPANY
PURCHASES ($000,000)

| Year | GTE System | Other Independents | Total Independent Industry |
|------|------|------|------|
| 1966 ...... | 25.5 | 23.2 | 48.7 |
| 1967 ...... | 30.8 | 23.9 | 54.7 |
| 1968 ...... | 41.4 | 33.3 | 74.7 |

TOTAL TELEPHONE INDUSTRY
(Bell and Independents)
($000,000)

| Year | |
|------|------|
| 1966 ........................... | $419.1 |
| 1967 ........................... | 444.2 |
| 1968 ........................... | 515.9 |

GTE PERCENTAGES OF TOTAL INDUSTRY
(Bell and Independents)

| Year | GTE % of Total Transmission | GTE % of Total Telephones | GTE % of Gross Plant |
|------|------|------|------|
| 1966 ...... | 6.1% | 7.0% | 7.2% |
| 1967 ...... | 6.9% | 7.4% | 7.9% |
| 1968 ...... | 8.0% | 7.7% | 8.4% |

GTE PERCENTAGES OF INDEPENDENT
INDUSTRY

| Year | GTE % of Total Transmission | GTE % of Total Telephones | GTE % of Gross Plant |
|------|------|------|------|
| 1966 ..... | 52% | 43% | 43% |
| 1967 ..... | 56% | 45% | 46% |
| 1968 .... | 55% | 46% | 47% [83] |

From the preceding data this court can only conclude that whether it were to use the total telephone market as insisted upon by GTE, or the independent telephone market which this court has found to be the relevant market, the share of the relevant line of commerce (telecommunications equipment) represented by the purchases made by GTE telephone operating companies is approximately the same as or greater than GTE's percentage share of the telephones or gross plant in each such market. As the preceding statistical data also shows, Lenkurt is the telephone industry's (including Bell) largest supplier of transmission equipment after WE, and AE's (including Lenkurt) domination of sales of the independent market gives GTE a market percentage far in excess of that market control found in *Brown Shoe*.[84]

This court notes that *Brown Shoe* states in footnote 38:

"Statistics reflecting the shares of the market controlled by the industry leaders and the parties to the merger are, of course, the primary index of market power; but only a further examination of the particular market—its structure, history and probable future—can provide the appropriate setting for judging the probable anticompetitive effect of the merger." 370 U.S. at 322, 82 S.Ct. at 1522.

*GTE Telephone Acquisitions and Market Impact*

Prior to 1955, GTE had acquired *by acquisition* only some 240,000 telephones —3% of the 1954 U. S. independent *total*. By 1967, however, GTE *by acquisition alone,* had acquired control over an *additional* 2,255,626 telephones—over 13% of the 1967 U. S. independent *total*.[85] In

83. PX 45; GTE Vol. II, Deps., Fletcher Ans. to Q 3.

84. Brown Shoe manufactured 5.8% of the nation's "childrens shoes", or when divided into submarkets, 6.5% of "youths and boys' shoes, 6% "misses and childrens", and 4.9% of "infants and babies" shoes. Kinney, the acquired outlet sold 2% of the nation's "childrens shoes" or, using the above submarkets, 3.1% of "youths and boys", 1.9% of "misses and childrens" and 1.5% of "infants and babies" shoes.

85. GTE Vol. III, Interr. & Stips., PX E, F.

the same corresponding periods, GTE owned 1,804,000 telephones in the U. S. in 1954—3.4% of total U. S. or 23% of the U. S. independents. By the end of 1967 it owned 7,729,000 telephones in the U. S.—7.4% of total U. S. or 45% of the U. S. independent telephones. By 1969 GTE owned 9,022,000—7.8% of the total U. S. or 46% of the independents.[86]

The total number of telephone operating companies in the U. S., including Bell's 23 and GTE's 16, was 4,-984 in 1954. By 1969 this had decreased to 1919, including Bell's 25 and GTE's 33 —through horizontal acquisitions.

Bell made no acquisitions during this period. It simply restructured its own organization. GTE made a multitude of acquisitions and restructured its acquired companies into its own system companies.

It is obvious from the above that as the number of independent companies has shrunken, control over the purchasing power of the 3,000 companies that have disappeared has been concentrated in their several acquired. During the above period GTE has far outstripped all other independents in eliminating, via the acquisition route, the number of potential buyers in the industry.

### Effects of GTE's Vertical Integration

Various officers of GTE, including its then president, Mr. Warner, have testified that GTE operating companies buy the best equipment at the best prices regardless of source and that each of its operating companies makes its own purchasing decisions without exercising any discretion in favor of in-house purchasing. GTE would have this court believe that the General System fully opens its market to all manufacturers of telecommunications equipment.[87]

The record of GTE prior to the bringing of this suit, however, makes it clear that in practice, regardless of such verbalization, when an independent telephone operating company has been acquired, all the independent manufacturers and suppliers, save AE and Lenkurt, have thereafter found their sales to the acquired company to have abruptly declined.

The sales figures and charts of Graybar verify the statement of Robert B. Thompson, General Communications Sales Manager of Graybar Electric, whose principal customers are the independent telephone companies, that in almost every case there was an abrupt decline in the volume of its sales to an operating telephone company after such company was acquired by GTE.[88] As Thompson also pointed out, Graybar was able to sell to GTE operating companies transmission equipment types not made by Lenkurt, e. g., WE type "O", "N" and "T" carriers, but when Lenkurt began to manufacture the "N" and "T" type carriers, Graybar sales of this equipment to GTE companies substantially decreased.[89] Of similar import was the testimony of Kerry R. Fox, Asst. Vice President of Marketing of Collins Radio, whose bookings to GTE in microwave and multiplex equipment declined from over $½ million in 1965 to $80 thousand in 1967 as Lenkurt came on stream. Similarly illustrative were Collins' sales to Western Utilities, which were over $¼ million in 1964, but after Western Utilities was acquired by GTE in the summer of 1964, Collins' sales to Western Utilities dropped to $1,600 in 1965.

Similarly, North Electric sales to West Coast Telephone of common control cross-

---

86. *Id.*, PX F.

87. It is unsurmountably difficult for this court to reconcile the above contentions with GTE's position that vertical integration is necessary in the telephone indus-

try in order to obtain the benefits of equipment standardization and cooperative research and development.

88. Thompson Dep., pp. 53–56.

89. *Id.*, pp. 39–40, 45–48.

bar equipment came to an abrupt halt after West Coast was acquired by GTE.[90] Prior to its acquisition by GTE, Peninsular Telephone purchased approximately 90% of its telephone instrument requirements from Stromberg-Carlson. Immediately after acquisition, GTE switched to AE telephone instruments.[91] ITT's sales to Peninsular also dropped from $67,000 in 1957 to $4,000 in 1958 and 0 in 1959–60.[92]

Because of the 73-day strike at AE's North Lake Plant (which ended January 24, 1967), AE was unable to meet its delivery commitments. In May 1967 General Telephone of the Southeast had ordered 27,000 lines of step-by-step additions from ITT, but suddenly AE "improved" its delivery commitments sufficiently to induce Southeast to cancel the order.[93]

GTE has "standardized" all AE's telephone apparatus and its operating companies purchase substantially all of their requirements for telephone apparatus from AE. Since 1960 GTE has installed AE's switching equipment in approximately 95% of all new and replacement central offices. Lenkurt's share of GTE System purchases of transmission equipment has been as follows:

LENKURT'S MARKET SHARE OF GTE SYSTEM PURCHASES

| Year | Percent of General Companies Purchases | |
|---|---|---|
| 1965 .................... | 97% | |
| 1966 .................... | 98% | |
| 1967 .................... | 94% | |
| 1968 .................... | 97% | 94 |

By contrast, during those same years, Lenkurt's share of the market of other independents plus Bell available, dropped from 55% to 35%.[95]

That this foreclosure does not result from simply "better equipment, better service", etc., is shown conclusively by the pre-complaint statements of GTE's executives of various rank. For example, Robert M. Wopat, who in February 1963 was Executive Vice President-Telephone Operations for the GTE Service Corporation, wrote to all operating vice presidents with copies to all chief engineers, plant directors and controllers (all those responsible for purchasing) that the operating companies did *not* have the option of arbitrarily deciding or specifying on orders what they individually considered to be items which would be equal to the items included in the System Standard Material List. Only AE and Service Corporation had that power. (PX 100)

Also, C. W. Schwob of AE noted in November 1967 (PX 131):

"The management of the Service Corporation has very strong feelings re the operating companies ordering nonstandard material when standard [AE] materials are available."

And George H. Gage, Vice President-Telephone Operations Staff, in a letter to R. J. Gressens, President of AE, on January 30, 1968 (PX 133), stated in effect that AE was to supply a non-System standard item only if it had been reviewed as to performance and quality by the Service Corporation. If the purchase order did not indicate that the item desired was non-System standard, then AE was to advise the operating company of the standard item that was available. In 1967, the same George Gage wrote to

90. Beck Dep., p. 9; GTE Ans. to ITT's Interrog. 2, dated March 18, 1970.

91. Darlington Dep., pp. 15–17, 28–30.

92. ITT's Ans. to GTE's Domestic Interrog. 39.5, dated November 15, 1968.

93. PX 258–260, 262.

94. PX 41, 45.

95. PX 358.

the operating vice presidents of the General System (PX 120):

"No engineering efforts other than those associated with a 'paper investigation' should be expended, nor should any commitments be made with any supplier and/or manufacturer regarding new products until approved by the GTE Service Corporation. In this manner we can all pull on the same team and minimize evaluation and field trial expenses.

"Over the past few years we have felt a great deal of pressure from the Bell System operating companies to establish jointly-operated T–1 carrier systems. Such efforts should be resisted or delayed until such time that a General System Standard is available * * *.

"Recently, we have also felt pressure from some Independent telephone operating companies to use the products of two manufacturers, which they state are compatible on an end-to-end basis with the Western Electric T–1, on jointly operated interconnected routes. Here again, such efforts should be resisted or delayed until a General System Standard is available. There are solutions to these problems such as the utilization of the 81A and 47 carrier systems. * * *

"While this letter deals specifically with the T–1 carrier situation, it should also be taken more generally to be applicable to all nonstandard items of equipment (central office, radio/microwave, outside plant, etc.). Bulletin AD-y is being revised to state more clearly the System policy. Our engineering Department here in New York is coordinating our standardization activities and should be contacted if there are any questions regarding the System rating of any items. Please take any action deemed necessary to implement this policy in your company."

When the policies concerning control of non-System standard purchases became firmly established and known, it is noted that at lower echelons "the facts of life" were well understood. In mid-1964 Jack A. White, GTE Service Corporation Materials and Supply Procedures Director, wrote to C. C. Lillig of AE concerning the treatment of nonstandard material items in the new mechanized billing procedures (PX 102):

"Our basic ideas behind the 'XX9999' number for non-standard materials are, first to attract attention to the number of such items and the frequency with which they are ordered, and second to deprive them of the convenience and smooth flow associated with standard materials. You probably remember Bob's facetious suggestion that all orders for non-standard material automatically go to a suspense file for thirty days before they are even entered."

The attitude which was inculcated into the GTE organization is aptly though facetiously illustrated by PX 139:

"PX 139 is a memorandum addressed from 'Fred' to Carl Schwob, Northlake office of Automatic Electric, enclosing a set of instructions for ordering supplies for General Telephone of Florida. The first page of those instructions states that the instructions for ordering non-standard materials per Section 05–99 are considered self-explanatory. 'Fred' commented humorously on those instructions as follows:

'I like the last two pages of this section (05–99). He lists all non-standard materials and illustrated the ease of ordering them. This came from his last flight on Northwest Air Lines. It illustrates what a deep thinker Russ really is. They don't come any better.' "

Page one of Section 05–99 of the referenced Supply practices states as follows in its entirety

"99.1 The exhibit attached covers instructions for ordering non-standard items."

(The next page of this decision is a reproduction of Exhibit 1 in Section 05–99, entitled "Instructions for Ordering Non-Standard Items.")[96]

05-99
Exhibit 1, Page 1
Issue 1

<u>INSTRUCTIONS FOR ORDERING NON-STANDARD ITEMS</u>

### 乗客の皆さまの安全確保のための緊急重要事項

米国連邦航空局の指令により，乗客の皆さまは緊急着陸の際，速やかに航空機から脱出する方法をあらかじめご承知おきください。このパンフレットの中には，この航空機の平面図がございます。そこには脱出口と，その開け方が明示してあります。脱出なさる時は，あなたの座席から一番近い脱出口へ直行してください。決してご自分の持物などをとるために立ち止まらないでください。

着陸の際には，座席についているテーブルはすべて元の位置におさめ，座席の背はまっすぐに立てておいてください。

座席ベルトについてのご注意：高空を飛行中たまたま機体がはげしく振動することがあります。座席ベルトをしめるサイン・ランプが点灯しましたら，ベルトをしっかりしめてください。

### 비상시 알아두어야할 중요한 사항

여러분의 안전을 위하여— 연방항공국은 비상착륙시 승객이 신속히 비행기로부터 탈출하는 방법을 알고 계시도록 요구하고 있읍니다. 본책자에는 여러분이 타고계시는 비행기의 평면도가 있으며 탈구의 위치 및 여는 방법도 설명이 되어있읍니다. 비상탈출시에는 여러분의 가장 가까운 탈구로 가십시오. 개인 소유물을 찾으시기 위하여 멈추지 마십시오.

연방항공국은 비행기 가착륙시 좌석앞에있는 탁상은 제자리에 그리고 좌석등받이는 정상적인 위치에 두도록 요구하고 있읍니다.

여러분의 좌석혁대에 관하여— 혼한일은않으나 고공에서 거칠은 기류를 맞나 심한 동요를 이르킬때가 있읍니다. 경고 신호가 커지면 혁대를 단단히 매어 주십시오.

### 應付緊急意外湏知爲閣下安全起見「民航联會」

促請貴乘客熟習緊急離機辦法，以便萬一遇緊急降落時，得以迅速脱離機艙。本小冊内印有所乘座機之平面圖，指示緊急出口所在，及其開啟方法。如遇緊急意外，請卽走向最近之緊急出口，切勿因顧及私人物件，致誤時機。

聯又在起飛及降落時，必湏收起座舡。及將座椅靠背宜立。

監於使用安全帶：在高空飛行中遇惡氣流時，机身會有激烈振動。如見安全帶信号灯点滅，請速將安全帶一扣緊。

[A6558]

---

As Mr. Rothe, counsel for GTE, admitted in oral argument on GTE's motion to join ATT (Bell) as a defendant in this case:

"The very essence of vertical integration implies—and this has always been recognized—that there is an in-house purchasing. This is not denied."

This statement was confirmed by Herbert F. Lello, then President of AE and subsequently Executive Vice President-Manufacturing for GTE Service Corpora-

96. The various ideograms actually describe in Japanese, Korean and Chinese, proper disembarkation procedures in the event of an unscheduled landing in the Pacific Ocean.

tion, in testifying during GTE's 1961 rate case hearings before the New York State Public Service Commission (PX 9):

"Q. From what you have told me, I take it that it is and always has been the policy of the GT&E System that its domestic telephone companies should purchase all of the requirements of equipment and supplies from Automatic and Leich where it is possible to do so?

A. That's correct where suitable equipment is available."

The record is loaded with testimony and instances unquestionably indicating that when AE (Lenkurt) makes it, products made by a competitor do not become standard-System items, and there "aren't very many" standardized items of non-affiliated manufacturers on the System-approved list.[97]

GTE also has a policy of resistance to introduction into the General System of improved equipment until AE or Lenkurt makes it. While this court does not feel it is necessary to engage in a minute detailed analysis of the relative technical merits of step-by-step switching systems with common control crossbar switching systems, nevertheless the court is satisfied that as AE has never manufactured a common control crossbar system as has North Electric, Stromberg-Carlson and ITT since 1956, General has continued to install the apparently less efficient step-by-step equipment into nearly all new and replacement central offices since that time, because (a) it had a tremendous investment in its step-by-step manufacturing facilities; (b) as indicated above, it does not propose to admit sales of competitive control crossbar switching systems into its telephone operating companies; and (c) it hoped to leapfrog (as it has done), regardless of the time and efficiency lag, into development of an electronic switching system.

This same policy to resist buying other than in-house is shown in the development of the sophisticated PCM (Pulse Code Modulation) carrier systems. The Bell System was installing a WE PCM carrier in 1962. By 1965 Vicom had developed an equivalent thereto. Lynch also developed an equivalent carrier. Lenkurt had not. When it became apparent to GTE that they would possibly be forced by service requirements to purchase an equivalent PCM carrier, even though Lenkurt had not developed one, on October 22, 1963, I. B. Jackson, Engineering Director of GTE Service, wrote to Lenkurt concerning the PCM carrier (PX 224):

"If possible, it would be well to try to hold the line [against purchasing WE's, Vicom's or Lynch's PCM carrier] to some degree by having the Lenkurt version in time to avoid the Lynch version * * *."

When Lenkurt still had not produced a PCM carrier, on August 30, 1967, C. E. Munsell, Engineering Director of GTE Service, wrote all operating company chief engineers that Service was just then conducting its field trial of a Lynch PCM carrier because

"we can not delay the construction program for * * * PCM carrier systems and * * * it will be necessary to purchase * * * outside the System."

He then continued:

"Hopefully, we will be able to hold such non-System purchases to an absolute minimum, until such time as an approved System Standard [i. e., Lenkurt]

makes the same available." (PX 225, 229.)

That policy was also maintained for dial-in-handset telephones (PX 168–172), as well as for tel-touch equipment which was introduced by ITT in 1965. Even though Gentel of the Southwest, without notifying GTE Service, tested and approved ITT's tel-touch, and the Bell

97. Clerkin Dep., p. 21.

System had standardized on it, Service recommended against purchase because AE was working on, and in 1969 released, comparable equipment.

■ As hereinabove set out, as a result of GTE's in-house buying policy and resistance to competitors' products, substantially all of the telecommunication equipment requirements of General companies have been purchased from AE. Even during the *post*-complaint period, when service requirements for common control crossbar switching equipment—not manufactured by AE—forced some of General's companies to buy outside until AE developed its new electronic switching systems, in 1969, despite those outside crossbar purchases, the General companies purchased approximately 79% of their *total* telephone equipment requirements from AE.[98]

Thus, the evidence would indicate that while this combination of restraint of competition and internal research and development may have benefited GTE, there is evidence that it may not have benefited the GTE subscribers, and it certainly has not benefited the general economic health of the independent telephone equipment manufacturing industry.

In this connection, while not necessary for the determination of the issues here, the court notes that the California Public Service Commission, after exhaustive investigation into the policy and purchasing practice of Gentel of California and AE, concluded that the prices charged by AE to Gentel were but the same as those charged by independent manufacturers for the equivalent equipment. AE gave no discounts to Gentel because of quantity purchases or because it had lower sales expenses. It did not even attempt to approximate the lower prices charged by WE to Bell companies for equivalent equipment. The conclusion of the California PSC was that the prices paid were excessive and unreasonably high. Although GTE has protested this conclusion, it does not deny the accuracy of the finding as to the underlying facts. It appears that AE prefers to sell its equipment to GTE's operating companies at list price, i. e., meeting the like list prices, etc., of independent manufacturing competitors rather than granting any volume distributor discounts such as normally are given to those independent telephone holding companies with supply organizations.[99]

*Post Acquisition Evidence*

■ GTE, in insisting that their several individual telephone operating companies' purchasing practices are uninhibited, now point to tests of competitive equipment, including that of ITT, which their companies are undertaking, as proof thereof. This court is highly dubious about the realities of "instant conversion on the road to Damascus", and gives but *de minimis* weight to the equipment testing and purchasing policies of GTE which came in force after the instant suit was started. This variance from its presuit practice would indicate that GTE has restrained its normal implementation of the merger advantages, hopefully to establish a more favorable record.

As heretofore discussed, even in the field of PABX, following *Carterphone,* it appears more than reasonably probable that there will be continued opposition to any form of competition in the sale, use, or installation of such devices on the part of the local telephone companies by use of litigation and aggressive sales promotions, coupled with possible tariff juggling by local telephone companies. An additional factor which also inhibits competition in this product field is the habit and therefore the normal reaction of subscribers of preferring to deal with the local telephone company. Service difficulties facing outside competitors in other than major metropolitan areas, as well as the cost of the interface device, are likewise restraining factors. The market opened up by *Carterphone* does

98. Seventh Partial Stip., ITT Item 27; Warner, Tr. 687–88, 799–800, 807–10.

99. Wandrey, Tr. 400–02; Woodruff, Tr. 156; PX 1, p. 53.

not eradicate to any material extent the probable future foreclosure of even this portion of the market served and represented by the GTE operating companies, and constitutes no actual or foreseeable mitigation of the probable adverse anticompetitive effects of GTE's vertical and horizontal acquisitions.[100]

 Even if, as GTE also insists, competition is still most vigorous in the microwave field as well as in the field of other telecommunications equipment, nevertheless, as pointed out by Justice Douglas in F.T.C. v. Consolidated Foods, 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), even if the evidence might show that competition may have remained vigorous after the acquisition, the fact that post-acquisition evidence might establish some increase in competition does not validate an acquisition. (380 U.S. at 598, 85 S.Ct. 1220.)

*Intent to Monopolize*

The entire horizontal acquisition program of GTE—its beginning, its subsequent implementation, and its future objectives—was fully spread out by its then President and Chief Executive Officer, Warner, in his address of December 2, 1966 [101] to 300 top management personnel of Gentel of Florida:

"I'm sure that most of you are familiar with the modest, small beginnings of what we call the General System. * *

"We had no manufacturing, and back in 1950 the total sales of the General System were $70 million dollars, and their net income was $4,100,000. * * [W]e closed out last year [1965] with sales of 2 billion and 36 million dollars. That ranked us number 25th in sales of all of the companies in America. Our net income was 167 million, which ranked us number 18. At the end of last year we had 3½ billion dollars invested in plant and equipment on the combined telephone and manufacturing side, which ranked us number 10. * *

"This year we're anticipating $2 billion, 400 million. * * * Our net income this year, we anticipate, will be 200 million dollars compared to the 167 which we made last year. * * *

"About half of our operations are in telephone companies that serve about 75 hundred communities in 32 states and this year will contribute a billion dollars to our total revenues. The other half, more or less, comes from this gigantic manufacturing complex that we've built up since 1950, which this year will contribute a billion, 400 million dollars to our total. * * *

"Automatic has grown and developed to the point where it has been, for a number of years, the largest supplier of communications equipment to the non-Bell sector. Another subsidiary company, Lenkurt Electric, is, as you know, a specialist in microwave radio, multiplexing equipment, data transmission and receiving systems, telemetering equipment, and things of that nature. The sales of these two domestic communications equipment manufacturing companies this year will reach about four hundred and fifty million dollars.

* * * * * *

"How did we get here? * * * [T]hrough a great deal of internal growth * * *. [O]ur internal growth on the telephone side is presently running at the rate of more than 500,000 telephones a year. This is a pretty astounding figure when you stop to think that in the non-Bell segment of the industry there are only three companies, other than General Telephone that have as many as 500,-000 telephones in total. They are United Utilities, Central Telephone, and Continental. So, every year we add more just through internal growth than all of the rest of the industry, save these three companies, put to-

---

100. Kinnaman Dep., pp. 126–137, Tr. 212–38, 366–68; Geneen, Tr. 425–28, Dep. pp. 228–31; Truss, Tr. 98(B)–113; Warner, Tr. 829–31; Woodruff, Tr. 161–62.

101. The Hawaiian acquisition had been "closed out finally" the afternoon before.

gether. * * * *Still, a very important part of our growth has resulted from acquisitions and mergers.*

"* * * * The Gary Company that I was originally associated with came in through merger in 1955. Certainly Sylvania and Lenkurt were acquired companies, and in the telephone side of the business, we were very successful in acquiring other telephone companies and spreading ourselves out. This is extremely important in the telephone business because telephone companies have franchises. They're regulated monopolies in the areas that they serve, and the only way that you can branch out to serve a territory that you do not presently serve is through acquisitioning the company that has that franchise.

"This is not true, of course, in the manufacturing side of our business, where we do business in all 50 states and throughout the world. Therefore, *in our opinion it becomes more and more important to acquire other telephone companies so that we can participate in the growth of the areas that they serve, which we could not otherwise get into.* When the Department of Justice filed suit against us in 1964 just prior to our merger with the Western Utilities Group, it was a serious thing for us because for the first time our program of acquiring other independent telephone companies throughout the country was challenged. * * *

"[The Department of Justice] advised us that they were going to seek an injunction to stop the merger." * * * [O]ver the last 2½ years we've had many meetings with * * * the Department of Justice—the Attorney General, the head of the Antitrust Division, many of the staff members. During that time we made a great deal of progress in educating them on the fact that the telephone business was different from most industrial businesses, that this was in the public interest. Again we achieved an unprecedented victory when, on the 14th

of November, they dismissed this case without any strings attached, with no restrictions whatsoever.

*"This, of course, meant that we were not only once more free to go ahead with our acquisition program in the telephone side, but * * * [it] permitted us to do it even with more assurance than we had before * *.* [T]he Department of Justice * * * now having challenged us and finally agreed with us that it wasn't violating the antitrust laws, it seems reasonable to expect that now we can move ahead without fear of interference from them.

"Well, as you might expect, during the 2½ years that our hands were tied on acquisitions we weren't exactly sitting around moping. We were out talking to people that we would like to marry up with some day and doing all the necessary ground work to condition their minds to joining the System. As a result, when the case was dismissed on the 14th, all hell broke loose at 730 Third Avenue [GTE Home Office] * * *.
* * * *

"Well, * * * we have a great company * * *. We have this great mix with half of our business being in manufacturing, half of it in telephone operations." (Emphasis added.) PX 2, pp. 2–7, 9.

*Sylvania*

As has undoubtedly been noticed, this court has concerned itself only with AE (Lenkurt) in its analysis of the area of competition in the telecommunications industry, even though Sylvania is an affiliate of GTE. By 1959 GTE had decided to develop an electronic switching system, and Warner, then president, felt that the acquisition of Sylvania, an acknowledged leader in electronics through its research and development facilities, could be of material assistance to AE and Lenkurt in such development. Unfortunately, as Warner testified, the electronic "know how" of Sylvania proved to be of no value whatsoever to AE and Lenkurt, and Sylvania has never been

engaged in the production of telecommunications equipment for the telephone industry.[102]

■ At the time it was acquired, as the testimony of Sylvania's past president Don G. Mitchell made clear, Sylvania was not a potential competitor for the telecommunications industry. Not alone was there no intention to enter that field but to him there was not even a remote probability, prior to acquisition, that it would enter the market.[103] Moreover, there has been no evidence that Sylvania was at the "edge" of the telecommunications market, or that its position had any effect on the conduct of the actual competition in that market.[104] Sylvania was not at the time of acquisition either an actual or potential competitor of AE or Lenkurt, nor was it then nor has it been an actual potential supplier of parts or equipment to AE or Lenkurt.

On the evidence before the court there has been no proof that the acquisition of Sylvania violated Section 7.[105]

### SUMMARY, and CONCLUSIONS OF LAW

As heretofore indicated, ITT has proved that the relevant market in telecommunications equipment for the purposes of this action includes switching equipment (central office switching and PABX equipment), telephone apparatus and radio transmission equipment, excluding wire and cable, for the independent, non-Bell, telephone operating companies. ITT has proved that AE (Lenkurt) manufactures a complete line of telecommunications equipment and is utilized by GTE to fulfill all of the basic requirements of the General System operating companies. AE (Lenkurt) possesses the financial, technical and productive resources, i. e., plants, necessary for reasonable expansion in the future to enable it to make the quantities and types of products demanded by GTE's affiliated operating companies.[106] Whenever AE or Lenkurt develops a new product, such as its new electronic switching system (Electronic Automatic Exchange, i.. e., No. 1 EAX), an in-house testing and subsequently in-house purchasing of its products is assured. It is equally assured that its products will be purchased by the affiliated companies over any possibly competing product, even if that product is more than equally efficient.[107] ITT has also proved that GTE's affiliated telephone operating companies buy substantially all of their telecommunications equipment—approximately 79% in 1969 —from AE (Lenkurt). Competing manufacturers have found their sales in the relevant market to have been curtailed, even to the point of complete elimination in some instances, as a result of the successive acquisitions.

The General System policy of "standardizing" on AE (Lenkurt) products and resistance to use of non in-house equipment effectively forecloses competing manufacturers from selling competing products to the General System. With General controlling about 46% of the independent, i: e., relevant market—as well as about 7.9% of the total industry (including Bell)—then, whether one takes the independent telephone industry to constitute the relevant market, as this court has done, or takes the total telephone industry market, as GTE insists,

---

102. While in the 1960's Sylvania had conducted research into a LASER device and it is believed that LASER may have a strong potential in communications, still, at this time, it remains nothing more than a "possible" potential.

103. Mitchell, Tr. 1049–50.

104. F.T.C. v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1965) ; United States v. Penn-Olin Chemical Co., 378 U.S. 158 (1964) ;

United States v. El Paso Nat. Gas, *supra*, n. 66.

105. This does not mean that the future of Sylvania may not be a factor for resolution when the court makes its decision as to the equitable relief which it will decree.

106. GTE Vol. III, Interr. & Stips., ITT Item 7, PX 2.

107. Warner, Tr. 690–93, 695–96, 699, 895.

in either market there has been a most substantial foreclosure of competition flowing from the vertical integration and continued horizontal merger policy of GTE.

Upon the Department of Justice dismissal of its antitrust GTE-Western Utilities merger action in 1965, GTE accelerated its horizontal acquisition program, accelerated its attempts to take over the independent telephone market to become the independents' "Bell." Admittedly GTE has been but following the ideology and example of Bell: vertical integration is "the way of life"—"in-house purchasing", etc. — and as it grabbed operating companies out of the open competitive market, their equipment business was given to AE.

Perhaps not one of GTE's successive acquisitions up to 1954, *per se,* could be said to have had the effect of "substantially" lessening competition. Perhaps any one of GTE's horizontal acquisitions might not have caused ITT, or any other like competitor, much damage, real or potential. With each successive acquisition, however, the progressive tendency toward building a monopoly or restraining trade was creating an apparent shadow.

As was made positive by *du Pont:*

"[A]ny acquisition by one corporation of all or any part of the stock of another corporation, competitor or not, is within the reach of the section [§ 7] whenever the reasonable likelihood *appears* that the acquisition will result in a restraint of commerce \* \* \*." (Emphasis added.) United States v. du Pont & Co., 353 U.S. at 592, 77 S.Ct. at 876–877.

The Court continued, in approving Judge Maris' opinion in Transamerica Corp. v. Board of Governors, 206 F.2d 163, 169 (3 Cir. 1953):

"A monopoly involves the power to \* \* exclude competition when the monopolist desires to do so. Obviously, under Section 7 it was not necessary \* \* \* to find that \* \* \* [the defendant]

has actually achieved monopoly power but merely that the stock acquisitions under attack have brought it measurably closer to that end. For it is the purpose of the Clayton Act to nip monopoly in the bud." *Id.,* at 592–93, 77 S.Ct. at 877.

With GTE's acquisition of the Gary interests in 1955, demand (purchasing power) was combined with supply and GTE's modest telephone system was transformed from a domestic kitten into a tiger cub.

GTE's subsequent acquisitions were used thereafter to construct, not just a "possible", but what became an actual, internal monopolistic program of channeling all possible purchases of telecommunication equipment for its successively acquired operating companies into its own supplier. Thus, as above indicated, by 1966 it had removed almost 7 million telephones from any real sales competition in the relevant market, i. e., 43% of the independent market! (7% of the *total* U. S. market.)

When Hawaiian was acquired in 1967 there was no longer just a pale possibility of restraint of trade, restraint had arrived. GTE's ultimate goal of monopoly of the independent telephone market was no longer a just faint gleam in GTE's eyes. The cub was almost half grown and its predatory appetite had not been sated.[108]

On the evidence now before it it is not necessary for this court to indulge in speculation as to what future competition there might be in the relevant market. GTE's in-house purchasing policies, persistently maintained after it acquired Gary in 1955, combined with its more recent acquisitions of Peninsular Telephone Company, Western Utilities Group, Central Telephone Company of Iowa, Northern Ohio Telephone Company and Hawaiian Telephone Company, has brought about restraint of trade equating almost an actual foreclosure of meaningful sales competition in 46% of the relevant market.

108. Warner statement, PX 2, p. 6.

ITT, as an independent manufacturer of telecommunications equipment, is entitled to have the opportunity to remain a viable competitor in that market—an opportunity which has been steadily eroded away and will continue to be unreasonably eroded, if relief, substantially in the nature prayed for, is not given.

From GTE's past history, from the policy statements of its officers and their implementation, the rational conclusion can be drawn that if GTE acquisitions of independent telephone companies is not only cut off now but in some measure rolled back, as prayed for by ITT, then it is reasonably probable that the ultimate result of the vertical and horizontal merger policy of GTE will give the U. S. just two operating telephone systems, Bell and General, with AE (Lenkurt) occupying a position in the GTE submonopoly parallel to that of WE in the Bell monopoly.[109]

*Trend Toward Concentration and Lessening of Competition*

It is not necessary for this court to reach the above conclusion before it can give ITT any relief. The continued decline in the number of independent operating companies, the concentration of control (73.6% in 1969) in the six leading non-Bell companies, GTE's own control of 46% in 1969 of the independent market, the market trend toward vertical as well as horizontal mergers in that same market by the market leaders, all point to probable and substantial lessening of competition in the production and sale of telephone equipment to the total U. S. as well as the independent market.

*Clayton § 7 Violated*

It is with certainty, then, that GTE's acquisition of each of the following companies, regarded individually and/or collectively, in the context of GTE's entire horizontal and vertical acquisition program, has the reasonably probable effect of substantially lessening competition in the production and sale of telephone equipment to all telephone operating companies in the U. S. and to all independent telephone operating companies in the U. S., in violation of Clayton § 7: Leich Electric (1950); Gary and Company Group, including AE (1955); Peninsular Telephone (1957); Lenkurt (1959); the Western Utilities Group (1964); Central Telephone of Iowa (1967); Hawaiian (1967); and Northern Ohio (1967).

*Sherman § 1 Violated*

GTE, acting in concert with GTE Service, Leich, AE, Lenkurt and all of the various GTE telephone operating companies, have since at least 1950, by reason of their agreements to merge and consolidate, their mergers and consolidations, and their subsequent actions and conduct in effectively foreclosing the market for telephone equipment represented by the GTE telephone operating companies, constituted a continuing combination in unreasonable restraint of interstate trade and commerce in the production and sale of telephone equipment to independent telephone operating companies in the U. S. in violation of Section 1 of the Sherman Act.[110]

*Jurisdiction*

As the evidence has shown, as to the federal claims, this court clearly has jurisdiction over the subject matter and the parties pursuant to § 15 of the Clayton Act (15 U.S.C. § 25), 28 U.S.C. § 1337, and as to the Hawaiian claims under § 480–13, Hawaii Revised Statutes. Venue is properly laid in this district under 15 U.S.C. § 22.

*"State Action" Immunity, Parker v. Brown*

GTE has persistently maintained that even though this court might find that its vertical and horizontal acquisitions violate the federal antitrust laws, it is nevertheless protected from any possible sanctions by the so-called "state action" doctrine of Parker v. Brown, 317

---

109. See *du Pont, supra*, n. 43.

110. See United States v. First Nat. Bank, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964).

U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943).

*Parker* involved an attack (by Brown) on the California Agriculture Prorate Act as it applied to the state's raisin crop. The Act created a citizen prorate commission which, after its own raisin marketing program had been approved by the raisin producers, empowered the State Director of Agriculture (Parker) to thereupon institute the program and enforce it with criminal sanctions.

The declared objective of the Act was to prevent excessive supplies of agricultural commodities from adversely affecting the market. Although the Act spoke in terms of "economic stability" and "agricultural waste" rather than of price, the evident purpose and effect was to conserve California's agricultural wealth by raising and maintaining prices "without permitting unreasonable profits to producers."

Brown, an aggrieved producer, argued that the California regulatory scheme conflicted with the Sherman Act, the Federal Agricultural Marketing Agreement Act, and the Commerce Clause.[111]

In its rejection of Brown's Sherman Act claim, the Court expressly relied on some rather scant Sherman Act legislative history—read with an eye to preserving state-federal comity. Because the Court saw "no suggestion of a purpose to restrain state action in the [Sherman] Act's legislative history," a state was held generally not a "person" subject to suit under sections 1 and 2 of the Act.[112] The Court said:

"[I]t is plain that the prorate program here was never intended to operate by force of individual agreement or combination. It derived its authority and its efficacy from the legislative command of the state and was not intended to operate or become effective without that command. We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. *In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress.*

\* \* \* \*

"It is the state which has created the machinery for establishing the prorate program. . . . [I]t is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy.

\* \* \* \*

"The state in adopting and enforcing the prorate program made no contract or agreement and entered into no conspiracy \* \* \* but, as *sovereign,* imposed the restraint as *an act of government* \* \* \*." (Emphasis added.) 317 U.S. at 350–52, 63 S.Ct. at 313–314.

The Court, however, added this important caveat:

"True, a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful \* \* \*; and we have no question of the state \* \* \* becoming a participant in a private agreement or combination by others for restraint of trade \* \* \*." *Id.* at 351–52, 63 S.Ct. at 314.

---

111. Those sections of the Court's opinion rejecting the latter two contentions rest, inter alia, on the Court's express finding that the state scheme was compatible with the federal agricultural stabilization program, which likewise had anti-competitive purposes and effects.

112. A state is a "person" entitled to sue for damages and injunctive relief under the Act, 15 U.S.C. § 15 (1964). See Georgia v. Evans, 316 U.S. 159, 62 S.Ct. 972, 86 L.Ed. 1346 (1942); Hawaii v. Standard Oil Co., 405 U.S. 251, 261, 92 S.Ct. 885, 31 L.Ed.2d 184 (1972).

Succinctly then, *Parker's* expressed rationale is that because state sovereign immunity is such a fundamental principle and because essential comity between state and federal sovereigns often depends on preservation of that immunity, if Congress intended otherwise it would have specifically excluded sovereign immunity as an antitrust defense. While *Parker* was concerned with a claimed Sherman Act violation, *Parker's* progeny have applied its rationale to alleged Clayton Act violations.[113]

It is within this background that GTE's contentions must be evaluated. The public utility commissions of the several involved states, investigated, held hearings, and approved the acquisition of Hawaiian Telephone, the Western Utilities Group, and Northern Ohio Telephone. Each commission had ample opportunity to draw its own inferences, favorable or unfavorable, from GTE's vertical structure.[114] Additionally, each commission, of course, presently regulates in its state the rates of GTE operating companies, and, by adjusting rate bases, allowable expenses, and rates of return, may indirectly, though lumberingly, control service, purchasing practices and interaffiliate dealings.

The statutes of Hawaii, California, Washington, Oregon and Ohio, among others, void any merger, consolidation or major disposition of utility property which has not received prior approval from the state commissions.[115] None of the statutes, however, sets out precise criteria to guide or upon which to base its commission's decision. The various commission orders [116] indicate that the Hawaiian and Western Utilities acquisitions did receive commission approval, and in the words of Hawaii's PUC, were deemed to be "in the public interest." [117]

*PUC Merger "Approvals"*

Because of relevance to ITT's federal as well as state claims, this court has examined, sua sponte, the Hawaii PUC files relating to the Hawaiian merger. Inferentially, even if not presumably, those files might be considered as fairly indicative of what was before the commissions which approved the acquisitions of Western Utilities and other GTE operating companies whose acquisitions are here challenged. The Hawaii files reveal a letter from Hawaii's PUC staff and Hawaiian's reply, discussing service, central office equipment needs and proposals, Hawaiian's pre-merger relationship with suppliers, cooperation between those suppliers and Hawaiian's engineers, the post-merger savings which supposedly would accrue to Hawaiian through discounts provided by AE, and the probable degree of autonomy in purchasing and policymaking for Hawaiian after the merger. The responses could not be dubbed superficial, but they were optimistic, self-serving, and sometimes bordering on the conclusory.[118]

113. See Washington Gas Light Co. v. Virginia Electric & Power Co., 438 F.2d 248 (4 Cir. 1971).

114. The Ohio Public Utilities Commission lacked jurisdiction to approve or disapprove an agreement under which Northern Ohio Telephone became a wholly-owned subsidiary of GTE. See Int'l Tel. & Tel. Corp. v. Public Utilities Commission, 18 Ohio St.2d 83, 247 N.E.2d 726 (Sup.Ct.1969).

115. See I.R.S. § 269-19 (1968); California Public Utilities Code §§ 851, 852; Revised Code of Washington §§ 80.12.020, 80.12.030, 80.12.040; Ore.Rev.Stats. § 757.155. Contrast the lack of statutory authority in Ohio, see nn. 113, 114, *supra*.

116. See GTE F & F, 15.8, 15.11.

117. In re Hawaiian Telephone Co., Haw. PUC Decision & Order No. 1939, Docket No. 1745 (April 25, 1967), at 4. See In re New California Water & Tel. Co., Calif. PUC Decision No. 67374, Application No. 46489 (June 16, 1964), at 6-7; In re West Coast Telephone Co., Washington Utilities & Transportation Commission, Order, Cause No. U-9530 (June 24, 1964), at 8; In re West Coast Telephone Co., Ore. PUC Order No. 40271 (June 24, 1964), at 15-16.

118. See letter from D. S. Guild, then president of Hawaiian, to Frederick Bolte, director of public utility regulation, April 15, 1967, in files of In re Hawaiian Tele-

Hawaii's PUC staff also directed a questionnaire to the commissions of every other state asking about its experience with GTE's telephone service, rates, equipment standardization, and the like. Each commission was asked whether any mergers, etc., had occurred in its jurisdiction, and if there had been any post-merger change in rates, service, purchasing and financing practices, loans to parent corporations, management's attitude, regulatory climate, and amount or nature of litigation. The thirty responses were uniformly brief and frequently monosyllabic.

At two public meetings, the Hawaii PUC heard testimony and received exhibits from representatives of its staff and the two merging corporations. ITT, RCA and Western Union were notified of the hearings, but the only formal non-party appearance was by an electrical workers' union representative.[119] It was obvious that the hearings lacked the testing adversarial quality of a trial such as was held in the instant case; the questions do not appear deeply penetrating nor the responses and prepared statements greatly revealing. For example: Witnesses were asked whether the merger was "in the public interest," i. e., Hawaiian telephone subscribers' interest. The PUC did not undertake the more far-reaching inquiry whether the effect of the merger might be substantially to lessen competition or tend to create a monopoly in the manufacture and supply of telephone equipment in either the state or national market. Nothing indicates that the commission considered either the nationwide trend toward concentration both in the independent telephone company industry and in and through vertical mergers with telecommunication equipment manufacturers, or, other than superficially, the long-range effects upon Hawaiian's service or rates of AE's becoming an in-house supplier of Hawaiian's equipment and supplies. That the PUC might order divestiture if the merger, horizontal and/or vertical, were to prove incompatible with the public interest was never mentioned.[120]

Clearly, the federal constitution does not bar a state regulatory commission from examining transactions between a public utility and its affiliates. See Smith v. Illinois Bell Telephone Co., 282 U.S. 133, 152–53, 51 S.Ct. 65, 75 L.Ed. 255 (1930). Some state statutes, e. g., Washington and Oregon where Western Utilities operated, expressly grant commissions authority to void interaffiliate contracts which are contrary to the public interest.[121] A third, California, implies an almost equally severe sanction in its delegation of rate-making power.[122]

The public utility commissions of other states, e. g., Hawaii[123] and New York,[124] while lacking statutory author-

---

phone Co., Docket No. 1745, at page 5 of letter:

"We anticipate no change in our relationships with suppliers after the merger."

See also, in the same files, testimony of Leslie Warner, GTE president, transcript of April 20, 1967 hearing, at page 25:

"* * * GTE will not impose any mandatory purchasing policies on Hawaiian or upset in any way its local sources of supply or its relationships with other vendors of its own selection."

119. ITT representative Bush made an informal appearance. GTE Stips. of Fact, Item 76.

120. This court is not aware of any provision empowering a public utility commission to so act. H.R.S. § 269–19 only empowers denial of proposed *horizontal* mergers.

121. See General Telephone Co. of Upstate New York v. Lundy, 17 N.Y.2d 373, 271 N.Y.S.2d 216, 218 N.E.2d 274, 277 (1966). See Rev.Code. Wash. § 80.16.020; Ore.Rev.Stats. § 757.170.

122. Pacific Telephone & Telegraph Co. v. Public Utilities Comm'n, 62 Cal.2d 634, 401 P.2d 353, 368, 44 Cal.Rptr. 1 (1965).

123. H.R.S. § 269–7, 16 (1968).

124. See General Telephone Co. of Upstate New York, *supra*, n. 121, at 277, 271 N.Y.S.2d 216.

ity to actually void affiliate contracts have power to examine into the financial transactions and business relations, as well as fix rates, etc., of the public utilities.[125] The New York Court of Appeals held in General Telephone Co. of Upstate New York v. Lundy [126] that

"the commission does not require the authority to invalidate contracts. All that is required—and, indeed, all that is given—is the authority to disregard unwarranted payments to affiliates when calculating the 'just and reasonable' rates which the telephone company will be permitted to charge to its subscribers."

As the court observed above (pp. 70–71), the record of the issues considered by the Hawaii PUC in its merger investigation was atypical of the approach of the several commissions throughout the U. S., which in their rate hearings involving General's telephone affiliates probed into transactions by those affiliates with AE and GT Directory. Between 1959 and 1968, the commissions of Florida, Illinois, Missouri, Wisconsin, New York, Pennsylvania, North Carolina, Washington, California, in fact the commissions of practically every state in which a General Telephone company operates, inquired into the sales by AE to GTE's telephone affiliates.[127] Similar to the Hawaii PUC's inquiry, not one, however, did more than inquire into the relationship between prices paid AE for equipment and the telephone rates

which should be allowed. Not one delved into possible antitrust restraint upon commerce from the vertical structure of GTE. Each state's concern was solely with rates, at that time, and solely within that state. Rates are the meat, bread and potatoes of state commission fare. Antitrust restraints are not.

 Antitrust immunity does not automatically follow, however, when the putative state action consists of regulatory rulings by a state agency and the regulated corporation's compliance therewith. This court also rejects the "facile conclusion that action by any public official [or regulatory agency] automatically confers [antitrust] exemption." [128] Unless it is inherent in the statutory scheme or program that antitrust restraints flowing from an "approved" merger were both anticipated and intended by the state to result therefrom and, nevertheless, were intended to be protected from antitrust attack as a necessary concomitant of the implementation of the state's scheme or program, and the state's regulatory policy is consistent with federal national policy, then "approval" of such a merger, horizontal or vertical or both, by a state regulatory agency does not cloak such merger with *Parker* immunity.[128-1] In the telephone industry there might possibly be some acquisitions which might be held to implement some necessary intrastate regulatory objective and which, after in-depth investigation and evaluation of

125. For other decisions adjusting rate base and expenses downward because of interaffiliate dealings, see In re General Telephone Co. of the Southeast, 76 P.U.R.3d 452, 457 (North Carolina Utility Comm'n 1968) ; Pennsylvania P.U.C. v. York Tel. & Tel. Co., 53 P.U.R.3d 146, 163 (Pa.P.U.C.1963) ; In re General Telephone Co. of Wisconsin, 34 P.U.R.3d 497, 512–15 (Wisc.P.S.C.1962) ; In re General Telephone Co. of Upstate N.Y., 41 P.U.R.3d 1, 18–19 (N.Y.P.S.C.1961). For decisions finding interaffiliate dealings reasonable, see In re General Telephone Co. of Missouri, 43 P.U.R.3d 366 (Mo.P.S.C.1962) ; Washington Pub. Serv. Comm'n v. General Telephone Co. of the Northwest, 30 P.U.R.3d 145

(Wash.P.S.C.1959) ; In re General Telephone Co. of Illinois, 29 P.U.R.3d 369 (Ill.Commerce Comm'n 1959) ; In re General Telephone Co. of California, 25 P.U.R.3d 129 (Calif.P.U.C.1958).

126. General Telephone Co. of Upstate N.Y., *supra*, n. 121, 17 N.Y.2d at 380, 218 N.E.2d at 278, 271 N.Y.S.2d at 222.

127. PX 394, pp. 95–102; PX 1, pp. 132–35; n. 125, *supra*.

128. George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc., 424 F.2d 25, 30 (1 Cir. 1970).

128–1. *Cf.* Woods Exploration & Producing Co. v. Alcoa, 438 F.2d 1286 (5 Cir. 1971).

resultant trade restraint by a commission, might upon "approval" fall within the distinctive walls of *Parker*. On the record here, however, there is nothing to indicate that even the horizontal aspects of GTE's questioned mergers were so studied and evaluated by any commission. · Neither the interstate nor intrastate restraint of trade aspects of the vertical side of the GTE mergers were ever so evaluated or "approved." [129]

As a policy matter a state may conclude that it is an economic necessity that certain public services be supplied to its residents through a privately owned monopoly.[130] However, there is nothing in the record or the statutes of the several states here considered to indicate that any of the several states intended that their regulations were expected to bring about any restraint of trade other than through a state-given monopoly of local or state *telephone service*. Nor is there any indication that Congress has ever intended to give them any other immunity power.[131] As the court said in Hecht v. Pro-Football, 444 F.2d 931, 935 (D.C.Cir. 1971):

> "[W]e suggest that it may be inaccurate and confusing to speak of 'valid governmental action which is immune from application of the antitrust laws.' Rather, the proper inquiry would seem to be to what extent Congress has knowingly adopted a policy contrary to or inconsistent with the previously established antitrust laws, or, where state action is concerned * * *, the inquiry should be to what extent is the state action permissible as not contravening the federal antitrust laws,

which in our federal system constitute overriding legislation under the federal commerce power."

GTE's acquisitions are not protected by *Parker*.

*Forms of Injunctive Relief Available*

This court has, long heretofore,[132] brushed aside GTE's claim that ITT could not properly bring this present action for injunctive relief under Clayton § 16. The relief requested by ITT, however, is more than routine injunctive restraint. It seeks (1) divestiture of GTE equipment manufacturing companies; (2) divestiture of its operating telephone companies acquired since 1950; (3) mandatory injunction requiring General to purchase equipment from suppliers other than AE (Lenkurt); (4) restriction on expansion of production facilities of AE (Lenkurt); (5) mandatory injunction requiring General to employ nondiscriminatory purchasing practices; (6) injunction against future acquisitions by GTE; (7) mandatory injunction to compel GTE to license AE's (Lenkurt's) patents and know-how, royalty free, for products heretofore purchased in quantity or standardized on by GTE telephone companies; and (8) attorneys' fees.·

*Divestiture and Mandatory Injunctions*

GTE's primary position is that the "Injunctive Relief for Private Parties" authorized by Clayton § 16 does not permit this court to order divestiture of any of its subsidiaries, either directly or indirectly. GTE posits that divestiture has never been granted in a "private"

---

129. *Cf.* the application of *Parker* to rates and practices fixed and approved by a state regulatory authority in Washington Gas Light Co. v. Virginia Electric & Power Co., *supra*, n. 113, and Gas Light Co. of Columbus v. Georgia Power Co., 440 F.2d 1135 (5 Cir. 1971). This court feels these were an unwarranted hyperextension of *Parker*.

130. As D. F. Turner observed, anent *local* telephone monopolies, direct compe-

tition in such a situation would be "a costly and idle gesture." Turner, The Scope of Antitrust and Other Economic Regulatory Policies, 82 Harv.L.Rev. 1207–08 (1969).

131. Hush-A-Phone Corp. v. U. S., 99 U.S. App.D.C. 190, 238 F.2d 266 (1956); *Carterfone, supra*, n. 57; United States v. R. C. A., *supra*, n. 31.

132. See n. 4, *supra*.

antitrust action under § 16 [133] nor have mandatory injunctions ever been issued in private suits under Clayton § 7, and insists that this court likewise can not so act, nor should it.

*Precedent*

Admittedly, several courts by way of bare holding,[134] dictum,[135] or pronunciamento [136] have indicated that divestiture is not available to a private party suing under § 16. In so doing, most have but asseverated [137] that first, only the government may sue for divestiture; [138] second, an injunction restricts only future acts, consummated transactions are therefore beyond the scope of § 16.[139] Other courts purport to rest such rationale on some precedent.[140]

Neither of the above conclusions stand up under scrutiny. As heretofore decided by this court, the first results from a distorted reading of Clayton § 15 with misplaced reliance on dicta in earlier federal cases. The second is resolved hereafter.

Section 15 of the Clayton Act in pertinent part provides:

"The several district courts of the United States are invested with jurisdiction to prevent and restrain viola-

tions of this Act, and it shall be the duty of the several United States attorneys * * * to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited." 38 Stat. 736 (1914), as amended, 15 U.S.C. § 25 (1970).

Section 16 in pertinent part reads:

"Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings * * *." 38 Stat. 737 (1914), as amended, 15 U.S.C. § 26 (1970).

There is no reference to divestiture in § 15, only of prevention, restraint, prohibition and injunction, yet legislative

---

133. Divestiture was ordered in Alden-Rochelle, Inc. v. Am. Soc'y of Composers, Authors and Publishers, 80 F.Supp. 888, 900 n. 2 (S.D.N.Y.1948) with other injunctive provisions.

134. Venner v. Pennsylvania Steel Co., 250 F. 292, 296 (D.N.J.1918).

135. *E. g.*, Am. Commercial Barge Line Co. v. Eastern Gas & Fuel Associates, 204 F.Supp. 451 (S.D.Ohio 1962).

136. *E. g.*, Graves v. Cambria Steel Co., 298 F. 761, 762 (S.D.N.Y.1924) (Learned Hand):
"* * * from no angle can section 16 of the Clayton Act be considered to apply * * * there can be no question that the words ['injunction,' 'equitable relief'] were used in the conventional sense which tradition would impute to them.
* * *
I cannot suppose that any one would argue that a private suit for dissolu-

tion would lie under section 16 of the Clayton Act." (This was before Zenith Corp. v. Hazeltine, 395 U.S. 100, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). See p. 83, *infra*.

137. At least one case neither cites authority for nor offers a justification of barring private divestiture suits under § 16. *Commercial Barge Line Co., supra*, n. 135, at 453.

138. Westor Theatres, Inc. v. Warner Bros. Pictures, Inc., 41 F.Supp. 757 (D.N.J. 1941).

139. *Id.*, n. 134, *supra*.

140. Fein v. Security Banknote Co., 157 F.Supp. 146, 148 (S.D.N.Y.1957); Fanchon & Marco, Inc. v. Paramount Pictures, Inc., 107 F.Supp. 532, 542 (S.D. N.Y.1952), rev'd on other grounds, 202 F.2d 731 (2 Cir. 1953); *Westor Theatres, supra*, n. 138, at 763 n. 7.

history and court treatment [141] of the section subsequent to its enactment confirm without question the government's right to secure divestiture thereunder. Although the phrase "or otherwise prohibited" in § 15 might possibly be said to distinguish it from § 16 in terms of available relief, more significantly both sections are directed toward the substantially identical objectives of "prevention and restraint" (§ 15) and "threatened loss or damage" (§ 16), the identical route of injunctive relief. Still, § 15 is now routinely employed by the government to undo consummated transactions by means of divestiture.[142] Section 15 is an almost exact copy of Sherman § 4,[143] and the government has also utilized § 4 to secure dissolution of already completed transactions.[144]

The notion that it is the exclusive right of the government to secure divestiture is traceable to a remark in Continental Securities Co. v. Michigan Central Railroad Co., 16 F.2d 378 (6 Cir. 1926), cert. denied 274 U.S. 741, 47 S.Ct. 587, 71 L.Ed. 1320 (1927). In 1898 the New York Central & Hudson River Railroad bought control of Lake Shore & Michigan Southern Railroad and Michigan Central Railroad. In 1914 the New York and Lake Shore railroads consolidated as the New York Central Railroad which in turn owned 90% of the stock of the Michigan Central Railroad. The Securities company, which had purchased 100 shares of Michigan Central stock in 1903, brought suit in 1915, alleging that the 1914 consolidation resulted in common management of two competing and parallel lines with resulting restriction on free competition, and asked for dissolution under the Sherman and Clayton Acts.

The court affirmed dismissal of the complaint, holding that the 1914 consolidation was merely a formal change in a situation which had long been in existence at the time plaintiff bought its stock. Plaintiff thus had voluntarily assumed any deleterious effects such a combination might produce. Moreover, plaintiff was held to lack standing to sue for injuries to a corporation affecting him only in his capacity as shareholder.

Although these two grounds adequately disposed of the case, the court nevertheless added:

"The main remedy sought is dissolution of the combination. Section 16 never has been held to reach such a case. The result sought is practically the same as would be asked for in a

141. The House Committee on the Judiciary officially reported Clayton § 15 to be a reenactment of Sherman § 4. H.R. Rep.No.627, 63d Cong., 2d Sess. 21 (1914). Section 4, although referring in terms to prevention and restraint initially had been interpreted to permit dissolution at the suit of the U. S. by means of appropriately worded injunction. See, e. g., United States v. American Tobacco Co., 221 U.S. 106, 188, 31 S.Ct. 632, 55 L.Ed. 663 (1911). Later dissolution was permitted directly. United States v. Corn Prods. Ref. Co., 234 F. 964 (S.D.N.Y.1916), appeal dismissed, 249 U.S. 621, 39 S.Ct. 291, 63 L.Ed. 805 (1919). Although litigated decisions are scant, the U. S. has employed § 15 directly to secure divestiture. See United States v. Reed Roller Bit Co., 274 F.Supp. 573 (W.D.Okla.1967) (partial divestiture).

142. Id., United States v. Reed Roller Bit Co. Cf. Maryland & Virginia Milk Producers Ass'n., Inc. v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960). The government sued under both §§ 4 and 15; it is not clear which section was relied upon by the court.

143. "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations of sections 1–7 of this title; and it shall be the duty of the several United States attorneys * * * to institute proceedings in equity to prevent and restrain such violations. Such proceedings may be by way of petition setting forth the case and praying that such violation shall be enjoined or otherwise prohibited." 26 Stat. 209 (1890) 15 U.S.C. § 4 (as amended).

144. E. g., United States v. Corn Prods. Ref. Co., supra, n. 141.

suit by the Attorney General." 16 F. 2d at 379.

The court did not explain why the government is entitled to secure divestiture nor does it make clear why the government's putative "right" to divestiture should negate an individual's right to secure the same. The court in no way supported or rationalized its gratuitous conclusion.

Several courts have followed the *Continental Securities* dictum, either citing the case directly [145] or otherwise indicating agreement with its sentiment.[146] However, since these cases were each adequately disposed of on alternative grounds than the weak authority of *Continental Securities,* their precedential weight is no greater than that of their source.

Although no court has allowed the remedy of divestiture in a § 16 suit, several courts have indicated that such a remedy is available. Much of this sentiment has been expressed also by way of dictum.[147] Some courts have refused to dismiss complaints seeking divestiture under § 16, declaring the issue not ripe for resolution "at this point." [148] Other courts have indirectly indicated an acceptance of such a private remedy by finding that divestiture is proper in the particular case before such court, without reaching the question of power to award it.[149]

145. See, e. g., *Westor Theatres, supra,* n. 138.

146. *Franchon & Marco, Inc., supra,* n. 140.

147. See, e. g., this court's own pronouncement in Bailey's Bakery, Ltd. v. Continental Baking Co., 235 F.Supp. 705, 717 (D.Haw.1964), aff'd 401 F.2d 182 (9 Cir. 1968), cert. denied, 393 U.S. 1086, 89 S.Ct. 874, 21 L.Ed.2d 779 (1969).

148. Burkhead v. Phillips Petroleum Co., 308 F.Supp. 120, 127 (N.D.Calif.1970) ; see also Julius M. Ames Co. v. Bostitch, Inc., 240 F.Supp. 521 (S.D.N.Y.1965).

149. In Georgia v. Pennsylvania R. Co., *supra,* n. 67, the Court held that the state of Georgia was a "person" entitled to sue for injunctive relief under § 16 of the Clayton Act and stated:

"Indeed, so long as the [alleged rate-fixing] collaboration which exists exceeds lawful limits and continues in operation, the only effective remedy lies in dissolving the combination or in confining it within legitimate boundaries. * * * Dissolution of illegal combinations or a restriction of their conduct to lawful channels is a conventional form of relief accorded in antitrust suits." 324 U.S. at 461–62, 65 S.Ct. at 728.

In McKeon Construction v. McClatchy Newspapers, 1970 Trade Cas. ¶ 73, 212 (N.D.Calif.1969), the court indicated begrudging acceptance of private divestiture suits under Clayton § 16:

"Injunctions under Section 16 of the Clayton Act are available to prevent only 'threatened loss or damage.' Within such a standard, the appropriateness of divestiture appears to fit only a limited number of cases where no other equitable relief is available. On the other hand, where a plaintiff alleges a monopoly which restrains trade or commerce, inflicting injury on the plaintiff, divestiture may be the only adequate and complete remedy available. I do not believe the court should attempt to determine this question on the motion to dismiss." ¶ 73, 212 at p. 88, 817.

In American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387, 400 (S.D.N.Y.1957), aff'd 259 F.2d 524 (2 Cir. 1958), the court declared:

"So much of the complaint as seeks a decree directing the defendant to divest itself of stock of the plaintiff company which it may now own is not granted in view of the fact that issuance of the injunction as hereinabove directed constitutes an appropriate remedy so that divesture is not necessary." (Footnote omitted.)

See also Crane Co. v. Briggs Mfg. Co., 280 F.2d 747 (6 Cir. 1960) ; *cf.* Muskegon Piston Ring Co. v. Gulf & Western Industries, Inc., 328 F.2d 830 (6 Cir. 1964) ; Switzer Bros., Inc. v. Locklin, 297 F.2d 39 (7 Cir. 1961), cert. denied, 369 U.S. 851, 82 S.Ct. 934, 8 L.Ed.2d 9 (1962). For a summary of prior and subsequent treatment of *Switzer* on grounds other than those discussed above, see 429 F.2d 873 (7 Cir. 1970).

*Ruling*

 In the absence of solid precedent or clear legislative history,[150] this court's own research into the availability of divestiture[151] and mandatory injunction to a private plaintiff suing under § 16 has impelled this court to conclude that both such equitable remedies are available to private plaintiffs under § 16.

Such a conclusion might well be sustained simply because equity would demand that, since divestiture has been approved as an appropriate equitable post hoc remedy for enforcement of the prevention and restraint language of § 15 and § 4, the same underlying equitable power and authority of the court should not be miserly withheld when by its use the court can make sure that the "threatened conduct" proscribed in § 16 can never cause "loss or damage" in the future.

Without, however, initially vesting in the equity concept underlying § 16 the broad interpretation given that same equity concept under § 15 and § 4, even the most conservative definition or interpretation of § 16's words, viz. "threatened loss or damage" and "threatened conduct", must admit them to embrace the same prospective relief available under the equitable remedy of divestiture as well as mandatory injunction. If it

were necessary to strain terminology in order to accomplish the same result, a court could easily phrase a "negative injunction" in such terms as to enjoin the activities of a corporation to such a degree that divestiture would be the only economical choice available to that corporation.

This is precisely what was done under Sherman's § 4 in Standard Oil Co. v. U. S., 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911), upholding the decree of the district court. That decree, phrased in the traditional terms of negative injunction, restrained Standard Oil from voting the stock of, or exercising any control or influence over, its subsidiaries. The subsidiaries were enjoined from declaring or paying dividends to Standard Oil and from permitting Standard Oil to vote or otherwise influence their affairs. The decree, not surprisingly, did permit Standard Oil to distribute its subsidiaries' stock. Obviously, divestiture thus occurred by the "negative injunction" route, and the Court said that the decree of the district court "commanded the dissolution of the combination, and therefore in effect, directed the transfer [of stock] by [Standard Oil] back to the stockholders of the various subsidiary corporations." 221 U.S. at 78, 31 S.Ct. at 523.

150. While this decision was being written, Judge Real of the Central District of California, in Calnetics v. Volkswagen of America Inc., etc., No. 70–2185–R, on June 30, 1972, independently reached the same conclusion as has this court, viz., equitable relief by way of divestiture is available to a private litigant under Clayton § 7.

See also, Peacock, Private Divestiture Suits Under Section 16 of the Clayton Act, 48 Texas L.Rev. 54, 68 (1969) ; Note, Availability of Divestiture in Private Litigation as a Remedy for Violation of Section 7 of the Clayton Act, 49 Minn.L.Rev. 267, 276 n. 55 (1964).

GTE has presented two colloquies in House Judiciary Committee Hearings which seem to indicate that at least one member of the Committee, as well as one witness before that Committee—Louis D. Brandeis—were opposed to private suits

for dissolution of a corporation. See 1914 Hearings on Trust Legislation before the House Committee of the Judiciary at 649–50, 842. Even if dissolution of a corporation is the equivalent of divestiture of the parts of a holding company—see next footnote—this court, acutely aware of the legislative process and the many obstacles a bill must overcome and changes it must undergo before emerging as a law, is usually dubious of the worth of any legislative material other than committee reports accompanying bills. See Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 395–96, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) (concurring opinion).

151. Although there are formal differences between divestiture, dissolution and divorcement, 49 Minn.L.Rev. 267, 270 n. 21 (1964), for purposes of this decision, they are treated as one.

**1208**

In American Crystal Sugar Co. v. Cuban-American Sugar Co., 152 F.Supp. 387 (S.D.N.Y.1957), aff'd. 259 F.2d 524 (2 Cir. 1958), the court found that Cuban-American had violated Clayton § 7 by acquiring 23% of competitor Crystal stock. The court enjoined Cuban-American from directly or indirectly voting any shares of stock it owned or controlled, and from acquiring a seat on Crystal's board. Future acquisition of stock was also barred. The court concluded: "So much of the complaint as seeks a decree [of divestiture of stock] is not granted in view of the fact that issuance of the injunction * * * constitutes an appropriate remedy so that divesture is not necessary." 152 F.Supp. at 400.

 Unquestionably this court, likewise, could devise an appropriately strangulative injunctional decree. When § 16 was enacted, Congress could not have intended that courts of equity should be forced to engage in such verbal calisthenics in order to carry out the underlying intent of Congress. Certainly, that which can be accomplished by indirection can be accomplished directly, when necessary.

In similar context to the above, the term "enjoined" has been interpreted to embrace mandatory as well as negative injunctions. Section 1(18) of the Interstate Commerce Act provides that the ICC must, after hearing, issue a certificate of public convenience before a railroad line is extended or abandoned. Section 1(20) reads:

"Any construction * * * or abandonment contrary to the provisions * * * of this section may be enjoined by any court * * * at the suit of * * * any party in interest."

These words were construed in Gross v. Missouri & A. Ry. Co., 74 F.Supp. 242 W.D.Ark.1947), to include mandatory injunction.

 Moreover, it is well settled that a court has inherent power to issue a mandatory injunction where appropriate.[152] The court's power to issue a mandatory injunction under § 16 does not simply flow from its inherent equitable power, however, for under § 16 the power is patently statutory. In implementing the statutory grant, however, the court of course must consider the broadness of its inherent equitable powers.[153]

In private actions under § 16 for refusals to deal, many courts by enjoining the violator from refusing to deal with the injured have but used negative phraseology to mandate actions on the part of the violator.[154] In a tie-in situation under Clayton § 3, the court in Teleflex Industrial Products, Inc. v. Brunswick Corp., 293 F.Supp. 196 (E.D.Pa. 1968)[155] ordered Brunswick to accept the return of the unused portion of the "package", to supply "critical" instruments to the plaintiff, etc.

As indicated above by the interpretation given thereto by the courts when other sections of the Act have been involved, this court sees no reason why the concept of mandatory injunctions cannot extend to actions under § 7.

 Obviously a mandatory injunction is but another approach to a straight divestiture order. Instead of the roundabout course of negatively enjoining stock voting or participating in profits or mandating disposition of as-

152. In re Lennon, 166 U.S. 548, 17 S.Ct. 658, 41 L.Ed. 1110 (1897).

153. Cf. Porter v. Warner Holding Co., 328 U.S. 395, 398–399, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946).

154. Kay Instrument Sales Co. v. Haldex Aktiebolag, 296 F.Supp. 578 (S.D.N.Y. 1968) ; Interphoto Corporation v. Minolta Corporation, 295 F.Supp. 711 (S.D. N.Y.1969) ; Airfix Corp. of America v. Aurora Plastics Corp., 222 F.Supp. 703 (E.D.Pa.1963) ; Greenspun v. McCarran, 105 F.Supp. 662, 664 (D.Nev.1952) ; Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725, 726 (3 Cir. 1962).

155. Vacated on other grounds, 410 F.2d 380 (3 Cir. 1969).

sets, this court squarely holds that, where the overall competitive interests of industry as well as the interests of the general public can best be served thereby, divestiture may be ordered under the authority of § 16.

Such holding does but follow the directions of the Court in J. I. Case Co. v. Borak, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964): "[I]t is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose. * * * * '[W]here legal rights have been invaded, and a federal statute provides for a general right to sue for such invasion, federal courts may use any available remedy to make good the wrong done.' Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 777, 90 L.Ed. 939 (1946)." "There is inherent in the Courts of Equity a jurisdiction to * * * give effect to the policy of the legislature." Clark v. Smith, 38 U.S. 195, 13 Pet. 195, 203, 10 L.Ed. 123 (1839).[156]

This court agrees with Judge McLean that "divestiture is a form of injunctive relief." Julius M. Ames Co. v. Bostitch, 240 F.Supp. 521, 526 (S.D.N.Y.1965).

 There is no question that actions seeking divestiture, whether by public or private attorneys general, are dangerous to the defending corporations, and GTE argues that only the government should be entitled to request such relief because of its more objective, less selfish posture. This position clearly runs counter to the Court's admonition in *Perma Life Mufflers*, that "the purposes of the antitrust laws are best served by insuring that the private action will be an everpresent threat to deter anyone contemplating business behavior in violation of the antitrust laws." 392 U.S. at 139, 88 S.Ct. at 1984. (See note 75, *supra*.) GTE's "only the government" argument actually confuses the availability of the remedy of divestiture

with its exercise. Certainly divestiture will not be awarded simply upon request. It, like any other equitable remedy, may or may not be appropriate depending upon the circumstances. There are ample remedies other than divestiture for insuring conformance with the antitrust laws even when merit is found in substantive complaints thereunder. So long as judges sit in courts of law, neither the pygmies nor the giants of industry need fear casual dismemberment at the entreaty of even a selfishly-motivated, litigation-minded private attorney general.

If the specter of rapacious private attorneys general had any substance, the Court certainly would not have said, as it did in Zenith Radio Corp. v. Hazeltine, 395 U.S. 100, 130–131, 89 S.Ct. 1562, 1580, 23 L.Ed.2d 129 (1969), "the purpose of giving private parties treble-damage and injunctive remedies was not merely to provide private relief, but was to serve as well the high purpose of enforcing the antitrust laws. * * * * Section 16 should be construed and applied with this purpose in mind, and with the knowledge that the remedy it affords, like other equitable remedies, is flexible and capable of nice 'adjustment and reconciliation between the public interest and private needs as well as between competing private claims.' Hecht Co. v. Bowles, 325 U.S. 321, 329–30 [64 S.Ct. 287, 592, 88 L.Ed. 754] (1944)."

As the Court also noted in United States v. E. I. du Pont & Co., 366 U.S. 316, 328–30, 81 S.Ct. 1243, 1251–52, 6 L.Ed.2d 318 (1961):

"It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7. (Footnote omitted.) * * * * The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for Sherman Act vio-

---

156. To the same effect, see Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 88 L.Ed. 754 (1944); Mitchell v. De-

Mario Jewelry, 361 U.S. 288, 293, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

lations whose heart is intercorporate combination and control, (footnote omitted) and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved."

*Divestiture*

■■■ Unquestionably, the injunctive relief sought by ITT, viz., divestiture of both the named operating companies and AE (Lenkurt) is drastic in nature. However, as the Court pointed out in *du Pont*, while it is most drastic, it is the most effective of antitrust remedies. As such, it is "the most important of antitrust remedies. · It is simple, relatively easy to administer, and sure. It should always be in the forefront of a court's mind when a violation of § 7 has been found." 366 U.S. at 331, 81 S.Ct. at 1252–53. The Court also in *du Pont* reaffirmed that the guidelines set by United States v. American Tobacco Co., 221 U.S. 106, 185, 31 S.Ct. 632, 55 L.Ed. 663 (1911) were still to be followed in its determination of the most effective and applicable form of relief, when antitrust violation is found:

"'[T]hree dominant influences must guide our action: 1, The duty of giving complete and efficacious effect to the prohibitions of the statute; 2, the accomplishing of this result with as little injury as possible to the interest of the general public; and, 3, a proper regard for the vast interests of private property which may have become vested in many persons as a result of the acquisition.'" 366 U.S. at 327–28, 81 S.Ct. at 1251.[157]

The Court in Ford Motor Co. v. U. S., No. 70–113 (1972), 405 U.S. 562, 92 S. Ct. 1142, 31 L.Ed.2d 492 (1972), reemphasized that "divestiture is a start toward restoring the pre-acquisition situation." And at footnote 8:

"The suggestion that antitrust 'violators may not be required to do more than return the market to the *status quo ante*,' * * * is not a correct statement of the law. In *United States v. Paramount Pictures, Inc.,* 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260, we sustained broad injunctions regulating motion picture licenses and clearances which were not related to the *status quo ante. Reynolds Metals Co. v. Federal Trade Commission,* 309 F.2d 223 (CADC 1962), concerned the enforcement powers of the Federal Trade Commission, not the equitable powers of the District Court.

"Section 4 of the Sherman Act, 15 U.S.C. § 4 and § 15 of the Clayton Act, 15 U.S.C. § 25, empower 'the Attorney General, to institute proceedings in equity to prevent and restrain . . . violations' of the antitrust laws. The relief which can be afforded under these statutes is not limited to the restoration of the *status quo ante.* There is no power to turn back the clock."

As above noted, GTE's acquisition of AE and Lenkurt, the leading non-Bell manufacturers, was immediately followed by an aggressive policy of horizontal acquisitions with a concomitant control of 46% of the non-Bell market. Therewith also came a most restrictive in-house buying policy that routinely gave approximately 80% of GTE's telephone business to its affiliate manufacturers.[158] The result has been to foreclose to the other independent manufacturers a most substantial segment of the relevant market, a market which, before each of the condemned acquisitions, was that much more open to competitive selling.

---

157. As this court has heretofore ruled, when a private litigant is engaged in enforcement of the same antitrust laws, under basically the same statutory authority as given the government, and is acting as a private attorney general, the court must make available to the private litigant the same equitable remedies as are given the government under a parallel statute.

158. In 1966 AE supplied 85% of General's equipment, PX 1, p. 41.

"The relief ordered should 'cure the ill effects of the illegal conduct, and assure the public freedom from its continuance,' United States v. United States Gypsum Co., 340 U.S. 76, 88, 71 S.Ct. 160, 169, 95 L.Ed. 89, and it necessarily must 'fit the exigencies of the particular case.' International Salt Co. v. United States, 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20. Moreover, 'it is well settled that once the Government has successfully borne the considerable burden of establishing a violation of law, all doubts as to the remedy are to be resolved in its favor.' United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 334, 81 S.Ct. 1243, 1254, 6 L.Ed.2d 318." Ford Motor Co., *supra*, 405 U. S. at 575, 92 S.Ct. at 1150–51.

▆ As this court heretofore inferentially pointed out in this case, divestiture is always for salient consideration when a violation of § 7 has been found, but not of course to the exclusion of other equitable remedies.[159] Upon the facts and the law applicable here, the primary remedy which will give "complete and efficacious effect to the prohibitions of" § 7 and accomplish "this result with as little injury as possible to the interests of the general public," while at the same time giving due consideration to vested private interests of the many stockholders of GTE is divestiture of such of GTE's acquisitions as this court finds necessary to restore competition in the relevant market; always bearing in mind that this court will mold its decrees to fit the exigencies of this particular case![160]

Divestiture, however, is but one of equity's tools. Others will here find use, also. The complexity of the problems inherently flowing from ITT's several requests for relief mandates that a hearing be held for determination of the most equitable means by which relief from the effects of GTE's violations may be insured.

A conference will be held in the near future to schedule briefs and a hearing on the form of the final decree.

\* \* \* \* \* \*

*ITT's Claim Under The Hawaii Antitrust Act*

In addition to ITT's action under Clayton § 7, it also maintains that GTE's acquisition of Hawaiian violated the Hawaii Antitrust Act, viz., § 480–7(a), H. R.S. (1968).[161] GTE immediately responded that there is no statutory basis for this court's jurisdiction, nor does ITT's claim fall within the doctrine of pendent jurisdiction. Alternately, GTE urges that, even if this court has the power to exercise pendent jurisdiction over the state claim, it should not do so.

▆ GTE relies on Hurn v. Ousler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933) as authority for its position. *Hurn*, however, was discarded in United Mine Workers v. Gibbs, 383 U.S. 715, 86

---

159. *Cf.* Mills v. Electric Auto-Lite, 396 U.S. 375, 386–89, 90 S.Ct. 616, 24 L.Ed. 2d 593 (1970).

160. See American Tobacco Co., *supra*, n. 141.

161. "§ 480–7 Mergers, acquisitions, holdings, and divestitures. (a) No corporation shall acquire and hold, directly or indirectly, from and after August 21, 1961, the whole or any part of the stock or other share capital of any other corporation, or the whole or any part of the assets of any other corporation where the effect of such acquisition and holding may be substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the State; provided that this subsection shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything in this subsection prevent a corporation from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of the subsidiary corporation, when the effect of the formation is not substantially to lessen competition."

S.Ct. 1130, 16 L.Ed.2d 218 (1966). *Gibbs* held that, as a matter of constitutional power, pendent jurisdiction exists whenever the state and federal claims "derive from a common nucleus of operative fact" and are such that the plaintiff would ordinarily be expected to try them all in one judicial proceeding. 383 U.S. at 725, 86 S.Ct. 1130. Here, similar to *Gibbs*, ITT has stated a claim under both federal and state laws. Both federal and state claims arise out of essentially the same factual context, viz., GTE's vertical and horizontal acquisitions, and the evidence in each is relevant to both, and has been so used herein. The relief requested is substantially the same under both § 7 and § 480–7 (a). There is, therefore, no reason why this court should decline to exercise its jurisdiction.[162]

If more were needed, the state statute under which ITT is suing is virtually identical with its federal model, Clayton § 7, and the legislative history of § 480–7(a), H.R.S., specifies that the section is to be interpreted in the light of federal case law.[163] This court, therefore, assumes jurisdiction over ITT's claim under the Hawaii Act.

Until August 21, 1961, local industrial competition in Hawaii was protected under the federal antitrust statutes. On that day, however, exactly two years after Hawaii became a state, it lost the federal antitrust protection for intrastate business practices. At the 1961 legislature, therefore, Hawaii passed Chapter 480, H.R.S.: Monopolies; Restraint of Trade—and deliberately copied, almost in toto, the Federal Antitrust Act. This was intentionally done so that Hawaii would instantly have available federal cases interpreting the same.[164]

*Jurisdiction Provisions*

Like § 7, § 480–7(a) applies exclusively to corporations[165] and here both GTE and Hawaiian qualify under the statute.

*Findings of Fact*

All facts heretofore set forth which are relevant to the state complaint are adopted by reference as part of the evidence therein. It is undisputed that on May 7, 1967, GTE "acquired" and "held" all of the stock and assets of Hawaiian.

*Product Market*

█ As indicated below, GTE, through AE, was a major supplier of telephone operating equipment to Hawaiian and, after acquisition, has continued to supply substantial amounts of equipment to its now subsidiary telephone operating company. This acquisition obviously concerned itself with the same product market as heretofore determined by this court under ITT's § 7 complaint. Hawaiian is one of the independent telephone operating companies and, as appears *infra*, Hawaii is not an unimportant segment of the independent telephone equipment market. It is manifest that this court's prior determination of the relevant product market must apply with full force to ITT's state

162. See Knuth v. Erie-Crawford Dairy Coop. Association, 395 F.2d 420 (3 Cir. 1968), where plaintiff brought a claim for treble damages under the Sherman Act, as well as a claim under state law alleging wrongful interference with business relations. The court held that the latter claim was properly before the district court under the doctrine of pendent jurisdiction.

163. The legislative history of H.R.S. § 480–7(a) provides:
"In conclusion it is the intent of your Committee on Conference that wherever there are comparable provisions of the federal anti-trust laws and tests similar in language to those provided in this bill, it is intended that those decided federal cases applicable and relating to those provisions and tests will guide the interpretation and application of such terms and provisions of this bill in the light of the economic and business conditions of this State." Journal of the House of Representatives of the First Legislature State of Hawaii General Session of 1961, Conference Committee Reports No. 16, at 1075. See also, pp. 577, 689.

164. See, *id.*, at 577, 686–88, 1075.

165. See 15 U.S.C. § 18. As to the state statute, see n. 163, *supra*.

claim. The relevant product market in Hawaii is telephone communication equipment, as heretofore defined by this court.

When, in December 1966, Hawaiian and GTE reached an agreement in principle to merge, Hawaiian's plant was valued at over $155 million, it had over 300,000 telephones [166] and serviced some 20,000 more. During the pre-merger years of 1962–66, Hawaiian's *total* purchases of equipment and supplies, including wire and cable, varied between approximately $10–$20 million each year, and its purchases of telephone communication equipment were between approximately $4–$10 million per year.

During that same period Hawaiian purchased from AE (Lenkurt) between about 27%–40% per year of its *total* purchases and its purchases from AE (Lenkurt) of telephone equipment (excluding wire and cable) appear to have been between about 60%–70% of that market. In 1969 Hawaiian's *total* purchases were over $39 million, of which some $7 million in telephone equipment was supplied by competing manufacturers and over $19 million by AE (Lenkurt) (including wire and cable).[167] It is notable that at no time before merger had AE ever reached the 80%–86% sales levels, normal with GTE's telephone companies. An inference of the motive behind the acquisition might be drawn, if necessary, from the fact that in the period of April–September 1966, before the merger news broke, Hawaiian's common stock had sold on the New York Exchange between a low of $23½ and a high of $35⅛. During that same period GTE's common sold between $35⅝ and $46.[168] GTE's 1966 earnings were $2.16 per share; Hawaiian's were $1.78. GTE's 1966 cash dividend was $1.20 per share; Hawaiian's was $0.91.[169] Nevertheless, GTE agreed to exchange its common on a share for share basis with Hawaiian!

### Geographic Market

Under ITT's state claim, this court can only concern itself with the effect of GTE's acquisition of Hawaiian upon competition within the State of Hawaii.[170] Hawaiian has a state-granted monopoly in the furnishing of conventional public telephone service throughout the state. It therefore represents the entire market in the State of Hawaii for sale of telephone communication equipment to an operating company.

Before acquisition, GTE, ITT, Graybar, Stromberg-Carlson, Farinon and other independent manufacturers have actively competed in the sale of telephone equipment to Hawaiian.

GTE correctly points out that Hawaiian purchases all of its equipment from mainland suppliers; that, as of now, there are no local (Hawaiian) manufacturers of telephone equipment. This, however, is immaterial because corporations need not be physically present to effectively compete with one another. The area of effective competition does not depend on any such artificial distinctions.[171] All that is necessary is that there are suppliers who effectively compete for sales

166. PX 364.

167. This market data comes from Hawaiian's Report of November 12, 1970, to the Hawaii PUC under its Docket No. 1871. As a public record, supplied by defendant, and judicially noticed, it is marked "Court's Ex. 1." In the computation of AE's percent of Hawaiian's telephone equipment market, the court has omitted purchases by Hawaiian from Amfac, Gaspro and "Other". Hawaiian constitutes the entire relevant market available to competition by suppliers. Certainly, trade in that relevant market was and is substantial.

168. PX 364.

169. *Ibid.*

170. In the context of the national market, Hawaii is not a severable "section of the country."

171. "The geographic market selected must * * * both 'correspond to the commercial realities' [footnote omitted] of the industry and be economically significant." *Brown Shoe, supra,* p. 24, 370 U.S. at 336, 337, 82 S.Ct. at 1530.

in the Hawaiian market, for it is, of course, in that market that the effects of the merger will be most strongly felt.[172]

CONCLUSIONS OF LAW

*Effect of Merger*

■ ■ Under § 480–7(a), just as under § 7, if the acquisition may substantially lessen competition or tend to create a monopoly and the size of the market is not *de minimis*, then a violation occurs.[173] Certainly in Hawaii, with its rapid population growth and industrial expansion, the telephone equipment market cannot be determined *de minimis* on any scale, local or national.[174]

ITT's suit came shortly after the merger and it is not surprising, therefore, that Hawaiian followed substantially the same purchasing patterns which it had used before acquisition. This court has heretofore indicated that it places little reliance upon "instant conversion." The same skepticism is shown by the Supreme Court in F.T.C. v. Procter & Gamble, *supra*, note 104; United States v. Continental Can Company, 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed. 2d 953 (1964); F.T.C. v. Consolidated Foods, *supra*, page 59, holding that post-acquisition conduct showing a lack of anti-competitiveness is of minimal value.

When viewed in the perspective of the national trend toward concentration of telephone companies, along with GTE's acquisition program and its history of market foreclosure upon acquisition of operating companies, the acquisition of Hawaiian posed a major threat to sales competition in the Hawaiian market. It certainly created a "clog on competition" [175] and if unchecked, Hawaii would, with real probability, become a captive market with competitive opportunity completely eliminated.[176] As heretofore indicated, this court is unimpressed by GTE's claims of alleged beneficial effects of the merger.[177] Hawaiian, as President Warner himself recognized, had been able to become "one of the real glamour" telephone companies without the assistance of GTE Service and GT Directory.

Obviously, GTE, by acquiring the sole operating buyer in Hawaii of telephone communication equipment is in a position to foreclose the entire market to competitors. In Hawaii there could be no "entry" in the market by any competing telephone company, and the acquisition would instantly place GTE in a monopolistic position over the relevant and sole Hawaiian market.

■ When a state-protected monopolist which is the sole buyer in the relevant market has been acquired by a supplier which is able to furnish almost all of the buyer's entire demands, the supplier, instantly, thus has achieved a position from which it can thereafter at a

172. See United States v. El Paso Gas Co., *supra*, n. 66. *Brown Shoe, id.*

173. "The Committees believe that this concept 'when the effect may be substantially to lessen competition' has been defined by the United States Supreme Court and the federal courts and therefore is of the opinion that further defining of that concept is not necessary." House Journal 1961, Standing Committee Reports, at 689.

174. "Hawaiian Telephone * * * serves the entire state of Hawaii. It's one of the real glamour situations in the telephone industry. They own 38% of the cables to the mainland; they own 26% of the cable on to the Pacific; they're going to be the independent that's most directly

involved in Satellite Communications at an early day. Comsat has established a ground station on the Island of Oahu. Their toll revenues are greater than their local exchange revenues. It's really a superb situation * * *." Warner, PX 2, p. 8.

175. *Brown Shoe, supra*, 370 U.S. at 323–24, 82 S.Ct. 1502, 8 L.Ed.2d 510.

176. See *e. g.*, Brodley, Oligopoly Power Under The Sherman And Clayton Act —From Economic Theory To Legal Policy, 19 Stan.L.Rev. 285, 315–19 (1967). Cf. Ford Motor Co. v. United States, *supra*, p. 85; Marquette Cement Mfg. Co., Trade Reg.Rep. 18,657 (F.T.C.1969).

177. *Cf.* United States v. Philadelphia Nat'l Bank, *supra*, n. 20.

time of its own choosing substantially lessen competition or create a monopoly of the market. Such vertical merger would appear to approximate as nearly a per se violation of § 480–7(a) as could ever occur.[178]

It is obvious that the tendency to substantially lessen competition and to create a monopoly in Hawaiian's communication equipment is overwhelmingly manifest in any such merger situation, and a violation of § 480–7(a) has occurred.

As heretofore indicated, GTE's acquisition of Hawaiian was but part of a deliberate policy of that company to acquire telephone operating companies throughout the U. S. (and Canada).[179] Moreover, GTE's past behavior and buy-sell policy, as fully developed *supra*, can only lead to the conclusion that, absent action such as taken by ITT, all competitors for Hawaiian's business would be steadily but surely eliminated from Hawaiian's market.[180] On any theory, the acquisition of Hawaiian by GTE was illegal under H.R.S. § 480–7(a).

*PUC Approval of Merger*

The "approval" of the merger by the Hawaii PUC does not save it from antitrust attack. As this court's prior review of Hawaii PUC's hearings details, there was no hard consideration by the commission of possible antitrust effect of the vertical merger; the entire inquiry into Hawaiian's post-merger autonomy with respect to purchasing, was *not at all* posited in an antitrust context. Frederick Bolte, Director of Public Utility Regulation and Chief Public Utility Engineer testified that the "public interest" test was approached in two areas: (1) from the viewpoint of quality of service to the public; and (2) in terms of capital and operating expense, as related to rates to be charged the public. The merger was not immunized in the slightest by the PUC's inquiry and "approval." [181] There is no "plain repugnancy" between Hawaii's Antitrust Act and Hawaii's public utilities regulatory provisions.[182]

*Remedies Available*

GTE has not only raised all its prior arguments that divestiture is unavailable under § 7 to a private plaintiff, but has added another. In substance § 480–7(b) [183] provides that no corporation shall hold a pre-August 21, 1961 corporate acquisition when the effect of such holding is substantially to restrain trade, etc. Where the court finds such a violation, it "shall order divestiture." GTE reasons that the omission of any mention of "divestiture" in

178. *Cf.* Kirihara v. Bendix, 306 F.Supp. 72, 89 (D.Haw.1969).

179. Warner, PX 2. See pp. 59–62 *supra*.

180. *Cf.* United States v. Bethlehem Steel Corp., 168 F.Supp. 576, 603–07 (S.D. N.Y.1958); United States v. Kennecott Copper Corp., 231 F.Supp. 95, 102–05 (S.D.N.Y.1964).

181. *Cf.* Eisen v. Carlisle & Jacquelin, 54 F.R.D. 565, 1972 (S.D.N.Y. April 4, 1972).

182. United States v. Philadelphia Nat'l Bank, *supra*, 374 U.S. at 351, 83 S.Ct. 1715, 10 L.Ed.2d 915.

183. " § 480–7 Mergers, acquisitions, holdings, and divestitures. * * * *

(b) No corporation shall hold * * * the stock * * * of any other corporation * * * acquired prior to August 21, 1961, where the effect of

such holding is substantially to lessen competition or to tend to create a monopoly in any line of commerce in any section of the State. Where the court finds that the holding of such stock * * * is substantially to lessen competition or tends to create a monopoly, and is therefore not in the public interest, then the court shall order the divestiture or other disposition of such stocks * * * of the corporation, and shall prescribe a reasonable time, manner, and degree of the divestiture or other disposition thereof; provided that the court shall not order the divestiture or other disposition of the assets of the corporation unless it is necessary to eliminate the lessening of competition or the tendency to create a monopoly, and the assets are reasonably identifiable and separable, and it can be done without causing undue hardship on the economic entity."

§ 480–7(a) while specifying it in § 480–7(b), squarely negates any intention of the legislature to permit divestiture under § –7(a).

This argument completely passes over the problems facing the Hawaii legislature when Chapter 480 was enacted. Over the years prior to statehood, many corporate mergers had taken place. Some might well result in prospective restraint of trade after August 21, 1961. The legislature wanted to adopt the wording of Clayton § 7 which spoke only of "acquisitions"—in the necessary post hoc sense. Without such a provision as § –7(b), prestatehood mergers would be exempt no matter what their prospective effect might be after August 21, 1961.[184] By § –7(b) the legislature did but make its intentions crystal clear: Whether it acquired and held after August 21, 1961 or acquired before and continued to hold after that date, the corporate violator had an "Appointment at Samarra."[185]

All of this court's preceding analyses of remedies available under § 7 have full application to the construction of § 408–7 of the Hawaii Act. The remedy of divestiture is just as available under § 480–7(a) and § –7(b).

*Relief Granted*

 It is now only by divestiture that competition in the Hawaii market can be insured for the future.[186] The vertical monopolistic status which followed the merger must be terminated. In its horizontal context, if the Hawaiian merger were not inherently involved in GTE's overall acquisition scheme, conceivably there might be some legally justifiable rationale for some such merger. On the state of the record, however, that remote possibility is obliterated by the realities of the market.

Hawaiian was providing excellent services at rates found reasonable when the merger was accomplished. Nothing that has occurred since has changed that status. Divestiture will, therefore, have no deleterious public effect. While some GTE stockholders may be made unhappy, their plight is no more serious than those who held Grinnell when it was restructured via the divestiture route.[187]

A decree, embodying divestiture by GTE of its Hawaiian acquisition, will be entered following the general hearing on the relief to be granted ITT on its Clayton § 7 complaint.

## CANADA

In Count II of its amended complaint ITT alleges unreasonable exclusion of its own as well as all other non-GTE U. S. manufactured telephone equipment from that part of the Canadian telephone market represented by GTE-owned telephone operating companies there, in violation of Sherman § 1, by virtue of the vertical structure of the General System. The substantive portion of Count II reads as follows:

"6. The market for telephone equipment represented by the General System operating companies in Canada and other foreign countries is effectively foreclosed to ITT and other United States manufacturers of equipment as a result of the vertical integration of General System operating companies with General Telephone manufacturing subsidiaries, Automatic Electric (including the Lenkurt Division) and the other domestic and foreign manufacturing subsidiaries of the General System.

---

184. The *proviso* of § –7(b) lucidly indicates the special concern the legislature had for the "grandfather" problems of those corporations involved in the pre-1961 mergers. See House Journal 1961, Conference Committee Reports, at 1069.

185. Lord Dunsany.

186. This determination under the Hawaii Act must not be construed as a holding that this court would not grant like divestiture under ITT's Clayton § 7 complaint.

187. United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

"7. ITT has been and now is foreclosed from selling telephone equipment to the operating companies of the General System in Canada and elsewhere except to the limited extent that particular products are not manufactured by the affiliated system companies. The General Telephone operating companies outside the United States represent a substantial portion of plaintiff's potential sales of telephone equipment which are being and will continue to be foreclosed by General Telephone unless appropriate injunctive relief is granted by this Court. Such foreclosure is an unreasonable restraint of the foreign commerce of the United States in violation of the Sherman Act [§ 1]." [188]

■ ■ Although ITT's complaint is uncommendably imprecise on this point,[189] it would appear that the holding company-subsidiary, horizontal and vertical, relationship between GTE and its American manufacturing companies, Canadian manufacturing companies and Canadian operating companies is alleged to constitute, in gross, the "illegal combination" in restraint of trade condemned by Sherman § 1. The mere *fact* of corporate relationship, of course, does not render illegal the *dealings between* parent and subsidiary. As the Court said in United States v. Columbia Steel Co., 334 U.S. 495, 523, 525, 68 S.Ct. 1107, 1122–23, 92 L.Ed. 1533 (1948):

"A subsidiary will in all probability deal only with its parent for goods the parent can furnish. That fact, however, does not make the acquisition invalid. When *other elements* of Sherman Act violations are present, the fact of corporate relationship is

material and can be considered in the determination of whether restraint or attempt to restrain exists. * * * *

"* * * [V]ertical integration, *as such without more*, cannot be held violative of the Sherman Act." (Emphasis added.) [190]

Examples of such "other elements" are (1) restraint is the primary object of the combination, United States v. Yellow Cab Co., 332 U.S. 218, 227–28, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); (2) the effect of the combination is to unduly restrict the opportunities for competitors to market their product, United States v. Columbia Steel, *supra*; (3) the effect of the combination is otherwise unreasonable. In such cases a quantitative assessment of the degree of market foreclosure is a relevant inquiry in determining reasonableness, United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D.N.Y. 1965).

### Foreign Trade and Reasonableness

■ ■ In contrast to Clayton § 7 which is concerned only with domestic restraints, Sherman § 1 also applies to restraint of U. S. foreign trade and commerce. However, the "foreign trade" element does not alter the requirements of proof for a successful Sherman Act prosecution, it does but add a different dimension. A contract, combination or conspiracy must be shown to exist. The *per se* rule and rule of reason still apply, United States v. Timken Roller Bearing Co., 83 F.Supp. 284 (E.D.Ohio 1949). The challenged arrangement must be shown to be unlawful both in purpose and effect.' United States v. Aluminum Corp. of America, 148 F.2d 416 (2 Cir.

---

188. Sherman § 1 provides:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *." 15 U.S.C. § 1.

189. *Cf.* Baim & Black, Inc. v. Admiral Corp., 132 F.Supp. 412, 413 (S.D.N.Y. 1955); see also Fedderson Motors v.

 Ward, 180 F.2d 519 (10 Cir. 1950); Alexander Milburn Co. v. Union Carbide & Carbon Corp., 15 F.2d 678 (4 Cir. 1926).

190. The fact that GTE is a holding company which controls wholly-owned customers and suppliers does not lessen the applicability of the principles herein set out. See also Bailey's Bakery, *supra*, n. 147, 235 F.Supp. at 719.

1945), in a properly defined product and "geographic" market.

This would appear to be the first reported Sherman Act case involving foreign trade in which a court has been directly confronted with the problem of defining a product market. Cases heretofore decided have dealt with allegedly illegal *practices*—such as territorial arrangements and pricefixing—indulged in by competitors in a similar product.[191] With the product market all but obvious in such cases there is no need to determine anything but the challenged practices.

■ In this case the challenged restraint is a vertical combination allegedly excluding ITT and U. S. manufacturers from the sale of "telephone equipment" to a segment of the Canadian operating telephone company market. Both parties have employed the phrase "telephone equipment" in discussing the Canadian claim. Breaking that broad product market into the various possible submarkets above discussed under Count I would not materially aid the court in its analysis or alter the result.[192] This court does therefore adopt its Count I holding that telephone equipment (excluding wire and cable, as defined in Count I) is also the relevant product market for purposes of Count II.

*Area of Commerce*

■ ■ In contrast to a domestic Sherman Act case, it is not necessary to define a geographic market as such in a foreign trade case. Rather than a "section of the country", the "area" involved is the foreign commerce of the U. S., and to have any chance of success ITT must bring into sharp focus the area in which GTE's alleged restraint is to be measured. One or more of the following must be shown to be the affected "area" of

the U. S. commerce: (1) direct sales of manufactured telecommunication equipment from the U. S. to Canadian operating companies; (2) sale of such items to Canadian manufacturers and distributors for resale; (3) sale of components from U. S. manufacturers to Canadian manufacturers for inclusion in Canadian-made telephone equipment.[193]

*Reasonableness*

■ Bottomed on ITT's allegations, this court shall proceed under the assumption that exports of telephone equipment from the U. S. to Canada is the appropriate area within which to measure the reasonableness of GTE's alleged restraints. ITT, therefore, must not only establish that the alleged restraint is unreasonable but that it is imposed on trade into Canada as the direct effect of GTE's structure, policies and practices.

■ ■ Restraint on foreign trade normally follows automatically from the establishment of a subsidiary manufacturing plant outside the U. S. Standing alone, however, such restraint could not be deemed the result of a proscribed "combination." Sherman § 1 does not prohibit an American manufacturer from seeking to make profits through mere ownership and operation of a foreign branch factory. To be proscribed under Sherman § 1 that operation must be tied in with a "conspiracy, combination or monopoly."

■ ■ In the absence of excuses for restraint—such as the actions or trade practices of a foreign government, or circumstances peculiar to an individual case—reasonableness must also be measured in reference to the magnitude of the restraint imposed. Precedent gives little help in establishing quantitative guidelines for measuring degree of impact;

191. *E. g.*, United States v. Imperial Chemical Industries, Ltd., 100 F.Supp. 504 (S.D.N.Y.1951) (division of territories); United States v. Timken Roller Bearing Co., 83 F.Supp. 284 (E.D.Ohio 1949) (division of markets, price fixing); United States v. Nat'l Lead Co., 63 F.Supp. 513 (S.D.N.Y.1945) (world wide territorial allocation).

192. See *Brown Shoe, supra,* 370 U.S. at 327, 82 S.Ct. 1502, 8 L.Ed.2d 510.

193. Imports from Canada to the U. S. and their effect on interstate commerce in the U. S. were not in ITT's allegations of restraint.

vague phrases such as "direct and influencing effect" [194] on trade or practices which merely "affect" [195] commerce are of little assistance. However, in United States v. Minnesota Mining & Manufacturing Co., 92 F.Supp. 947 (D. Mass.1950), Judge Wyzanski, in discussing whether a violation of Sherman § 1 could be found where the dominant manufacturers in an industry combined to establish factories in certain foreign countries, stated:

"And on that issue this Court has ruled as a matter of law that it was necessary to inquire whether, *if* the manufacturers had not combined, *there could have been a substantial volume of profitable commerce* moving to those foreign countries from American factories owned by these or other manufacturers * * *." (Emphasis added.) 92 F.Supp. at 963.

What is substantial must, of course, be defined for the particular product and industry involved.

 It must not be overlooked that the standards of proof differ in Clayton and Sherman Act cases.[196] Under the less stringent standards of the Clayton Act, statistics may be juxtaposed and inferences drawn as to the tendency toward restraint of practices still in their incipiency. The technique of juxtaposition and inference carries less weight in Sherman Act cases; *actual* restraint, because of the proscribed "combination", as measured by actual effect is the benchmark. It is within the preceding framework that ITT's evidence is analyzed.

*Findings of Fact*

The structure of the telephone industry in Canada is similar to that in the

U. S. but it is definitely not the same. Approximately two-thirds of the operating companies are controlled by Bell of Canada or its affiliates. (In 1959 this was about 6.2 million telephones. Bell of America has a minority interest in Bell of Canada.) Such Bell of Canada companies purchase substantially all their requirements of telephone equipment from the Bell manufacturing affiliate, Northern Electric of Canada (not to be confused with North Electric in the U. S.). Basically the same equipment is used in Canada and the U. S.[197]

Government-owned companies in Alberta, Saskatchewan, Manitoba, and the city of Edmonton (with a total of some 2 million telephones in 1969), together with GTE subsidiaries, constitute virtually the remainder of telephone operating companies in Canada. GTE operating subsidiaries—British Columbia Telephone Company (Brico) and Okanagan Telephone Company—serve practically all of the province of British Columbia, with, in 1969, about 900,000 telephones. GTE's Quebec-Telephone Company (Quebec) was acquired in 1966 and in 1969 served about 150,000 telephones in the Quebec area.[198]

Prior to October 31, 1955, GTE owned no telephone operating companies in Canada. When it acquired Gary it was presented with about 16,000 Canadian telephones and since then, GTE has acquired 20 telephone companies in Canada, with, in 1969, over one million telephones. (No General System company has less than 50% ownership in any Canadian telephone operating company.) [199]

In 1967, out of a total of 8.3 million telephones in Canada some 5.6 million were "Bell", 980,000 were GTE, and 2.7

194. Sanib Corp. v. United Fruit Co., 135 F.Supp. 764, 766 (S.D.N.Y.1955); United States v. Imperial Chemical Industries, Inc., *supra*, n. 191, at 592.

195. United States v. Timken Roller Bearing Co., *supra*, n. 191, at 309.

196. United States v. Manufacturers Hanover Trust Co., 240 F.Supp. 867 (S.D. N.Y.1965).

197. GTE Vol. III, Interrog. & Stips., ITT Canada Ex. F; Bruner, Tr. 386–88, Dep., 82–83; James Dep., 59–61; Wilkinson Dep., 43.

198. Bruner, Tr. 386–87, 389–90; GTE Vol. III, Interrog. & Stips., ITT Canada Item 4.

199. GTE Vol. III, Interrog. & Stips., ITT Canada Item 4, Ex. R.

million were others. Thus GTE had 11.7% of the total market. By 1969, out of a total of 9.3 million telephones, GTE had 1.1 million or 12% of the market.[200] During those same periods, out of a total of $1.164 billion in plant investment in 1967, GTE, with $147.3 million represented 12.7% of that total. By 1969, out of $1.4 billion plant investment, GTE with $183.9 million represented 13.1%.[201] This represents approximately 12% of the total number of telephones in Canada.[202]

The General System acquired Automatic Electric (Canada) Ltd. (AE Canada) in the Gary merger. AE Canada has two manufacturing plants. By 1969 AE Canada manufactured Strowger-type step-by-step central office exchange switching equipment and peripheral equipment, PBX and PABX equipment, manual switchboards, telephone instruments, military communications systems, electromechanical relays, toll boards, PLX systems, electronic switching systems and miscellaneous components.[203]

Through that same Gary merger, the General System was able to acquire Lenkurt Electric Co. of Canada, Ltd. (Lenkurt Canada) in 1959 which manufactures, in Canada, carrier and radio multiplex, microwave radio systems, and terminating and remote equipment.[204]

ITT has four telecommunications manufacturing plants in Canada; all are under the aegis of ITT Canada, a wholly-owned subsidiary of ITT. The main plant in Ontario manufactures key telephone systems, transmission equipment and data switching equipment for voice and data transmission purposes. Three small plants are located in the Western Provinces—Saskatchewan, Manitoba and Alberta—and assemble and sell telephone subsets to operating companies in these Western or Prairie Provinces.[205]

*"Area" of Commerce Affected*

It is significant by its omission that apart from its own and AE (Lenkurt) sales, no annual sales figures to Canadian telephone operating companies from American manufacturing companies have been cited by either party. While ITT has shown that there has been some flow of telephone equipment *from* Canadian manufacturing companies to the U. S., whether this equipment is sold directly to telephone companies or distributed by American manufacturing companies is not clear from the record. ITT has shown that central office semi-electronic switching systems (C1–EAX) manufactured in Canada by AE Canada have recently been *imported into* the U. S. and installed in several GTE telephone operating companies in the U. S.[206] On the other hand it appears that GTE has also installed in the U. S. cross-bar switching equipment manufactured by Northern Electric of Canada and sold through Stromberg-Carlson![207]

ITT has proved that the market for telephone equipment represented by General's operating companies in Canada is substantial in dollar amount, as the Appendix 7 chart illustrates. GTE's Canadian manufacturing subsidiaries deliver virtually all of the telephone equipment requirements, including wire and cable and supplies, of these companies.

Although as heretofore delineated ITT's complaint is focused on foreclosure of the Canadian telephone market, much of the evidence adduced by ITT with respect to Canada relates to sales of equipment and components from the U. S. to Canadian manufacturing companies. The court can only assume that

200. *Id.*, ITT Canada Ex. F.

201. *Id.*, ITT Canada Ex. M.

202. *Id.*, ITT Canada Ex. F.

203. *Id.*, ITT Canada Items 5, 6.

204. *Id.*, ITT Canada Items 5, 7.

205. Bruner, Tr. 386.

206. (GTE Vol. III, Interrog. & Stips., ITT Int. March 16, 1970, GTE Ans. to Interrog. No. 2.) During 1967–69 the AE plant in Brockville, Canada, transferred $11,569,454 in telephone equipment to AE's plant at Northlake, Illinois. (Fifth Partial Stip., GTE Item 92.)

207. *Ibid.*

ITT presents such evidence in support of some such rationale as this:

1. Almost all of the requirements of GTE's Canadian telephone operating companies are met by GTE Canadian manufacturers;

2. ITT Canadian and American manufacturers are therefore foreclosed from this market;

3. A substantial amount of the output of ITT's Canadian plants either contains parts originating in the U. S. or is a resale of completed units manufactured in the U. S.;

4. Any limitation on the sales of ITT's Canada manufacturers would necessarily have an adverse effect on the flow of such components and completed units from the U. S. to Canadian manufacturing plants.

Even presupposing this assumption as to ITT's rationale is correct, the record is devoid of evidence as to just what quantitative restriction of ITT and other manufacturers' sales has taken place.

▆▆▆ ITT cannot prove restraint by simply proving, as it has, that there has been some flow of commerce in telephone equipment across the United States-Canadian border, including sale of complete items from the U. S. to Canada for resale and sale of components from the U. S. to Canada. It is not sufficient for ITT to but show the following sales to General's Canadian manufacturing companies from plants located in the U. S., and thereafter claim "Foreclosure":

| | AUTOMATIC ELECTRIC | LENKURT |
|-------|--------------------|---------|
| | (U. S. Dollars) | |
| 1964 | 2,589,000 | 1,550,077 |
| 1965 | 3,353,000 | 1,253,670 |
| 1966 | 3,752,000 | 2,547,910 |
| 1967 | 4,013,000 | 2,069,710 |
| 1968 | 2,391,000 | 1,734,963 [208] |

ITT has been selling to and in Canada also. In 1969, ITT's Canadian sales of telephone equipment from its U. S. plants totaled $1,369,000.[209] ITT's Canadian plants have imported Tel Touch conversion equipment from the U. S. for resale in Canada.

In recent years ITT has supplied the Prairie Province telephone companies with about one-half their requirements of subsets. Components for these subsets are shipped into Canada from Corinth. ITT has also shipped to Canada wall Tel Touch sets, its Dial in Hand, Corinthian, Trendline sets, the dials for its Tel Touch sets and transmitters, receivers, key sets and some dial parts. Central office switching equipment manufactured in Milan is resold by ITT in Canada. ITT has also attempted to sell in Canada some of its European manufactured PABX's.[210]

In the presentation of its case ITT has bypassed the fact that the Canadian market is a "horse of another color." Differing from the "relevant market" problem in the U. S., ITT has pointed to no evidence of any severability of the Canadian Bell, governmental and GTE telephone industry into Bell-independent markets. So far as the evidence shows there is a "total" telephone equipment market in Canada. Moreover, in viewing GTE's alleged restraint of foreign trade, the quantitative effect of such restraint, if any, must be analyzed in the perspective of the trade with Canada in telephone equipment of not only the "independent" U. S. manufacturers but also Bell. Access to the Canadian market was not eliminated by the Consent Decree.

ITT cannot prove foreclosure in the quantitative sense, therefore, by just showing that GTE controls 36% of the non-Bell market. It is only GTE's 12% of the *total* market that conceivably GTE's vertical set up would affect. As to that narrow segment of the market, ITT has pointed to no evidence eminat-

208. GTE Ans. to ITT Interrog. 5 (b) (i).

209. GTE Vol. III, Interrog. & Stips., ITT Interrog. March 16, 1970, GTE Ans. to Interrog. 2.

210. Bruner Dep., 59, Tr. 388; James Dep., 13–15, 24–29; Wilkinson Dep., 11.

ing from Canada of the nature found in GTE's American files on out-of-house, "non-system standard" purchasing.[211] The only "evidence" of GTE's Canada anticompetitive purchasing policies and practices is simply that GTE's Canadian subsidiaries buy "substantially all of their requirements" from AE and Lenkurt in Canada and the U. S.[212]

That this proves restraint does not *per se* follow. Proof that out of GTE's 1969 $41 (Canadian) million Canadian equipment market, $1,369,000 (U.S.) thereof was supplied by AE (Lenkurt) (U.S.) or in that same year AE (Lenkurt) (U.S.) sold $4 (U.S.) million to the *total* Canadian market, without more evidence of cause, is insufficient to show substantiality of *foreclosure*—it only shows some possible substantiality of *sales*.

A strong inference contrary any restraint is shown by the memorandum of ITT's Lucas to MacKay of December 14, 1967:

"Within minutes of meeting my first B.C. telephone contact, (Mr. S. Carstairs), it was obvious that we have sadly neglected B.C. Telephone. Although they purchase a large quantity of equipment from A.E. Co., A.E. *certainly does not have a captive market*. Proof of this is the fact that N.E. Company maintains three communications marketing representatives in Vancouver. Every member of the B.C. Telephone organization that I met indicated that they evaluate and select the best economical equipment for their use." (Emphasis added.) ITT 56301–303 at 56301.

Both British Columbia and Quebec have public utility commissions but there is no evidence of the control exercised by either over telephone company purchases. The record shows that tariffs are imposed on imports of goods which Canadian industry is capable of producing. Favored treatment is given to United Kingdom countries.[213]

The evidence also shows that the Provincial and Municipal owners of the telephone companies in the Western Provinces look with favor on local manufacturing.[214] If all other factors are equal, Canadian products are preferred.[215] Provincially-owned corporations will pay a premium for items manufactured within the province. Quebec, for example, has an established written policy of paying a 10% premium for an item manufactured within the confines of the province.[216] Moreover, Canadian telephone companies exhibit "a social conservatism which is leery of strangers * * *."[217]

Northern Electric is not proscribed from dealing with non-Bell telephone companies (as is WE under the Consent Decree in the U. S.). Thus, Northern Electric competes in Canada with other telephone manufacturers.[218]

As has been agreed, AE is the largest non-Bell tele-equipment manufacturer in North America. ITT does not manufacture *all* the items manufactured by AE (Lenkurt). An unknown amount of electrical equipment would perforce flow to AE (Lenkurt) by virtue of its product and service reputation. The "Buy Canada" reflex[219] and Canadian tariffs[220] likewise would have a shrinking effect on American trade. On the evidence this court can only speculate as to the effect the "Made in Canada" tag would have on American sales, and its bearing on AE Canada's business.

There is no evidence that AE and Lenkurt of Canada were acquired with the specific intent of restraining the flow of U. S. exports to Canada or that any other GTE Canadian acquisitions were made with such purpose in mind.

---

211. See pp. 50–57, *supra.*

212. ITT F & F, Item 99.

213. Bruner Dep., 28.

214. James Dep., 9–10.

215. Wilkinson Dep., 53.

216. James Dep., 94.

217. Bruner Dep., 29.

218. Bruner, Tr. 387.

219. Bruner Dep., 29–30; Wilkinson Dep., 51–53.

220. Bruner Dep., 24–28; DX 171 at 54953.

The weakness of ITT's case was inferentially forecast by its statement, Item 211 of its Trial Brief:

"Standing alone GT & E's acquisition of telephone companies in Canada which now control over 1 million telephones and the vertical foreclosure of that market might not appear to threaten a sufficient actual or potential volume of U. S. *exports* to give rise to a Sherman Act violation. However, those facts when combined with GT & E's program of massive horizontal and vertical acquisitions which now encompasses 46% of the independent telephones in the United States as well as 36% of the immediately adjacent independent market in Canada, in their totality constitute a combination in unreasonable restraint and foreclosure of United States interstate and foreign commerce." (Emphasis added.)

*Conclusions of Law*

The General System as a whole, and its Canadian outlets in particular, constitute a combination within the intendment of Sherman § 1. The standards by which this court could determine that the alleged violation has thereafter resulted have not been met by ITT, neither quantitatively nor qualitatively.

ITT has failed to prove that GTE's combination was formed with the intent to restrain the foreign trade or commerce of the U. S., nor has it proved that the combination has engaged in any acts which would constitute a *per se* violation.

ITT has not proved that absent said combination there would have been a substantial volume of profitable commerce moving to Canada from the U. S. Neither has it proved that if any foreclosure of U. S. manufacturers from the GTE telephone market in Canada occur-

red, it did not result from factors other than the existence and practices of GTE's combination.

ITT has failed to prove that GTE's combination has unreasonably restrained the foreign trade and commerce of the U. S. in telephone equipment, and this court cannot say that there has been a violation of Sherman § 1. This is not to say that a violation could not be proved, but that, on the evidence before it, on Count II judgment for GTE will be entered.[221]

## GTE'S AMENDED COUNTERCLAIM

### *Puerto Rico and Virgin Islands*

Only GTE's amended counterclaim remains for disposition, i. e., the portion in which GTE alleges that ITT's prior acquisitions of Ricotelco and Vitelco, when coupled with its acquisitions of International Western Electric and Kellogg, plus the resultant potential foreclosure of sales of telephone equipment in Puerto Rico and the Virgin Islands, has brought about a violation of Clayton § 7 by ITT, and ITT, by its vertical structure and buy-sell practices in Puerto Rico has violated Sherman § 1, and in the Virgin Islands has violated Sherman § 3.[222]

(As an appendage to its Clayton § 7 charges, *supra*, GTE alleges that by stock purchase, ITT controls Central Telephone, i. e., over 6% of the non-Bell 50-state market, and thus through ITT's vertical structure, it had violated Clayton § 7. See note 259, infra.)

*Findings of Fact*

Porto Rico Telephone Company was incorporated June 23, 1914. ITT was incorporated on June 20, 1920, as part of a plan to unite, by ITT stock exchange and purchase, the Porto Rico Telephone and

---

221. This holding is not to be construed as eliminating possible evaluation by the court of the quantum as well as the potentials of trade between GTE's operating and manufacturing subsidiaries of Canada and the U. S., in resolving and making its decree under Count I.

222. Section 3 of the Sherman Act provides in pertinent part:

"Every contract, combination * * * or conspiracy, in restraint of trade or commerce in any Territory of the United States * * * or between any such Territory * * * and * * * States * * * is declared illegal."

two Cuban telephone companies under a common corporate parent, ITT. Although 100% control over Puerto Rico Telephone (renamed from "Porto Rico") (Ricotelco) was not acquired until the 1960's, it is now a wholly-owned subsidiary of ITT.[223]

ITT acquired its present wholly-owned subsidiary, Virgin Islands Telephone Company (Vitelco), from the U. S. government in 1959.[224]

Prior to 1925, ITT did not have any plant for manufacturing telephone equipment. In that year, WE's non-domestic manufacturing arm, International Western Electric, was sold to ITT and renamed International Standard Electric. At that time International Standard was the largest non-U. S. manufacturer of telephone equipment, owning subsidiaries in eight countries.

In 1951 ITT acquired control of Kellogg Switchboard and Supply Company (Kellogg), a U. S. manufacturer of switching equipment, manual switchboards, and telephones; the next year a full merger was effected. In 1959 ITT's entire U. S. telephone equipment manufacturing operations were consolidated into ITT's Kellogg.

In July 1956, the Public Service Commission (PSC) of Puerto Rico undertook an investigation of Ricotelco's rates, practices and services. Later that year, Ricotelco formally requested a rate increase, so the study of that request was combined with the pending investigation. In February 1959, the PSC granted a rate increase and ordered Ricotelco to undertake a (long delayed) major expansion program. The 1959 order required Ricotelco to request bids on central office equipment from three or more U. S. manufacturers, at least two of which could not be affiliated with ITT. Invitations for bids on some or all of eight central offices went to WE, North Electric, AE, Stromberg-Carlson and

Kellogg. Neither WE nor Stromberg submitted quotations, but North Electric responded with three and AE with eight. Nevertheless, Ricotelco purchased Kellogg K–60 common control crossbar for all eight offices.

In order to fully weigh the unusual Puerto Rican telephone equipment market, the sequential actions of the parties involved must be detailed:

In December 1960, or January 1961, Teodoro Moscoso, Administrator of "Fomento" (i. e., "Operation Bootstrap", Puerto Rico's economic self-improvement program), Puerto Rico's Economic Development Administration, met with ITT's President Geneen and ITT's vice president in charge of Latin American operations, Westfall. At this meeting, Moscoso reiterated prior complaints made by himself and others that Ricotelco's slow expansion and poor service were handicapping the island's economic development. Moscoso reminded the ITT executives that the giant conglomerate had gotten its start in Puerto Rico but in recent years had contributed little to advance the Commonwealth's economy. He warned of growing enmity among portions of the populace. Moscoso urged ITT to construct a telephone equipment plant in Puerto Rico.

ITT officials were unenthusiastic: Puerto Rico lacked the requisite technically skilled labor and ITT's mainland U. S. plants could amply meet Ricotelco's foreseeable needs. Aware however of what governmental hostility and regulations could do to ITT's Ricotelco investment, ITT agreed to construct a plant in Puerto Rico provided that Ricotelco would be an assured market for the plant's products. On March 10, 1961, Moscoso wrote to Puerto Rico's PSC chairman stating that a "necessary condition for the economic success" of an ITT manufacturing plant in Puerto Rico was the "assurance that [Ricotelco] would purchase all

223. Subsequently, ITT purchased controlling interests in telephone companies in Argentina, Brazil, Chile, China, Mexico, Peru and Uruguay. All such interests, as well as the Cuban interests, were later sold, or expropriated.

224. ITT also has small stock interests in several telephone companies in South America and the U. S. See GTE Stips. 8, 9.

its requirements of the items in local production from the local plant." On April 14, 1961, the chairman agreed to waive the bidding requirement for equipment purchases so long as all purchases from the ITT plant would be made at arm's length, be reasonable, and be documented to prove that they were so made. (PX 325)

In 1962 Ricotelco applied for a rate increase. In orders dated June 11 and July 29, 1964, the PSC disallowed $2 million in expenses for the test year, feeling that Ricotelco's 1959–1962 purchases of Kellogg crossbar had been unwarranted in the face of lower bids received from North Electric and AE. The June 11 order also reinstated the competitive bidding requirement so as to discourage purchase of over-priced central office equipment in the future. (PX 325)

ITT appealed to the courts. On October 11, 1966 the Superior Court of Puerto Rico reversed the PSC finding that Ricotelco's Kellogg crossbar purchases were unreasonable. The Court found that North Electric's total bid on three offices actually exceeded Kellogg's, provided that the cost of necessary modifications was included in the calculations, and that AE's bids involved step-by-step equipment, which evidence before the PSC seemed to indicate was inferior to Kellogg's common control crossbar.

Meanwhile, in June of 1963, ITT Caribbean Manufacturing, Inc. (ITT-CM) had been established as a Ricotelco affiliate in conformance with ITT's agreement with Moscoso/PSC, i. e., Puerto Rico. A subsidiary, ITT Caribbean Sales & Service (CS&S) was created to act as purchasing agent for Ricotelco as well as Vitelco and to coordinate order and delivery documentation between ITT-CM's factory and the operating companies.[225] In 1964 the ITT-CM plant began production of central office equipment for both domestic and export sales.

In early 1966, Ricotelco planned a second major central office expansion and applied for relief from the competitive bidding requirement which had been reinstated by the June 11, 1964 order. After hearing (PX 340), the PSC granted relief from the bidding requirement for purchases from ITT-CM. A factor in PSC's decision was a memorandum from Puerto Rico's Economic Development Administration urging elimination of the bid requirement. The presidents of Ricotelco and ITT-CM agreed to furnish the PSC all data necessary to insure that the prices agreed upon by the affiliated companies would be reasonable and not yield to ITT-CM an excessive rate of return on its investment.

The publicly declared reasons given by the PSC for abandoning the bid requirement were (1) the substantial acceleration in delivery time (ITT-CM had under production certain equipment intended for export which could be diverted to Ricotelco); (2) availability of local factory engineers for both installation as well as solution of any installation problems which might develop at Ricotelco offices; (3) lowered expense in supplying Ricotelco's technicians with factory training; (4) increased job opportunities for Puerto Rican workers (both through direct expansion of ITT-CM's payroll and through creation of jobs in related industries; and (5) testimony of ITT-CM's president that, unless Puerto Rican orders were obtained, ITT-CM would have to discontinue its operations because exporting alone offered very limited profit potential.

Further evidencing official government support, Puerto Rico's governor ruled on September 29, 1966, that ITT-CM, as a new industry, was entitled to a ten-year tax exemption, under a 1948 Puerto Rican law. (PX 337)

*ITT's Sales and Purchasing Control*

Prior to ITT's 1952 acquisition of Kellogg, Ricotelco made no purchases of telephone equipment from Kellogg.[226] As

225. An ITT subsidiary, ITT-Puerto Rico, formerly acted as purchasing agent.

226. GTE Stips., Item 21.

the following chart shows, from 1953 to 1962, purchases from Kellogg increased dramatically—particularly during 1961–62 when ITT, as part of its *quid pro quo*, was trying to fulfill its promise to Puerto Rico to improve service:

RICOTELCO PURCHASES OF ITT KELLOGG EQUIPMENT ($000)
(1953–1964)

| Year | Purchases | Year | Purchases | Year | Purchases |
|------|-----------|------|-----------|------|-----------|
| 1953 | $ 40 | 1957 | $ 1,689 | 1961 | $11,117 |
| 1954 | 1,752 | 1958 | 185 | 1962 | 11,906 |
| 1955 | 436 | 1959 | 1,573 | 1963 | 701 |
| 1956 | 582 | 1960 | 5,365 | 1964 | N/A [227] |

That Ricotelco and Vitelco bought ITT products whenever each could, cannot be denied.

RICOTELCO TELEPHONE EQUIPMENT PURCHASES ($000)
(1965–1969)

| Year | Manufactured By ITT–CM * | Not Manufactured By ITT–CM | | |
|------|--------------------------|----------------------------|---|---|
| | | Manufactured By ITT–North American Div. ** | Manufactured By Other ITT Plants Outside Puerto Rico & North America **** | Manufactured By Non–ITT Plants *** |
| 1965 | $2,252 | $ 275 | $2,418 | $221 |
| 1966 | 3,446 | 1,369 | 555 | None |
| 1967 | 4,421 | 2,663 | | 118 |
| 1968 | 6,770 | 2,407 | 758 | 603 |
| 1969 | 7,722 | 1,932 | 2,227 | 700 [228] |

SALES OF TELEPHONE EQUIPMENT TO VITELCO BY ITT–CM ($000)
(1964–1969)

| Year | Sales | Year | Sales |
|------|-------|------|-------|
| 1964 | $ 564 | 1967 | $ 822 |
| 1965 | 483 | 1968 | 753 |
| 1966 | 883 | 1969 | 1,049 [229] |

ITT concedes that non-ITT manufacturers of telephone equipment have been, are, and probably will continue to be foreclosed from selling such equipment to Ricotelco and Vitelco.[230]

## Product Market

For the purpose of this counterclaim, the parties have stipulated that the relevant product market is telephone equipment, including central office switching equipment, PABX's, station apparatus, and electronic transmission equipment, but excluding wire and cable.

## Geographic Market

▮▮▮ The parties have not agreed upon the relevant geographic market

227. *Ibid.*

228. Sources:
 * ITT Stip., Item 24. The court assumes that these figures do not reflect purchases of wire and cable.
 ** GTE Stip., Item 17.
 *** GTE Stip., Item 17.
 **** These figures are, by necessity, only approximate. The parties furnished no direct information regarding these purchases. The court calculated these figures by subtracting the sum of ITT-North American-manufactured goods and non-ITT-manufactured goods from the total non-ITT-CM-manufactured goods purchased by Ricotelco. See ITT Stip., Item 24.

229. GTE Stip., Item 17, last portion, Schedule B.

230. ITT F & F, 105.

within which to evaluate the alleged restraint. Even though for self-serving purposes each did not include Puerto Rico in the 50-state market,[231] this court is in no way bound by such actions.[232]

Some U. S. manufacturers have regarded Puerto Rico and the Virgin Islands as part of their export or international markets. Auto manufacturers have likewise in the past so regarded the State of Hawaii.[233]

GTE International Telecommunication Division has a general manager for Latin America and has also offices for the Caribbean as well as Port-of-Spain, Trinidad, and San Juan, Puerto Rico. ITT has classified Ricotelco and Vitelco as part of its Latin American sales group. That this type of sales area designation indicates nothing more than internal division of sales responsibility, is illustrated by the fact that ITT-CM has always been a part of the ITT Latin American group *except* during 1965–68 when it was part of the North American group!

In examining the geographical structure of customer-supplier relationship, Ricotelco and Vitelco purchase the major portion of their equipment through ITT-CM. ITT acknowledges that its principal telephone equipment sales to the "Latin America area" consist of sales to these two telephone companies. When one sees that ITT-CM has had little success in exporting to Latin America, it bolsters this court's rejection of Latin America as a separate submarket for telephone equipment. Puerto Rico regulatory officials have assured ITT of an exclusive market "at home." For its own purchasing/supplying

methodology ITT has simply conjoined the two island complexes into one sales area.

The nomenclature used by either ITT or GTE for "market areas" cannot foreclose this court from its obligation to make its own determination of the area of effective competition with attention to practicalities and realities. Viewing the commercial realities of the Puerto Rico/Virgin Island area, considering that they are a part of U. S. territory, without tariff restrictions on goods sold to or manufactured there, and that the parties agree that freight costs are not a competitive factor in the telephone condition, the commercial realities of the area tie it in with the 50-state non-Bell market. Those same commercial realities of sales in the area are simply that all U. S. independent telephone equipment manufacturers would like to sell there [234] but cannot because, as will hereinafter be set forth, the government of Puerto Rico has given to ITT a protected monopoly over the telephone equipment sales there, and ITT's vertical structure has brought about a preemption of Vitelco purchases.

▇▇▇ Ricotelco and Vitelco, whether *jointly* or *severally*, do not here constitute a market or a submarket for Clayton § 7 or Sherman §§ 1 and 3 purposes any more than would any other telephone company located anywhere in the U. S. Ricotelco's status in the relevant market is fundamentally the same as was Hawaiian's in the context of the ITT Clayton § 7 claim. As of December 31, 1969 Vitelco served 18,248 telephones and Ricotelco 281,459,[235] i. e., about 300,000 telephones. ITT itself has

231. ITT F & F, 117; GTE F & F, 17.7, but *cf.* 17.26(b) and GTE Vol. III, Interrog. & Stips., ITT Ex. P, p. 4, where Ricotelco is listed as number 7 among the top 25 independent telephone operating companies in the U. S.

232. See n. 44, *supra.*

233. See trial briefs in Kapiolani Motors v. General Motors, 337 F.Supp. 102, D. Hawaii, decided February 18, 1972.

234. GTE Brief in Support of Counterclaim, 4.5.

235. Ricotelco provides conventional telephone service throughout Puerto Rico, except for approximately 20,000 telephones (located principally near the center of the main island) which are operated by the Puerto Rico Communications Authority, a government agency for which AE supplies equipment.

already equated this number of telephones as substantial, in that at the time Hawaiian was acquired by GTE, Hawaiian served only 302,506 telephones.

*Conclusions of Law*

1. *"Acquisition" Within Clayton § 7*

■ ITT's acquisitions of International Western (now Standard) Electric, Kellogg, Ricotelco and Vitelco were clearly "acquisitions" within the meaning of that term in § 7 of the Clayton Act. ITT disputes this conclusion only as it relates to Ricotelco.

While the original version of § 7 (in effect in 1920) may not have barred mergers or asset acquisitions (as it now does),[236] it has always barred stock acquisitions.[237] ITT existed as a corporate entity prior to the time when holders of Porto Rico Telephone and the two Cuban companies' stock exchanged their shares for ITT shares and purchased additional ITT shares. Concededly, that pre-acquisition existence was of short duration. Nevertheless, a pre-existing corporate entity did purchase the shares of the three companies and did give ITT shares as consideration. The transaction was not simply a parent doling out some business to its subsidiary; it was a stock acquisition.[238]

■ ■ Even if it were to be conceded that, prior to 1950, Clayton § 7 did not cover the Ricotelco acquisition, today that acquisition must be judged in light of its *present* reasonably probable effects, including effects traceable to the vertical relationship resulting from this acquisition in combination with subsequent ITT acquisitions.[239] On the other hand, the creation of ITT-CM and its subsidiaries, with the erection of its Puerto Rican factory constituted internal expansion of ITT and were not acquisitions within the meaning of § 7.

2. *Relevant Market*

■ The preceding facts mandate a conclusion that for GTE's counterclaim the relevant market is still the independent telephone equipment market as heretofore defined in ITT's Clayton § 7 claim. As indicated, the Ricotelco portion of the market is not insubstantial, in terms of telephones served (299,707 as of December 31, 1969) or in dollar volume of purchases ($12,630,000 in 1969).

3. *Parker v. Brown Immunity*

Here, not surprisingly, ITT also raised the defense that Parker v. Brown, *supra*, immunizes its acquisitions and its present vertical integration in Puerto Rico from antitrust attack. ITT does not contend that the Puerto Rican government caused or even actively encouraged the acquisitions of Ricotelco, International or Kellogg, or that that government caused or encouraged Ricotelco's increasing reliance during the 1950's upon ITT-made products. Instead, ITT contends that the *present* foreclosure of the Puerto Rican portion of the relevant telephone equipment market is a result of governmental insistence that an ITT plant be built in Puerto Rico and of the Puerto Rico PSC's waiver of competitive bidding for Ricotelco purchases of ITT-CM goods. Apparently ITT would further maintain that, even conceding that prior to 1959 its acquisitions violated the antitrust laws, the governmental action since 1959 immunizes its present status from antitrust attack.

As discussed during consideration of GTE's *Parker* defense, *supra*, there are two criteria for determining *Parker's* applicability.

(a) *Sovereignty/Comity*

After the island of Puerto Rico and several closely adjacent smaller islands came to the U. S. by cession from Spain

---

236. See U. S. v. Philadelphia Nat'l Bank, *supra*, 374 U.S. at 338–340, 83 S.Ct. 1715, 10 L.Ed.2d 915.

237. 38 Stat. 731–732 (1914). See *du Pont*, *supra*, 353 U.S. at 590–591, 77 S.Ct. 872, 1 L.Ed.2d 1057.

238. *Cf*. United States v. Philadelphia Nat'l Bank, *supra*, 374 U.S. at 388 n. 16, 83 S.Ct. 1715, 10 L.Ed.2d 915.

239. *du Pont*, *supra*, 353 U.S. at 607, 77 S.Ct. 872.

under the Treaty of Paris of December 10, 1898, as an aftermath of the Spanish-American War, by the Foraker Act, 31 Stat. 77, April 12, 1900, and its superseding Organic Act of 1917, 39 Stat. 951, 48 U.S.C. § 731 et seq. (1964), with minor exceptions, all inhabitants of Puerto Rico became and are United States citizens.

"The aim of the Foraker Act and the Organic Act was to give Puerto Rico full power of local self-determination, with an autonomy similar to that of the states and incorporated territories. * * * * The effect was to confer * * * many of the attributes of *quasi*-sovereignty possessed by the states—as, for example, immunity from suit without their consent. * * By those acts, the typical American governmental structure, consisting of the three independent departments—legislative, executive and judicial—was erected. * * * [A] commonwealth—was created. * * * * The power of taxation, the power to enact and enforce laws, and other characteristically governmental powers were vested. And so far as local matters are concerned * * *, legislative powers were conferred nearly, if not quite, as extensive as those exercised by the state legislatures." Puerto Rico v. Shell Co., 302 U.S. 253, 261–262, 58 S.Ct. 167, 171, 82 L.Ed. 235 (1937).

Evolution in the direction of greater local autonomy became increasingly evident in the amendment of the Organic Act by the Act of August 5, 1947, 61 Stat. 770, under which Puerto Rico was given the right to elect its own governor, a right never accorded to U. S. territories. Then on July 3, 1950, President Truman approved Public Law 600, which "pro-

vide[d] for the organization of a constitutional government by the people of Puerto Rico." 64 Stat. 319, 48 U.S.C. §§ 731b–731e. The Puerto Rican constitution, duly ratified by the people of Puerto Rico on March 3, 1952 (see 48 U.S.C.A. § 731c note), was approved by Congress on July 3, 1952, 66 Stat. 327, and on July 25, 1952, the Governor of Puerto Rico proclaimed the constitution of the Commonwealth of Puerto Rico. Those portions of the Foraker and Organic Acts which were expressly continued by the 1950 "compact" are now known as the Puerto Rican Federal Relations Act.[240]

It is properly inferrable, both from decisions upholding Puerto Rico's immunity from suit, see, e. g., Porto Rico v. Rosaly y Castillo, 227 U.S. 270, 33 S.Ct. 352, 57 L.Ed. 507 (1913), and from the legislative developments outlined above, that the Commonwealth of Puerto Rico is entitled to as much respect of its *sovereignty* as was the state of California in Parker v. Brown.[241]

Moreover, comity between the U. S. and Puerto Rico is at least as important to national stability as is state-federal comity.[242] The 1964 creation of a broad-based commission to study the alternatives of statehood, independence and commonwealth, reflects Congress' continuing sensitivity to the question of Puerto Rico's status.[243]

In actively soliciting an ITT plant for Puerto Rico, plus waivers of competitive bidding, Puerto Rico's Economic Development Administration (EDA) certainly acted within its broad governmental power to stimulate the Puerto Rican economy.[244] Nor can it be seriously doubted that Puerto Rico's PSC acted within its proper sphere of authority when it waived, reinstated, and

240. See 48 U.S.C.A. § 731e and note.

241. For Puerto Rico's unique status, see Americana of Puerto Rico, Inc. v. Kaplus, 368 F.2d 431, 435 (3 Cir. 1966).

242. See Fornaris v. Ridge Tool Co., 400 U.S. 41, 42–43, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970).

243. See 112 Cong.Rec. 26,311 (1966) (remarks of Senator Jackson).

244. PX 345. See Laws of P.R.Ann. tit. 23, § 231 and Reorganization Plan No. 10 in accompanying note (1964).

**1230**

once again waived the competitive bidding requirement for the purchase of central office equipment for the purpose of assisting in fulfilling the objectives sought by the EDA.[245]

From all the evidence before it, this court concludes that the primary basis underlying the bidding waiver was a governmental desire to boost Puerto Rico's economy through increased employment and payrolls. Any risks of enhanced telephone rates, and possibly less efficient service, which might result from interaffiliate abuses, were tacitly assumed.

Puerto Rico's "Operation Bootstrap", with its commitment to internal economic growth is certainly as deep as California's commitment was to its raisin industry. Establishment of a telephone equipment factory and retention of viability of that plant through tax incentives and an assured local market were and are vital parts of Puerto Rico's overall program of pulling its people—living on a crowded, resource-poor island—up by their "bootstraps." It was the Puerto Rican officials who initiated the plant idea; Puerto Rican officials pushed for the bidding waiver; other Puerto Rican officials granted it. The record is replete with evidence of letters and meetings by which government representatives became deeply involved in and encouraged both the plant and waiver decisions.

 Any federal antitrust interference with ITT-CM's governmentally assured market, e. g., by an order eliminating the bid waiver arrangement or barring common ownership of Ricotelco and ITT-CM, would directly contravene Puerto Rico's declared economic policy. It would endanger local payrolls and economic stability. Puerto Ricans would view any such antitrust order affecting the employment of its people as a gross insult to their sovereignty and a serious blow to their "Operation Bootstrap." The Puerto Rican government has already determined that any possible long range benefits to Puerto Ricans through possibly better quality or less expensive telephone equipment purchased from a variety of non-ITT sources would be of little immediate value in giving jobs, food and housing to the unemployed of Puerto Rico. In view of Puerto Rico's recent rapid movement toward political autonomy and economic progress, interference by a federal court, even in the name of free enterprise could only appear to Puerto Ricans as an anachronistic remanifestation of Yankee domination.

(b) *Federal Supremacy Analysis*

If one focuses instead on the propositions that immunity from the antitrust laws is not lightly implied and that federal law is supreme, the result is the same. In light of all the facts and of Congress' oft-expressed special treatment for Puerto Rico, this court concludes that ITT's present vertical integration in Puerto Rico and the situation resulting from the competitive bidding waivers are immune from antitrust attack. In *Parker*, Congress had enacted anticompetitive legislation which in many respects paralleled California's legislation. So, here, Congress has enacted legislation to protect Puerto Rico's economy which complements Puerto Rico's Operation Bootstrap.

Congress is well aware of Puerto Rico's distinctive Latin heritage and fiery desire for relative autonomy.[246] In its own words, Congress "has progressively recognized the right of self-government of the people of Puerto Rico." [247]

 There is no question that, as a general proposition, the federal antitrust laws are applicable in Puerto Rico—that was decided in Puerto Rico v. Shell, *supra*, as to Sherman § 3. Moreover,

245. PX 342. See *id.*, tit. 27, §§ 1101, 1104–05 (1964).

246. See 100 Cong.Rec. 2434, 2484–485 (1954) ; 96 Cong.Rec. A7425 (1950) (remarks of Representative Crawford).

247. Act of July 3, 1950, 64 Stat. 319 (preamble).

since Puerto Rico has become a commonwealth, the federal district court in Puerto Rico has ruled that Sherman §§ 1 and 2 apply in Puerto Rico.[248]

The Puerto Rico Federal Relations Act (carried over from the pre-commonwealth Organic Act of 1917) states:

"The statutory laws of the United States not locally inapplicable, * * * [exceptions], shall have the same force and effect in Puerto Rico as in the United States * * *."[249]

While Clayton § 7 speaks of "commerce in any section of the country," and inferentially it might be argued that it is confined to commerce between the fifty states, the words must be given the same liberality of construction as the Supreme Court did in Puerto Rico v. Shell Co. Section 1 of the Clayton Act defines "commerce" very broadly, to mean, *inter alia:*

"trade * * * between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States or the District of Columbia or any foreign nation." 15 U.S.C. § 12 (1964).

The Puerto Rico Federal Relations Act no more alters the general applicability of the Clayton Act than it alters the general applicability of the Sherman Act.[250]

Although the antitrust laws are applicable to Puerto Rico, nevertheless Congress' frequent deference to the peculiarities of Puerto Rico's economy indicates that Congress has given Puerto Rico many areas of exceptions to our federal acts. The Puerto Rico Federal Relations Act reads:

"The Interstate Commerce Act [49 U.S.C. chaps. 1, 8, 12 and 13 (1970)] and the several amendments made or to be made thereto, the Safety Appliance Acts [45 U.S.C. chap. 1 (1970)] and the several amendments made or to be made thereto, and section 19a of Title 49 [valuation of property of common carriers], shall not apply to Puerto Rico." 48 U.S.C. § 751 (1970).

Clearly Congress declined to interfere with certain aspects of Puerto Rican commerce and industry.

Individual residents of Puerto Rico, including domestic corporations, may exclude from their gross income for federal income tax purposes any income derived from sources within Puerto Rico, except amounts received as a U. S. employee.[251] On the other hand, they must include income derived from sources within the fifty states and the other American possessions.[252] Apparently Congress wanted Puerto Rico to have greater freedom in revenue raising and economy stimulation than would be possible if the federal government were simultaneously taxing the same source of revenue.

Unlike its provision for the fifty states, Congress has provided for a special industry committee to set appropriate federal minimum wages for Puerto Rico.[253] Congress created this unique arrangement in order to achieve a rather special federal policy, viz., " * * * to reach as rapidly *as is economically feasible without substantially curtailing em-*

248. See, e. g., Truxes v. Rolan Electric Corp., 314 F.Supp. 752 (D.P.R.1970) ; Cooperativa de Seguros Multiples de Puerto Rico v. San Juan, 289 F.Supp. 983 (D.P.R.1968) ; cf. Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Co., 303 F. Supp. 414, 420 (D.P.R.1969).

249. 48 U.S.C. § 734 (1964).

250. See Cabrera, Inc. v. Union de Choferes y Duenos, 256 F.Supp. 839, 842 (D.P.R. 1966) (Clayton § 1, 15 U.S.C. § 12, has the same force and effect in Puerto Rico after Commonwealth status as before) ; cf. Cooperativa de Seguros Multiples, supra, note 248, at 987 (Sherman and Clayton Acts must be construed in *"pari materia"*).

251. See 26 U.S.C. §§ 931, 933 (1970).

252. See, id., §§ 61, 931(c), 932(a) (1970) ; United States v. Rexach, 185 F.Supp. 465 (D.P.R.1960).

253. See 29 U.S.C. § 205 (1970).

*ployment* the objective of the minimum wage [as prescribed for the fifty states]." 29 U.S.C. § 208 (1970). (Emphasis added.)

In 1964, when Congress exempted from the federal interest equalization tax [254] persons investing in "less developed countr[ies]", it incorporated by reference a Presidential order [255] denominating Puerto Rico such a "country." [256] In order to assure a continuing flow of needed American capital to underdeveloped areas such as Puerto Rico, Congress accepted the risk that such flow would adversely affect the American balance of payments position.[257]

### (c) *Conclusion on Parker Immunity*

Consistent with Congress' intent, and with Congress' long-standing sensitivity toward Puerto Rican autonomy, this court can only conclude that ITT's common ownership of ITT-CM and Ricotelco and the foreclosure of sales by competitors which results from Ricotelco's purchase of ITT-CM-manufactured goods are immune from attack under the federal antitrust laws.

### 4. *Effect of Foreclosure*

As indicated *supra*, ITT has also foreclosed the remainder of relevant sales to Ricotelco, that is, the portion not governed by Parker v. Brown. During 1966–69, ITT-CM-manufactured goods accounted for about 63% of Ricotelco's purchases. In the pre-suit years of 1965–67, it preempted from 92% to 100% of Ricotelco's total purchases of relevant products. It can be assumed, then, that, absent this counterclaim, ITT would still continue to preempt substantially all of the 37% of non-*Parker*-protected Ricotelco purchases.

Virtually all Vitelco purchases were of goods manufactured by ITT-CM or other ITT plants. Since the Virgin Islands government did not urge creation of an ITT plant in Puerto Rico or waive competitive bidding, Vitelco's purchases from ITT-CM are not protected by *Parker*.

The overwhelming reliance of Ricotelco and Vitelco upon ITT products (even excluding the purchases immunized by *Parker*) belies any claim that either of those operating companies base their purchases simply on price and quality. Nevertheless, one must not overlook the realities of the ITT-Puerto Rico alliance. At the present time Vitelco has but 18,-000 telephones, an economically insignificant segment, i. e., but .09% of the total market. Because Ricotelco *must* buy most (63%) of its equipment from ITT-CM, Puerto Rico has given ITT a telephone equipment "lock-in" on Ricotelco. This government action inferentially requires that almost all correlating equipment be ITT's, also, in order that engineering expertise may be instantly available. The "standardization" factor, extolled by GTE in its own defense, here has been integrated in Ricotelco operations by Puerto Rican governmental fiat. The Puerto Rican government, as part of its economic policy, has negated any application of the federal antitrust laws to the Puerto Rico portion of the telephone equipment market.

From telephone statistics for 1969 (PX 363), Ricotelco had some 281,000 telephones and Vitelco 18,000. Upon combining the two, since they represent the area of ITT's "market control", the 301,-000 telephones constitute but 0.026% of total U. S. telephones and 1.5% of the total non-Bell telephone market.

---

254. 26 U.S.C. § 4911 et seq. (1970).

255. Exec. Order No. 11071, 3 C.F.R. 684 (1963), superseded in 1966 by Exec. Order No. 11285, 3 C.F.R. 122 (Supp. 1966), 26 U.S.C. § 4916 (1970), which retained the designation of Puerto Rico as "less developed."

256. See 26 U.S.C. § 4916(b) (1970).

257. S.Rep.No.1267, 88th Cong., 2d Sess. (1964), in 1964 U.S.Code Cong. & Adm. News, p. 3478, at p. 3492.

In effect, Puerto Rico has "removed" 63% of Ricotelco's telephones from that market, i. e., 177,000 telephones. Thus Ricotelco and Vitelco have but 122,000 telephones that could be said to be open to competition. This represents but 0.063% of the relevant non-Bell market. Not even under *Brown Shoe* could that be called a substantial portion of that market.

Unquestionably, ITT through its acquisitions of Ricotelco, Vitelco, International Standard and Kellogg, has intentionally set up an economic structure in Puerto Rico and the Virgin Islands which tends "to lessen competition [and] to create a monopoly" in violation of the tenets of Clayton § 7, and it has also created a "combination in restraint of trade" in violation of the tenets of Sherman §§ 1 and 3. This court is, nevertheless, constrained by *Parker* as to 63% of Ricotelco's purchases, and by the "*de minimis*" rule [258] as to the "open" remainder of its purchases, even when combined with Vitelco's, to *deny* to GTE the relief it prays for.

Let judgment be entered for ITT on GTE's counterclaim.[259]

See Appendix on next page.

258. *Brown Shoe, supra,* 370 U.S. at 329, 82 S.Ct. 1502, 8 L.Ed.2d 510.

259. GTE's Clayton § 7 claim arising out of ITT's ownership of 5% of the stock of Central Telephone was dismissed on oral motion and without objection at the beginning of the trial.

# Appendix 1

## C. The Bell System

7. The "Bell System" means American Telephone and Telegraph Company and Western Electric Company, Incorporated and their subsidiaries, and the Bell Telephone operating companies. The Bell System owns and/or controls the following Bell affiliated telephone operating companies which operate in the areas indicated:

| Company | Area |
| --- | --- |
| New England Telephone and Telegraph Company | Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont |
| New York Telephone Company | New York |
| New Jersey Bell Telephone Company | New Jersey |
| The Bell Telephone Company of Pennsylvania | Pennsylvania |
| The Diamond State Telephone Company | Delaware |
| The Chesapeake and Potomac Telephone Company | Washington, D. C. |
| The Chesapeake and Potomac Telephone Company of Maryland | Maryland |
| The Chesapeake and Potomac Telephone Company of Virginia | Virginia |
| The Chesapeake and Potomac Telephone Company of West Virginia | West Virginia |
| Southern Bell Telephone and Telegraph Company | Florida, Georgia, North Carolina, South Carolina, Alabama, Kentucky, Louisiana, Mississippi, and Tennessee |
| The Ohio Bell Telephone Company | Ohio |
| Michigan Bell Telephone Company | Michigan |
| Indiana Bell Telephone Company, Incorporated | Indiana |
| Wisconsin Telephone Company | Wisconsin |
| Illinois Bell Telephone Company | Illinois |
| Northwestern Bell Telephone Company | Iowa, Minnesota, Nebraska, North Dakota, and South Dakota |
| Southwestern Bell Telephone Company | Arkansas, Kansas, Missouri, Illinois, Oklahoma, and Texas |
| Mountain States Telephone and Telegraph Company | Arizona, Colorado, Idaho, Montana, New Mexico, Texas, Utah, and Wyoming |
| Pacific Northwest Bell Telephone Company | Washington, Idaho and Oregon |
| The Pacific Telephone and Telegraph Company<br> Bell Telephone Company of Nevada (a wholly owned subsidiary of Pacific) | California and Nevada |
| The Southern New England Telephone Company | Connecticut |
| The Cincinnati and Suburban Bell Telephone Company<br> Citizens Telephone Company (a wholly owned subsidiary of Cincinnati and Suburban) | Ohio and Kentucky. |

(GTE Vol. III, Interrogatories and Stipulations, ITT Item 9)

[A6553]

## Appendix 2

8. The number of telephones owned and operated by the Bell System in each year for each year since 1935 is:

| Year | No. of Bell System Telephones |
|------|------|
| 1935 | 14,280,000 |
| 1936 | 15,192,000 |
| 1937 | 16,097,000 |
| 1938 | 16,536,000 |
| 1939 | 17,329,000 |
| 1940 | 18,311,000 |
| 1941 | 19,742,000 |
| 1942 | 21,000,000 |
| 1943 | 22,301,000 |
| 1944 | 22,653,000 |
| 1945 | 23,547,000 |
| 1946 | 26,900,000 |
| 1947 | 29,773,000 |
| 1948 | 32,698,000 |
| 1949 | 34,775,000 |
| 1950 | 36,795,000 |
| 1951 | 38,943,000 |
| 1952 | 41,014,000 |
| 1953 | 43,010,000 |
| 1954 | 45,039,000 |
| 1955 | 48,028,000 |
| 1956 | 51,344,000 |
| 1957 | 54,241,000 |
| 1958 | 56,759,000 |
| 1959 | 60,110,000 |
| 1960 | 62,989,000 |
| 1961 | 65,507,000 |
| 1962 | 68,393,000 |
| 1963 | 71,152,000 |
| 1964 | 74,659,000 |
| 1965 | 78,632,000 |
| 1966 | 82,813,000 |
| 1967 | 83,762,000 |
| 1968 | 91,122,000 |
| 1969 | 95,942,200 |

(GTE Vol III, Interrogatories and Stipulations, ITT Item 10)

[A6547]

Appendix 3

## D. General Industry Facts (Bell and Independent Industries)

9. The number of telephones (sometimes referred to as "stations") in the United States owned and operated as indicated below for each year from 1935 to 1969 inclusive are (000 omitted):

| Year | U. S. | U. S. Non-Bell* | Non-Bell % of Total U. S. | General System U. S. (Company-Owned) | General System's % of Total U. S. | General System's % of Non-Bell |
|------|-------|-----------------|---------------------------|---------------------------------------|-----------------------------------|--------------------------------|
| 1935 ... | 17,465 | 3,185 | 18% | 381 | 2.2% | 12% |
| 1936 ... | 18,498 | 3,306 | 18 | 410 | 2.2 | 12 |
| 1937 ... | 19,523 | 3,426 | 18 | 444 | 2.3 | 13 |
| 1938 ... | 20,082 | 3,546 | 18 | 460 | 2.3 | 13 |
| 1939 ... | 20,995 | 3,666 | 17 | 502 | 2.4 | 14 |
| 1940 ... | 22,097 | 3,786 | 17 | 532 | 2.4 | 14 |
| 1941 ... | 23,648 | 3,906 | 17 | 579 | 2.4 | 15 |
| 1942 ... | 25,026 | 4,026 | 16 | 611 | 2.4 | 15 |
| 1943 ... | 26,446 | 4,146 | 16 | 644 | 2.4 | 16 |
| 1944 ... | 26,919 | 4,266 | 16 | 670 | 2.5 | 16 |
| 1945 ... | 27,973 | 4,426 | 16 | 696 | 2.5 | 16 |
| 1946 ... | 31,725 | 4,825 | 15 | 833 | 2.6 | 17 |
| 1947 ... | 34,994 | 5,221 | 15 | 948 | 2.7 | 18 |
| 1948 ... | 38,347 | 5,648 | 15 | 1,073 | 2.8 | 19 |
| 1949 ... | 40,862 | 6,086 | 15 | 1,187 | 2.9 | 20 |
| 1950 ... | 43,170 | 6,374 | 15 | 1,306 | 3.0 | 20 |
| 1951 ... | 45,822 | 6,880 | 15 | 1,404 | 3.1 | 20 |
| 1952 ... | 48,255 | 7,240 | 15 | 1,527 | 3.2 | 21 |
| 1953 ... | 50,387 | 7,577 | 15 | 1,680 | 3.3 | 22 |
| 1954 ... | 53,090 | 7,996 | 15 | 1,804 | 3.4 | 23 |
| 1955 ... | 56,490 | 8,161 | 14 | 2,548 | 4.5 | 31 |
| 1956 ... | 60,460 | 9,117 | 15 | 2,775 | 4.6 | 30 |
| 1957 ... | 63,918 | 9,677 | 15 | 3,330 | 5.2 | 34 |
| 1958 ... | 66,949 | 10,190 | 15 | 3,565 | 5.3 | 35 |
| 1959 ... | 70,901 | 10,791 | 15 | 3,874 | 5.5 | 36 |
| 1960 ... | 74,424 | 11,435 | 15 | 4,107 | 5.5 | 36 |
| 1961 ... | 77,582 | 12,074 | 16 | 4,411 | 5.7 | 37 |
| 1962 ... | 81,109 | 12,717 | 16 | 4,684 | 5.8 | 37 |
| 1963 ... | 84,619 | 13,468 | 16 | 4,984 | 5.9 | 37 |
| 1964 ... | 88,976 | 14,317 | 16 | 6,013 | 6.8 | 42 |
| 1965 ... | 93,866 | 15,233 | 16 | 6,437 | 6.9 | 42 |
| 1966 ... | 99,006 | 16,193 | 16 | 6,885 | 7.0 | 43 |
| 1967 ... | 103,971 | 17,195 | 17 | 7,729 | 7.4 | 45 |
| 1968 ... | 109,515 | 18,393 | 17 | 8,482 | 7.7 | 46 |
| 1969 ... | 115,501 | 19,559 | 17 | 9,022 | 7.8 | 46 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. F)

[A6548]

Appendix 4

10. The gross operating revenues of telephone companies or systems in the United States for each of the years 1935 to 1969 inclusive are as set forth below ($000,000 omitted):

| Year | Total U. S. | U. S. Non-Bell (Including General) | Non-Bell % of Total U. S | General System U. S. | General System's % of Total U. S. | General System's % of Non-Bell |
|------|------|------|------|------|------|------|
| 1935 ... | $ 1,042 | $ 95 | 9% | $ 11 | 1.1% | 12% |
| 1936 ... | 1,122 | 100 | 9 | 12 | 1.1 | 12 |
| 1937 ... | 1,186 | 107 | 9 | 13 | 1.1 | 12 |
| 1938 ... | 1,193 | 112 | 9 | 15 | 1.3 | 14 |
| 1939 ... | 1,253 | 116 | 9 | 18 | 1.4 | 16 |
| 1940 ... | 1,327 | 122 | 9 | 20 | 1.5 | 17 |
| 1941 ... | 1,462 | 128 | 9 | 22 | 1.5 | 17 |
| 1942 ... | 1,650 | 142 | 9 | 24 | 1.5 | 17 |
| 1943 ... | 1,846 | 154 | 8 | 28 | 1.5 | 18 |
| 1944 ... | 1,982 | 167 | 8 | 30 | 1.5 | 18 |
| 1945 ... | 2,164 | 181 | 8 | 32 | 1.5 | 18 |
| 1946 ... | 2,357 | 201 | 9 | 38 | 1.6 | 19 |
| 1947 ... | 2,510 | 222 | 9 | 44 | 1.8 | 20 |
| 1948 ... | 2,952 | 253 | 9 | 53 | 1.8 | 21 |
| 1949 ... | 3,257 | 287 | 9 | 61 | 1.9 | 21 |
| 1950 ... | 3,669 | 324 | 9 | 70 | 1.9 | 22 |
| 1951 ... | 4,100 | 367 | 9 | 85 | 2.1 | 23 |
| 1952 ... | 4,557 | 416 | 9 | 101 | 2.2 | 24 |
| 1953 ... | 5,009 | 479 | 10 | 128 | 2.6 | 27 |
| 1954 ... | 5,433 | 526 | 10 | 142 | 2.6 | 27 |
| 1955 ... | 6,021 | 596 | 10 | 206 | 3.4 | 35 |
| 1956 ... | 6,614 | 648 | 10 | 232 | 3.5 | 36 |
| 1957 ... | 7,201 | 734 | 10 | 283 | 3.9 | 39 |
| 1958 ... | 7,747 | 809 | 10 | 316 | 4.1 | 39 |
| 1959 ... | 8,487 | 916 | 11 | 368 | 4.3 | 40 |
| 1960 ... | 9,131 | 1,020 | 11 | 410 | 4.5 | 40 |
| 1961 ... | 9,744 | 1,127 | 12 | 453 | 4.6 | 40 |
| 1962 ... | 10,448 | 1,254 | 12 | 506 | 4.8 | 40 |
| 1963 ... | 11,172 | 1,376 | 12 | 569 | 5.1 | 41 |
| 1964 ... | 12,068 | 1,519 | 13 | 699 | 5.8 | 46 |
| 1965 ... | 12,990 | 1,670 | 13 | 765 | 5.9 | 46 |
| 1966 ... | 14,298 | 1,879 | 13 | 846 | 5.9 | 45 |
| 1967 ... | 15.337 | 2,026 | 13 | 974 | 6.4 | 48 |
| 1968 ... | 16,734 | 2,305 | 14 | 1,139 | 6.8 | 49 |
| 1969 ... | 18.672 | 2,614 | 14 | 1,288 | 6.9 | 49 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. M).

[A654°]

## Appendix 5

11. The total gross plant investment of telephone companies or systems in the United States for each of the years 1935 to 1969 inclusive are as set forth below ($000,000 omitted):

| Year | Total U.S. | U.S. Non-Bell (Including General) | Non-Bell % of Total U.S. | General System U.S. | General System's % of Total U.S. | General System's % of Non-Bell |
|---|---|---|---|---|---|---|
| 1935 ... | $ 4,805 | $ 596 | 12% | $ 65 | 1.4% | 11% |
| 1936 ... | 4,975 | 582 | 12 | 67 | 1.3 | 12 |
| 1937 ... | 5,112 | 582 | 11 | 71 | 1.4 | 12 |
| 1938 ... | 5,237 | 603 | 12 | 89 | 1.7 | 15 |
| 1939 ... | 5,348 | 609 | 11 | 94 | 1.8 | 15 |
| 1940 ... | 5,513 | 613 | 11 | 96 | 1.7 | 16 |
| 1941 ... | 5,823 | 613 | 11 | 103 | 1.8 | 17 |
| 1942 ... | 6,086 | 620 | 10 | 106 | 1.7 | 17 |
| 1943 ... | 6,158 | 597 | 10 | 107 | 1.7 | 18 |
| 1944 ... | 6,281 | 593 | 9 | 109 | 1.7 | 18 |
| 1945 ... | 6,512 | 610 | 9 | 112 | 1.7 | 18 |
| 1946 ... | 7,097 | 656 | 9 | 131 | 1.8 | 20 |
| 1947 ... | 8,341 | 751 | 9 | 155 | 1.9 | 21 |
| 1948 ... | 9,716 | 829 | 9 | 189 | 1.9 | 23 |
| 1949 ... | 10,688 | 961 | 9 | 227 | 2.1 | 24 |
| 1950 ... | 11,501 | 1,086 | 9 | 270 | 2.3 | 25 |
| 1951 ... | 12,523 | 1,231 | 10 | 318 | 2.5 | 26 |
| 1952 ... | 13,746 | 1,393 | 10 | 373 | 2.7 | 27 |
| 1953 ... | 15,041 | 1,579 | 10 | 434 | 2.9 | 27 |
| 1954 ... | 16,363 | 1,795 | 11 | 488 | 3.0 | 27 |
| 1955 ... | 17,842 | 2,043 | 11 | 672 | 3.8 | 33 |
| 1956 ... | 19,879 | 2,323 | 12 | 773 | 3.9 | 33 |
| 1957 ... | 22,486 | 2,805 | 12 | 1,027 | 4.6 | 37 |
| 1958 ... | 24,444 | 3,190 | 13 | 1,183 | 4.8 | 37 |
| 1959 ... | 26,432 | 3,584 | 14 | 1,352 | 5.1 | 38 |
| 1960 ... | 28,778 | 4,023 | 14 | 1,517 | 5.3 | 38 |
| 1961 ... | 31,125 | 4,504 | 14 | 1,676 | 5.4 | 37 |
| 1962 ... | 33,746 | 5,055 | 15 | 1,876 | 5.6 | 37 |
| 1963 ... | 36,515 | 5,616 | 15 | 2,064 | 5.7 | 37 |
| 1964 ... | 39,671 | 6,241 | 16 | 2,637 | 6.6 | 42 |
| 1965 ... | 43,252 | 6,974 | 16 | 2,981 | 6.9 | 43 |
| 1966 ... | 47,267 | 7,900 | 17 | 3,385 | 7.2 | 43 |
| 1967 ... | 51,438 | 8,882 | 17 | 4,074 | 7.9 | 46 |
| 1968 ... | 56,122 | 9,985 | 18 | 4,696 | 8.4 | 47 |
| 1969 ... | 61,919 | 11,393 | 18 | 5,357 | 8.7 | 47 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. G).

[A6550]

## Appendix 6

12. The number of telephone operating companies in the United States for each of the years from 1935 to 1969 inclusive is set forth below:

| Year | Approximate Total Number of Companies (Including Bell & General) | Bell System Companies | General System Companies |
|------|------|------|------|
| 1935 ........ | 6,627 | 24 | 13 |
| 1936 ........ | 6,497 | 24 | 12 |
| 1937 ........ | 6,587 | 24 | 12 |
| 1938 ........ | 6,553 | 24 | 17 |
| 1939 ........ | 6,502 | 24 | 16 |
| 1940 ........ | 6,515 | 24 | 14 |
| 1941 ........ | 6,847 | 24 | 18 |
| 1942 ........ | 6,815 | 24 | 18 |
| 1943 ........ | 6,780 | 24 | 17 |
| 1944 ........ | 6,656 | 24 | 18 |
| 1945 ........ | 6,117 | 24 | 20 |
| 1946 ........ | 6,007 | 24 | 28 |
| 1947 ........ | 5,882 | 23 | 30 |
| 1948 ........ | 5,773 | 23 | 21 |
| 1949 ........ | 5,673 | 23 | 20 |
| 1950 ........ | 5,565 | 23 | 15 |
| 1951 ........ | 5,469 | 23 | 15 |
| 1952 ........ | 5,324 | 23 | 15 |
| 1953 ........ | 5,143 | 23 | 16 |
| 1954 ........ | 4,984 | 23 | 16 |
| 1955 ........ | 4,737 | 23 | 39 |
| 1956 ........ | 4,413 | 23 | 30 |
| 1957 ........ | 4,137 | 23 | 20 |
| 1958 ........ | 3,891 | 23 | 21 |
| 1959 ........ | 3,584 | 23 | 26 |
| 1960 ........ | 3,324 | 23 | 26 |
| 1961 ........ | 3,060 | 24 | 31 |
| 1962 ........ | 2,870 | 24 | 34 |
| 1963 ........ | 2,700 | 24 | 36 |
| 1964 ........ | 2,560 | 24 | 35 |
| 1965 ........ | 2,447 | 24 | 32 |
| 1966 ........ | 2,270 | 24 | 32 |
| 1967 ........ | 2,126 | 24 | 34 |
| 1968 ........ | 1,997 | 25 | 35 |
| 1969 ........ | 1,919 | 25 | 33 |

(GTE Vol. III, Interrogatories and Stipulations, ITT Ex. N)

[A6551]

Appendix 7

## PURCHASES BY MAJOR TELEPHONE CANADIAN OPERATING COMPANIES (1969)

| | TOTAL PURCHASES OF TELEPHONE EQUIPMENT (Canadian Dollars 92.5 Conversion Factor) | TOTAL PURCHASES OF TELEPHONE EQUIPMENT & SUPPLIES FROM GENERAL SYSTEM COMPANIES IN CANADA |
|---|---|---|
| British Columbia Tel. Co. | | |
| Central Office | 12,843,000 | 30,717,367 (AE Can.) |
| Station Apparatus | 9,727,000 | 5,395,034 (Lenk. Can.) |
| PBX-PABX | 2,444,000 | 36,112,401 *** |
| Transmission | 5,210,000 | |
| | 30,224,000 | |
| Okanagan Tel. Co. | | |
| Central Office * | 755,703 | 1,515,000 |
| Station Apparatus ** | 1,174,025 | |
| Transmission | 16,798 | |
| | 1,946,526 | |
| Quebec-Telephone & Subsid. (Bonaventure and Gaspe Tele. Co.) | | |
| Central Office | 4,167,797 | 3,695,598 (AE Can.) |
| Station Apparatus | 1,317,998 | 1,070,839 (Lenk. Can.) |
| PBX-PABX | 353,218 | |
| Transmission | 1,070,839 | |
| | 6,909,852 | |

\* Includes large PABX equipment
\*\* Includes small PBX equipment
\*\*\* This figure includes items such as wire and cable, and other supply items which are not included in the primary "total purchases of telephone equipment" figures.

Source: GTE Answers to ITT Interrog. Nos. 4(a), 4(b), served March 16, 1970

[A6552]

## FINAL JUDGMENT

Plaintiff, International Telephone & Telegraph Corporation, having filed its complaint herein on October 18, 1967, a full trial on all issues of liability and relief having been had, the parties having filed their respective proposed findings of fact and conclusions of law and having briefed all issues of fact and law, the Court having, on July 14, 1972, filed its Decision, which constitutes its Findings of Fact and Conclusions of Law pursuant to Rule 52(a), Federal Rules of Civil Procedure, and the Court having made, in accordance with Rule 54(b), Federal Rules of Civil Procedure, an express determination that there is no just reason for delay and having expressly directed the entry of this Final Judgment:

Now, therefore, it is hereby Ordered, Adjudged and Decreed as follows:

### I

This Court has jurisdiction of the subject matter hereof and all the parties hereto.

The acquisition by General Telephone & Electronics Corporation (hereinafter "GTE") of each of the following companies, regarded individually and/or collectively, in the context of GTE's entire horizontal and vertical acquisition program, has the reasonably probable effect of substantially lessening competition in the production and sale of telephone equipment to all telephone operating companies in the U.S. and to all independent telephone operating companies in the U. S., in violation of Clayton § 7: Leich Electric Company (1950); Gary and Company Group, including Automatic Electric Company (1955); Peninsular Telephone Company (1957); Lenkurt Electric Company (1959); the Western Utilities Group (1964); Central Iowa Telephone Company (1967); Hawaiian Telephone Company (1967); and Northern Ohio Telephone Company (1967).

GTE, acting in concert with GTE Service Corporation, Leich, Automatic Electric, Lenkurt and all of the various GTE telephone operating companies, have since at least 1950, by reason of their agreements to merge and consolidate, their mergers and consolidations, and their subsequent actions and conduct in effectively foreclosing the market for telephone equipment represented by the GTE telephone operating companies, constituted a continuing combination in unreasonable restraint of interstate trade and commerce in the production and sale of telephone equipment to independent telephone operating companies in the U. S. in violation of Section 1 of the Sherman Act.

The acquisition by GTE of Hawaiian Telephone Company also violated the Hawaiian Antitrust Act, § 480–7(a), Hawaii Revised Statutes (1968).

### II

As used in this Final Judgment, the following terms have the following meanings:

(a) "GTE" means General Telephone & Electronics Corporation.

(b) "General System" means the following, individually and collectively:

1. GTE.

2. All domestic telephone operating companies and all manufacturers or vendors of telephone equipment now or hereafter owned or controlled by GTE, whether or not separate corporate entities, and their subsidiaries. The term "General System" applies to the companies ordered to be divested hereunder both before and after such divestiture takes place.

3. GTE Service Corporation.

4. GTE Laboratories, Incorporated.

5. GTE Automatic Electric Incorporated and its subsidiaries, including GTE Lenkurt Incorporated, and GTE Automatic Electric Laboratories, Incorporated.

(c) "General System telephone operating companies" means the United States subsidiaries of GTE engaged in operating telephone companies which have not been, or have not yet been, divested pursuant to Section IV(b) of this Final Judgment.

(d) "Divested telephone operating companies" means the companies, individually and collectively, which have been divested pursuant to Section IV(b) of this Final Judgment.

(e) "Person" means any individual, partnership, firm, corporation, association, or other business or legal entity.

(f) "Subsidiary" of a person means any person controlled by, or more than 50 percent of whose voting stock is directly or indirectly controlled by such person.

(g) "GTE telephone equipment companies" means all manufacturers or vendors of telephone equipment (whether or not separate corporate entities) owned or controlled by GTE, including such manufacturers or vendors which have been divested pursuant to the provisions of Section IV(a) of this Final Judgment, but a company shall not be deemed to be a GTE telephone equipment company solely by reason of its manufacture or sale of software.

(h) "Telephone equipment" means items of communication and related equipment (excluding wire and cable, supplies and installation) purchased by or used by telephone operating companies including electro-mechanical and electronic central office equipment, station apparatus, PABX, and transmission equipment, including repair parts and spare parts:

1. "PABX" includes manual or dial private branch exchanges installed on the premises of the telephone company or the premises of a subscriber.

2. "Central office equipment" consists of all electrical instruments, apparatus, switching and other equipment and related software (including PABX, toll, and tandem switching equipment) making up a central, tandem, or toll office including, without limitation, associated common control equipment, software, relays and selectors, and related items.

3. "Station apparatus" consists of station apparatus and such other items of communication equip-

ment, including PABX, as are normally located in or about the premises of a subscriber.

4. "Transmission equipment" consists of various types of carrier (e. g., open wire carrier, cable carrier, radio multiplexed carrier) and microwave radio, multiplex and other related equipment (but excluding the wire and cable itself), whether located in a central office or elsewhere.

(i) "Non-affiliated manufacturer" means a manufacturer or vendor of telephone equipment which is not a GTE telephone equipment company.

### III

The provisions of this Final Judgment shall apply to each of the companies in the General System and to each of their subsidiaries, successors and assigns, and to each of their respective officers, directors, agents, and employees, and to those persons in active concert or participation with any of them who receive actual notice of this Final Judgment by personal service or otherwise.

### IV

(a) Provisions Relating to GTE Telephone Equipment Companies.

1. No later than eighteen (18) months after this Final Judgment is not subject to further appeal, GTE shall divest itself of all its interest in the United States and Canadian business operations and assets acquired in connection with GTE's acquisitions of Leich Electric Company, Automatic Electric Company, and Lenkurt Electric Company and their respective subsidiaries, together with all improvements, betterments, replacements and additions made thereto, and all new facilities constructed by or for such business operations of such companies or their subsidiaries, successors or assigns, including specifically all such operations and facilities for the research and develop-

ment, manufacture, distribution and sale of telephone equipment.

2. After divestiture under this Section IV(a) has been completed, GTE and its remaining subsidiaries are enjoined from manufacturing in the United States and Canada telephone equipment (except military-type telecommunications equipment for the United States Government or any agency thereof, and except software) so long as GTE continues to hold an ownership interest in GTE Sylvania Incorporated, or its successors or assigns.

3. After this Final Judgment is not subject to further appeal, the GTE telephone equipment companies required to be divested by this Final Judgment and their successors and assigns are each enjoined from acquiring any interest in a United States telephone operating company (other than a mortgage security interest in connection with financing the sale of equipment) and after completion of the divestiture hereunder are each enjoined from being under common control with a United States telephone operating company.

(b) Provisions Relating to GTE Telephone Operating Companies.

1. No later than two (2) years after this Final Judgment is not subject to further appeal, GTE shall divest itself of all its interest in the U. S. telephone company operations acquired in connection with GTE's acquisition of the Theodore Gary and Company Group, Peninsular Telephone Company, Western Utilities Group (California Water and Telephone Company, Southwestern States Telephone Co. and West Coast Telephone Company), Central Iowa Telephone Company, Hawaiian Telephone Company and Northern Ohio Telephone Company, together with all improvements, betterments, replacements and additions to such telephone operating companies' operations (including all new and replacement central offices) made in their respective operating territories since the time of their respective acquisitions by GTE. Such telephone company operations shall be divested in going, viable and operating condition in the form of at least six separate operating companies, or groups of operating companies; in the alternative GTE may, subject to prior approval by this Court after notice to plaintiff, make a substantially equivalent divestiture (as measured by telephone stations in service) in the form of GTE telephone operating companies as presently organized in regional groups, together with divestiture of Hawaiian Telephone Company.

2. For a period of 10 years after the divestiture of the GTE telephone equipment companies required by this Final Judgment, GTE is enjoined from acquiring directly or indirectly all or any part of the assets or capital stock of any United States telephone operating company except with the approval of this Court, after notice to plaintiff, based upon an affirmative showing that no anti-competitive effects would be likely to result from the proposed acquisition.

3. After this Final Judgment is not subject to further appeal, GTE, its subsidiaries and the divested telephone operating companies, and their successors and assigns, are each enjoined from acquiring any interest in or merging with a United States or Canadian manufacturer of telephone equipment, and after completion of the divestiture hereunder are each enjoined from merging with, or as a result of an acquisition, being under common control with such a manufacturer of telephone equipment, except that GTE's insurance subsidiaries, if any, and the pension and profit-sharing trusts of GTE and its sub-

sidiaries may acquire and hold in the aggregate up to one percent (1%) of such assets, stock or other beneficial interests in any such manufacturer.

4. Nothing contained in this Final Judgment shall be construed to preclude the General System from adopting methods of centralized purchasing, including utilization of a wholly-owned subsidiary for the purchase of telephone equipment for resale to General System telephone operating companies.

### V

(a) No divestiture shall be made directly or indirectly, to any person who is at the time of divestiture (1) an officer, director, employee, or agent of GTE, or (2) who beneficially owns, or has power to vote, or controls, or has rights to own or control more than one percent (1%) of the outstanding shares of stock of GTE or (3) in whom GTE has a financial interest whether by an equity interest or otherwise other than as may arise out of a customer or supplier relationship, provided, however, that this provision shall not apply to an interest arising out of the conversion of a debt interest acquired incident to a sale or other credit transaction and disposed of within two hundred twenty (220) days or resulting from a distribution described in Section V(b) herein.

(b) If divestiture is accomplished in whole or in part by distribution of stock, defendant GTE shall require that any officer or director, employee or agent of GTE, or any stockholder of GTE beneficially owning or controlling, or having rights to own or control, in excess of an aggregate of one percent (1%) of GTE's outstanding shares entitled to vote, shall within two hundred twenty (220) days of receipt of divested stock dispose of all such stock in excess of one percent (1%) of the divested stock to a person not described in this Section V.

### VI

If GTE proceeds with divestiture by sale:
(a) Not less than sixty (60) days prior to the closing date designated in any contract for the sale of the assets or stock to be divested, GTE shall advise the Court and plaintiff in writing of the name and address of the proposed purchaser together with the terms and conditions of the proposed sale, and such other information concerning the transaction as the Court or plaintiff may reasonably request. No more than thirty (30) days after the receipt of the information required by this provision, including specifically the additional information which the Court or plaintiff may reasonably request, plaintiff shall advise the Court and GTE in writing whether it objects to the proposed sale. No sale shall be consummated without express prior approval by this Court.

(b) Automatic Electric and Lenkurt may be sold separately or to a single purchaser, provided however that neither company shall be sold to any purchaser which holds an ownership interest in any United States telephone operating company; and provided further that no purchaser of Automatic Electric or Lenkurt or both may also purchase, directly or indirectly, any of the capital stock or assets of the divested telephone operating companies.

(c) No two of the divested telephone operating companies shall be sold directly or indirectly to the same purchaser.

### VII

If divestiture is accomplished in whole or in part by means of sale of stock to the public, defendant GTE shall prohibit each of its officers, directors, employees, or agents and the stockholders described in Section V(a) of this Final Judgment from initially acquiring, or in the case of any such officer, director, employee or agent from owning more than one percent (1%) of any such stock so long as he remains in any such position.

### VIII

Prior to divestiture, GTE shall cause each company being divested to agree to abide by the provisions of this Final Judgment and to submit to the jurisdiction of this Court for the enforcement

thereof and the entry of such further orders as this Court may deem appropriate. If divestiture is accomplished in whole or in part by sale of stock or assets (other than a public offering), GTE shall cause the persons acquiring the assets or stock to be divested to agree, as a condition of purchase, to abide by the provisions of this Final Judgment, and to submit to the jurisdiction of this Court for the enforcement thereof and the entry of such further orders as this Court may deem appropriate.

## IX

Within 90 days after the close of the first calendar year following entry of this Final Judgment, and within 90 days after the close of each calendar year thereafter for a period of 10 years after divestiture of the GTE telephone equipment manufacturing companies required to be divested hereunder, unless sooner terminated by order of this Court, the General System telephone operating companies as a group, and each individual divested telephone operating company, shall file with the Court and furnish to plaintiff a report sworn to by a responsible officer setting forth the following information with respect to their respective purchases of telephone equipment: (a) the types of equipment, number of units, and dollar volume of telephone equipment purchased and ordered for delivery during the preceding calendar year (i) from GTE telephone equipment companies and (ii) from non-affiliated manufacturers; and (b) the types of equipment, number of units, and dollar volume of telephone equipment ordered during the preceding calendar year for delivery in later years (i) from GTE telephone equipment companies and (ii) from non-affiliated manufacturers; and (c) such additional information as the Court may direct from time to time; provided, however, that such reports must be prepared but need not be filed with the Court or furnished to the plaintiff until 60 days after this Final Judgment is not subject to further appeal, unless the Court otherwise directs.

## X

Within sixty (60) days after this Final Judgment is not subject to further appeal:

(a) GTE shall cause to be distributed to all General System personnel who are concerned with the planning, designing, specification, standardization, purchase and sale of telephone equipment in the General System, a copy of this Final Judgment and a formal written statement expressly stating that it is the business policy of the General System that all purchases of telephone equipment shall be made on an open commercial basis without preferential treatment or consideration of GTE telephone equipment companies.

(b) GTE shall adopt and observe and cause the General System telephone operating companies to adopt and observe comprehensive purchasing procedures applicable to the purchase of telephone equipment which procedures shall be designed to implement the foregoing statement of purchasing policy. Such purchasing procedures shall continue to be observed after divestiture by the divested telephone operating companies.

(c) The purchasing procedures shall, among other things, make provision for the fair evaluation of telephone equipment offered for sale by non-affiliated manufacturers. Such evaluation shall include (1) the use of objective criteria and standards of evaluation, including the use of objective performance tests in appropriate cases and the application of the same tests to comparable telephone equipment offered by GTE telephone equipment companies; (2) the establishment in appropriate cases of installations for trials or field testing by the General System on the same basis as telephone equipment offered by the GTE telephone equipment companies; and (3) making available to the non-affiliated manufacturers copies of all reports evaluating their equipment and any reports evaluating or comparing similar equipment offered by GTE telephone equipment companies.

1246

(d) Representatives of non-affiliated manufacturers of telephone equipment shall have reasonable access and opportunity to meet with all General System management and operating personnel who are concerned with the designing, planning, specifications, standardizations, and purchasing of telephone equipment for the purpose of discussing and analyzing proposed and final plans, budgets, equipment specifications, standardization programs, and other steps related to decisions in the procurement of telephone equipment within the General System, on substantially the same basis and terms as such access and information is made available to representatives of GTE telephone equipment companies. This shall include specifically the opportunity for representation on any design or product planning group or committee for consideration and development or purchase of products for use in the General System, and the opportunity to attend all General System conferences of operating and executive personnel and to make presentations of new or existing products on the same basis as GTE telephone equipment companies.

(e) The General System shall not disclose to the GTE telephone equipment companies any confidential proposed prices, delivery terms or other conditions of sale for telephone equipment, which have been the subject of a formal quotation or offer by non-affiliated manufacturers, prior to award or execution of a purchase contract for such equipment, and shall not otherwise directly or indirectly permit or give the GTE telephone equipment companies any preferential opportunity to delay, revise or re-submit telephone equipment bids or quotations to meet or under-bid offers or quotations received from non-affiliated manufacturers.

(f) GTE shall by appropriate notice advise all U. S. vendors of telephone equipment of the above-described changes in the General System's purchasing practices.

(g) The General System shall not discriminate against plaintiff in any way in purchasing practices and procedures or in the evaluations and decisions to purchase telephone equipment.

(h) For a period of 10 years after the divestiture of the GTE telephone equipment companies, required by this Final Judgment, each General System telephone operating company, and each of the divested telephone operating companies, shall appoint a senior officer of the company, with adequate staff, whose responsibility shall include (i) insuring that the above-described purchasing policies and procedures are complied with and (ii) acting as the liaison officer with respect to any non-affiliated manufacturer of telephone equipment who believes that such policies and procedures may not have been complied with in connection with a particular procurement. Each such operating company shall maintain records concerning all procurements of telephone equipment for five (5) years following the year of procurement, and upon reasonable request shall make such records available for inspection by plaintiff. In the case of each procurement of telephone equipment in excess of $250,000 (or any series of related procurements totalling in excess of $250,000), and in the case of each initial procurement of telephone equipment on which the telephone operating company proposes to standardize, each such telephone operating company shall prepare and include in its records an affidavit of the officer designated pursuant to this subparagraph certifying that the provisions of Section X of this Final Judgment have been observed.

XI

After this Final Judgment is not subject to further appeal:

(a) The General System and the GTE telephone equipment manufacturing companies shall grant a license, to any U. S. non-affiliated manufacturers who request it to do so, under any pertinent U. S. patents, and shall make available (on a continuous basis within a reasonable time after request) any and all technical information and reports which may

be necessary, appropriate or useful to enable any interested U. S. non-affiliated manufacturer to engineer, manufacture, produce, test, furnish, install, and start-up according to the best techniques and methods known to the General System and the GTE telephone equipment manufacturing companies any General System telephone equipment for which a decision or intention to adopt as a standardized product has been made for (or which is purchased in substantial quantities by) any of the General System telephone operating companies, including but not limited to technical information and reports relating to:

(1) engineering and manufacturing methods, drawings, and blue prints;

(2) process specifications;

(3) test and operating software;

(4) metallurgical and chemical compositions;

(5) production techniques;

(6) material lists and names of suppliers of materials;

(7) fabrication, assembly and testing processes and specifications;

(8) tools and dies;

(9) test sets;

(10) manufacturing and assembly drawings and specifications covering manufacture, assembly, wiring and testing;

(11) manufacturing drawings of production machinery;

(12) reports of laboratory and field testing; and

(13) such other information, data, writings and reports as may be necessary, appropriate or useful, including providing opportunities for reasonable visits to General System facilities to observe actual manufacturing, installation, and testing of such General System telephone equipment and reasonable consultation with pertinent General System personnel where necessary to make efficient use of the technical infor-

mation and reports furnished pursuant to this Final Judgment;

provided, however, that the General System may condition the grant and furnishing of the foregoing license and technical information and reports upon:

(1) Payment of the actual cost without profit to the General System of gathering, reproducing and transmitting such technical information and reports;

(2) Execution of a covenant against disclosure for a reasonable time (not to exceed five (5) years from the date of each transmission of technical information or reports) of any General System trade secret information (including specifically any software developed by the General System) not in the public domain to an unauthorized third party, and providing that after such time period the licensee will not disclose any such trade secret knowing at the time of such disclosure that it is a trade secret not in the public domain.

(3) Execution of an agreement to pay a reasonable nondiscriminatory patent license fee and a reasonable non-discriminatory technical information fee with respect to sales of such telephone equipment, provided that the payment of any such patent license fee shall not extend beyond the life of the patent involved and provided further that the amount of any such patent license or technical information fees will permit non-affiliated manufacturers to compete meaningfully and effectively in manufacturing and selling such General System telephone equipment.

(4) Execution of an agreement by licensee to grant back to the licensor non-exclusive licenses at reasonable royalties under U. S. patents covering improvements by licensee on General System telephone equipment for which a li-

cense is granted pursuant to this paragraph XI.

(5) Such other terms and conditions as the parties to a license may mutually agree.

(b) The foregoing provisions of sub-paragraph (a) of Section XI shall not apply to any new telephone equipment developed by a divested GTE telephone equipment company more than the following number of years after the divestiture of such company has been carried out:

(1) station apparatus—four (4) years after divestiture;

(2) transmission equipment—five (5) years after divestiture;

(3) PABX—five (5) years after divestiture;

(4) central office equipment—six (6) years after divestiture.

(c) The foregoing provisions of sub-paragraph (a) of Section XI shall not apply to any new telephone equipment developed by the General System (other than a divested GTE telephone equipment company) more than five (5) years after completion of all of the required divestitures of GTE telephone equipment companies.

### XII

At any time after five years from the date this Final Judgment is not subject to further appeal, upon a showing that despite the foregoing provisions of this Final Judgment, the market for telephone equipment represented by the General System tends to be substantially foreclosed to non-affiliated manufacturers, plaintiff may apply to this Court for such further and different relief as the Court may find necessary to establish open and effective competition in the relevant market, including but not limited to, imposition of a requirement that the General System and each of the divested telephone operating companies shall be enjoined from purchasing more than 50 percent of their annual requirements of telephone equipment from GTE telephone equipment companies, except to the extent that the purchaser demonstrates to the Court, and the Court finds, that telephone equipment adequate in quantity and quality is not available from U. S. non-affiliated manufacturers on terms which are substantially similar and competitive with the terms offered by GTE telephone equipment companies.

### XIII

Jurisdiction of this cause is retained by this Court for the purpose of enabling any of the parties to apply at any time for such further orders or directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions thereof, for the enforcement of compliance therewith, and for the punishment of violations thereof.

### XIV

Count II of plaintiff's amended complaint is hereby dismissed on the merits.

### XV

The first amended counterclaim as severed for trial pursuant to Pretrial Order No. 30 (the so-called domestic counterclaim) of counter-claimant GTE is hereby dismissed on the merits.

### XVI

Pursuant to the provisions of Section 480–13 of the Hawaii Revised Statutes, and this Court's inherent power as a court of equity, and after considering plaintiff's application and the supporting affidavits of counsel filed October 10, 1972, plaintiff is hereby awarded a reasonable attorney's fee of $810,000 to be paid by defendant GTE, based upon this Court's determination as set forth in paragraph I herein that defendant GTE has violated Section 480–7 of the Hawaii Revised Statutes, Section 7 of the Clayton Act (15 U.S.C. § 18), and Section 1 of the Sherman Act (15 U.S.C. § 1), and that plaintiff is entitled to equitable relief in order to restore effective competition in the production and sale of telephone equipment to telephone operating com-

panies in the United States and to independent telephone operating companies in the United States.

Defendant GTE shall pay all of the plaintiff's taxable costs herein.